16



# GEORGE KARL
## August 17, 2016

| | |
|---|---|
| sam vitaro: | My name is Sam Vitaro. I've been appointed by Captain Kurgan to conduct an administrative investigation of two employees, one of whom is in the room here, Mr. George. Mr. Karl, thanks for coming in. Is it okay if we're on a first name basis? |
| George Karl: | Sure. |
| sam vitaro: | Okay. You're George, I'm Sam. Mr. Karl has a union representative here, Mr. Stan Wankowski. W-A-N-K-O-W-S-K-I. I'm being assisted by AJ Ostrander, who's assisting in the investigation, and he's present here as well. |
| | What I'm doing- |
| George Karl: | Could you spell Ostrander? |
| sam vitaro: | O-S-T-R-A-N-D-E-R. |
| [00:00:50] George Karl: | Okay. Easier than ... |
| sam vitaro: | What I'm doing for a report, which I'm to submit to Lieutenant Commander Pitcairn, is conducting interviews. I'll conduct a whole bunch of interviews, I'll gather a whole bunch of documents and I'll put those together and then I'll make recommendations in my report as to the allegations as to the two employees. Do you have any questions about what I'm doing or who I am or what the process is? |
| George Karl: | Good Lord, yes, but I mean, that's a whole 'nother topic. What's your role, why'd they hire you, somebody at your level? Because looking you up you handle these serious misconduct issues by senior management officials, you know, who am I? |
| sam vitaro: | They wanted a careful, neutral here and it was so complex that they wanted someone to assist me with the explanation as to the organization if I need it, as to the language and to help me track down documents and witnesses. I do these, I do a lot of administrative investigations. |
| George Karl: | You feel being a paid by NAVFAC hired company you are a neutral? |

Need Help? mailto:support@rev.com
Get this transcript in a non-tabular format

| | |
|---|---|
| sam vitaro: | I've always acted as neutral and I've made many findings that were contrary to what the agency liked. |
| George Karl: | You feel you can be a neutral even though you're paid by the agency [crosstalk]. |
| sam vitaro: | That's what I'm saying. I'm always paid by the agency. |
| George Karl: | Kind of like, not so neutral, in my opinion, I feel. |
| sam vitaro: | Okay. That's fine. Any other questions you have about me or about the process? |
| George Karl: | Like I said, there's too many to even begin. I've got tons of them, but, you know, it's obvious ... |
| Stan | So, this will wind up in recommendations? |
| sam vitaro: | Yes. That's the only thing I have authority to do is make recommendations, then it's really up to Lieutenant Commander Pitcairn. |
| Speaker 3: | Okay. |
| sam vitaro: | Whether to accept or reject them. |
| | Do you have anything you want to put on the record? |
| George Karl: | Yeah. We can do stuff that I got from my attorney that since I have current legal action ongoing with this agency for EEO and whistleblowing complaints, reprisal and everything else. We feel it's very unethical and conflict of interest to be once again interviewed during this process that's ongoing without my attorney being present. I object to being questioned on civil actions that are not part of my official duties, so you have an explanation, you're going to tell me why they are, but initially, right now, I feel that interviewing me or questioning me on things that happened off base, unrelated to my job performance or my duties is not relevant, but I will participate.

You were talking earlier about some past incidents or something, so I object to being re-investigated for past allegations that have already been investigated. And, those investigations have already caused disciplinary action against me. Now we're revising those again, apparently. This investigation, in my opinion, is continual reprisal, retaliation for my participation in the EEO activities and whistleblowing on activities here at the command. |
| sam vitaro: | Why do you presume that I'm going to get into the old stuff for which you've been counseled, for which you've been given a letter of caution and for which you've been given a two day suspension? Why do you think I'm going to get into those? |
| George Karl: | Before we were on the record, when we were talking earlier, you mentioned the helmet camera and all this stuff and everything else. I figured since you had all that |

160817_004_combined

Page 2 of 145

background, you're going to be revisiting some of those things. If you're not, that's fine. I'm just saying, that's my interpretation immediately for now, since it's so cryptic about what's going on.

sam vitaro:     You were not disciplined for the helmet camera.

George Karl:    Well. Yes, I think I was disciplined for the helmet camera.

sam vitaro:     I think you're going to have to define discipline in a way that I don't understand it. How would you define discipline in that sense, George?

George Karl:    As far as what you guys I guess would call discipline and what I would call punishment would be the same thing.

sam vitaro:     No, it's not the same thing.

George Karl:    I'm just saying, you asked me a question, right? I'm telling you this is how I look at it. I look at it that if I was pulled over, arrested, charged with a crime, having an attorney to fight back, cost me time, money, leave and the intent, in my opinion and my attorney's opinion was to pull my security clearance because of these actions, then we fought back from maybe your definition of what discipline was coming. We fended off the intended discipline in your opinion. But, in my opinion the discipline, the punishment, the cause and effect, basically the racketeering causing a problem to exist so therefore you could become the solution. That's all part of what I feel and my opinion and what my attorneys believe is there. It just depends on how you look at it. There's no "how do you define disrespectful?" That's one of my questions, right? You said I did something disrespectful, well, as what I put out in one of the emails was somebody heating up the fish in the microwave at lunch is disrespectful to me because it makes the whole place stink, but that person apparently didn't think it was disrespectful.

These definitions are kind of nebulous. They really don't have a lot of good ... discipline, adverse action- every organization has something else. Like the MSPB says adverse action is one thing, the EEOC says an adverse action is one thing, so there's adverse actions, there's all these words that have multiple definitions.

sam vitaro:     George, I'm going to advise you that you're out of league with me talking about things like adverse actions and these different definitions of discipline. You're out of your league.

George Karl:    I'm answering your questions.

sam vitaro:     I'm a case law guy.

George Karl:    But I'm answering your questions.

sam vitaro:     You aren't answering my question. I'm a case law guy and as to things like disrespect,

I rely on the case law, okay? I'll figure that out.  As to adverse actions, we're not at EEO, we're not even at MSPB. To the extent that this is a conduct matter, I apply MSPB standards.

Now, it's not going to help me and it's not going to help you if during the course of this you're using terms like racketeering. I don't know where that's coming from and I'd like you to support, since you put it on the record, this claim that you made that there was an intent in stopping you at the gate so that your security clearance could be pulled. What you should talk about is the ultimate result and any evidence that you have that suggests that that was the intention. Because everything that I've read and every person I've talked to about that, there's not, and to use a legal word, scintilla of evidence to support that. Why don't you talk about those things. Why don't you talk about why you believe that stopping you at the gate was an intent to pull your security clearance.

George Karl:   Why don't we discuss why you just chastised me that I'm out of my league and when you asked me a question and I tried to explain my opinion and my thoughts on it and how I reached those thoughts, you chastised me that I'm out of my league.

sam vitaro:   I did say that, because I think you're using terms that don't-

George Karl:   I'm answering your question.

sam vitaro:   I think you're using terms and that's my concern. You're using terms that you don't understand.

George Karl:   Maybe I am and maybe I don't understand them, but that's how I can answer my questions. I'm not a lawyer, I'm not an attorney, that's why he should be here. If you're asking me, I can tell you what I think, what I believe, what my logic is, what my background is based on average Joe words, not legalese words.

sam vitaro:   Maybe you can, maybe you can-

George Karl:   I take objection, serious objection to you chastising me about what words I can and can't use when trying to describe my ... my background and my feelings.

sam vitaro:   That's fine. That's fine that you take exception and the exception is on the table, but why don't we move on. The only thing I'd like you to do now is to tell me why you believe that your being stopped at the gate and any treatment that you got was an intent to pull your security clearance.

George Karl:   Where is that in my charges?

sam vitaro:   You just made a representation.

George Karl:   You asked me a question. If I say I like the Seahawks, you going to challenge me over what their scores are?

sam vitaro:      I didn't ask you a question about who was intending to do what-

George Karl:     Okay then, let's just drop that and stick to the charges that you were here to investigate me on.

sam vitaro:      Okay.

George Karl:     And I'll watch how I answer because apparently I don't know the right words to use.

Sam Vitaro       I would be careful in the answering.

George:          I mean how do I know what I don't know?

Sam vitaro       Take a chance and I'll let you know if it's okay.

George:          {Laughter} Apparently yes.

sam vitaro:      George, you don't have to be sarcastic. You don't have to be ...

George:          You see?

sam vitaro:      You don't have to look to your representative and makes snide,  ha, ha. That's not the purpose of this, really. I think you are playing into and supporting some of the claims that are made against you.

George:          My claims are I've been defending myself and fighting back from what I call, however you want to word it, illegal actions and has been years and years of doing this. At a certain point when you start getting these investigations and people of your level coming in to investigate me that I laughed as somebody walked by, it is what it is. It's either break down and have a nervous breakdown and get pulled out of here in an ambulance or just wonder what kind of kangaroo court we're doing again. What kind of inquisition we're doing. I will answer your questions. Ask me whatever you need for the evidence. I've got some stuff I can maybe give you, maybe I can't. And . . . you have no background. You have not walked in these shoes for 6 years to know whether or not my body language or my speech is appropriate.

sam vitaro:      I know when you're making a snide remark to your representative.

George:          What remark did I make?

sam vitaro:      A snide sound, okay. You reached  . . . turned your head and you said, "Ha." I know that.

Stan             I'm sorry Sam, but I thought he was looking at me to make sure I was taking notes. He did not make a face or anything disparaging.

| George: | Yeah . . . You're interpreting stuff just like you're making up stuff just like they make up with me. You just told me that earlier before we were on record that it was Holzner who said I laughed when I walked by. |
|---|---|
| sam vitaro: | I actually have [crosstalk 00:11:55]. |
| George: | That's the kind of stuff I'm talking about. Do I have to wear a brown paper bag over my head and a body suit or something and not have any contact with humans around me to not be misinterpreted on what my body actions are or what my levels are after 6 years of this kind of abuse? |
| sam vitaro: | You don't. |
| George: | Let's just stick with this. Let's not interpret my actions. Let's just ask the questions and stick to the facts. This is fact-finding right? |
| sam vitaro: | I'd love to. |
| George: | Let's do that. |
| sam vitaro: | I'd love to. What's your position George? |
| George: | Engineering technician is the title. |
| sam vitaro: | What's your organization? |
| George: | Well NAVFAC Northwest. |
| sam vitaro: | Your specific organization? |
| George: | What do you mean? |
| sam vitaro: | The organization under which you work as an engineering technician? |
| George: | Public Works Department. |
| sam vitaro: | Who's your immediate supervisor? |
| George: | Right now it's Ross Lund, L-U-N-D. |
| sam vitaro: | When did you start as an engineering tech? |
| George: | With PWD o . . . |
| sam vitaro: | Yes, with PWD? |
| George: | About March of 2012, I think March or April 2012. |

160817_004_combined

sam vitaro:     Where were you before that?

George:         I was over at lower base what they call the Military Construction Team, the Mil-Con Team. That was still an engineering tech.

sam vitaro:     How long were you there?

George:         From about - I think it was 2008 to 201 - about 4 years. Then I got reassigned up here.

sam vitaro:     In 2012?

George:         Yeah, around 2012 I got reassigned here.

sam vitaro:     One of the things that you know that I'm looking into is the protection order?

George:         Yes.

sam vitaro:     And the claimed falsification in the protection order?

George:         Mm-hmm (affirmative).

sam vitaro:     Your request for a protection order. You had raised the issue earlier as to suggesting that that did not have to do with your official duties, didn't you?

George:         That's what I thought was that this is a, I was kind of given assurance, which I watch my words, I was kind of given assurance that Dave Herriott wouldn't push me, body slam me, do anything physically to me on base. It was also, although told, that they can't do anything to keep him from doing anything off base. That's an off base thing. I went to the civil court in Port Orchard and asked for some restraining order.

sam vitaro:     Protection order?

George:         Protection order, a protection order basically so when I'm off base if he's walking around with something he has to just stay away from me and not bother me. That's kind of the gist of it.

sam vitaro:     What I was asking was whether you're claiming, I was giving you an opportunity to put it on the record that that's inappropriate for me to look at because it occurred not in your official duties?

George:         That's what I said earlier on the - I object to. I guess I would object to that - I don't, I'm not a lawyer, but as a layman I don't see where something that happened off base is punishable, investigable on base if it's not related to my performance, my duties, his performance duty. It's a private matter between 2 individuals. There were 2 people from NAVFAC in front of us who had similar problems. They got it taken

|             | care of.                                                                                                                                                             |
|-------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| sam vitaro: | We're going to have to disagree on that George on the basis that the claim is you made a misrepresentation about what the agency had done. That's what I'm going to ask you about. |
| George:     | You're kind of saying that I misrepresented the situation on base?                                                                                                    |
| sam vitaro: | You misrepresented among others what the agency had said and done to you.                                                                                             |
| George:     | Okay, all right, so shoot.                                                                                                                                            |
| sam vitaro: | Now, do you have a copy of your application for protective order?                                                                                                     |
| George:     | The temporary one? Yeah.                                                                                                                                              |
| sam vitaro: | The temporary one.                                                                                                                                                    |
| George:     | Yeah I should. Just so you guys know basically when you apply for this they give you a temporary one until you can go back to court and show evidence to get the permanent one. |
| sam vitaro: | Yes, and you applied for this in July?                                                                                                                                |
| George:     | Yeah this is the same one. It looks like it right?                                                                                                                   |
| sam vitaro: | I think it's the same.                                                                                                                                                |
| George:     | Probably. I'm sure it's pretty much the same just depends on what page you have.                                                                                     |
| sam vitaro: | You applied for this July 6, 2016?                                                                                                                                    |
| George:     | It looks like it from the date it was filed.                                                                                                                          |
| sam vitaro: | At this point you knew that the traffic ticket had been dismissed administratively, didn't you?                                                                       |
| George:     | Yes.                                                                                                                                                                  |
| sam vitaro: | What I want to ask you about ...                                                                                                                                      |
| George:     | It wasn't a traffic ticket. It was the assault charge.                                                                                                                |
| sam vitaro: | I'm sorry. An assault charge.                                                                                                                                         |
| George:     | I knew what you meant by it. I just wanted to make sure these guys are following along.                                                                               |

| | |
|---|---|
| sam vitaro: | In question 5 on the form. |
| George: | Yes. |
| sam vitaro: | You have that? |
| George: | Yeah, the big long, fill out everything? Yeah. |
| sam vitaro: | But, it begins on page 3 I think. |
| George: | Mm-hmm (affirmative). |
| sam vitaro: | Actually what I wanted to ask you about is on page 4. |
| George: | Okay. |
| sam vitaro: | It's the line - you designate these by dashes. |
| George: | Bullets, got it, yeah okay. |
| sam vitaro: | It's equivalent of a bullet. The one bullet that interests me is the one that says David Herriott was issued a ticket for assault. Ticket and results attached. Do you have that one? |
| George: | Yes. |
| sam vitaro: | You didn't attach the results showing that the ticket had been dismissed administratively did you? |
| George: | I think so. |
| sam vitaro: | You did? |
| George: | I think so. This here when I was filling this out they actually told me to do this in the courtroom. I had all my stuff there, my evidence. She said, "No. You don't give us the evidence yet. You give us the evidence at the next stage." I had it with me but she wouldn't let me attach it to this  .  .  . package. This is just the temporary. I did have it. Of course you'd have to believe me, but I did have it in the evidence package that I was going to present before I got the gag order that I couldn't present anything. I think they even say in there - those facts. I was planning when I filled this out, I was planning to attach all this stuff because I didn't know the process. I was going to fill all this stuff out and attach the photos, the evidence, the tickets, the FOIA request I got. |
| Stan | Can I ask a question here? |

| | |
|---|---|
| sam vitaro: | Sure. |
| Stan | Where's this gag order? Where did that come from? |
| George: | That was from the Navy. |
| Stan | The Navy gave you a gag order? |
| George: | Yeah, that I couldn't release information. Let me see if I ... |
| sam vitaro: | To the extent that you didn't attach it would you agree that that's kind of misleading? |
| George: | No, I was going to attach all that stuff, but the county clerk lady said this is all we do now at this stage. The next stage is at 7/18. |
| sam vitaro: | I'm not talking about it from a point of view of evidence. I'm talking about it from the point of view of completeness, where you're saying that a ticket was issued, but you don't tell the whole story |
| George | That was my story. I didn't think along your line of thought. I didn't think about writing a novel. This is only what she asked me to do right there while I was sitting in court, not court, but in the county clerk's office. I wrote this by hand, right there sitting at her desk. I just off the top of my head bulleted all these little blurbs. When it said it was going to be all attached and stuff, that's what I brought with me, but I didn't get a chance to give them all that stuff. |
| Sam vitaro | Do you agree that if you had had time it would be more complete and accurate if you had ... |
| George: | Well, no. It would be just what it is. If I had more, if I had been allowed to admit all my package, then it would have been ... Because I wrote this and when I gave it back to her, and I gave her all the stuff, she just gave me all the evidence, I would call it evidence, she gave me all the evidence back saying we don't use that right now. We just need this. Of course this now doesn't match what my planned package was to her. |
| sam vitaro: | When you said ticket and results attached, it looks like you attached something. |
| George: | Yeah, because I was going to, but she wouldn't accept it. |
| sam vitaro: | You didn't actually attach it? |
| George | Well no, she wouldn't accept it because that's evidence. She says we don't use evidence now. Evidence comes later. That's why I said tickets and results, and the results are the letter, the ticket would be here, and then the results of the investigation, the letter, would be here. |

| | |
|---|---|
| sam vitaro: | Why didn't you write in though that the ticket had been dismissed administratively? |
| George: | Because it was going to be attached so that she could read that for herself. |
| sam vitaro: | What were you going to attach showing that it... |
| George: | The letter. |
| sam vitaro: | The letter from? |
| George: | From the justice of the department of whoever it was? It's in here. |
| sam vitaro: | It's from the Special Assistant U.S. Attorney. |
| George: | Yeah. Something like that. I had all this stuff in here, the Freedom of Information Act, and everything, I had all that in there as a package deal to give them, but she didn't, they don't take that. She said they don't take everything now. That's for later. |
| Sam vitaro: | Is it your position that all of the claims that you made are accurate and truthful? |
| George: | Well, yeah. |
| Sam vitaro: | Okay. |
| George: | Here you go. Is this it? No, that's it. |
| Sam vitaro: | That's okay. |
| George: | I'm trying to find ... Because it's in the package. I just want to show you what ... |
| Sam vitaro: | Is this what you're looking for? |
| George: | Maybe. It was just the letter from ... That the agency gave me saying that ... Oh yeah, it wasn't in this big package, it was just this one letter, yeah. |
| Sam vitaro: | Okay. |
| George: | That was going to be ... That was to be the ticket and the results, but she didn't take any of it. She didn't ... The ticket's not in there either. She didn't take anything because they don't do that at this stage. That's what she told me. |
| Sam vitaro: | You stick to this is accurate and truthful. |
| George: | Yeah, I believe so. |
| Sam vitaro: | Let's look at the line that begins with "Months go by before I get any email." Do you see that one, it's about in the middle? |

**142**                                         **000154**

George:          Yeah, I probably remember it but, let me try to find it. Oh yeah. "Months go by before I get any email that appropriate action was taken by command. Dave was directed to stay away from me."

Sam vitaro:      Now that, I'm interested in the last sentence, "Dave was directed to stay away from me." Where do you get that from?

George:          From the verbal counseling that Chuck Monie gave Dave to avoid bumping into me, especially me, actually.

Sam vitaro:      While we're at it, because I think what I'll show you really relates to it as well, in number eleven . . .

George:          Number eleven?

Sam vitaro:      Yeah.

George:          Yes.

Sam vitaro:      You state similarly, "yes, Dave was directed to keep away from me by management."

George:          Yeah, and the investigation reported appropriate action was taken and for me to report any further harassment.

Sam vitaro:      Yes, now, by the time you had filed this though, in what we said, July 6th, the agency had actually sent you a couple of emails telling you they weren't going to direct Dave to stay away from you.

George:          But, I had the evidence that said that they did direct Dave to stay away from me, and, I based my research on this email from Brian VanWoudenberg that says, it took forever, right? "This is to inform you," this came in March 23rd this year, for something that happened last summer, so, that's why months went by kind of thing. Because I've been waiting for the investigation results, "this is to inform you that the allegation on July 30th," that's when my allegation was, July 30th, and then I got the results back March 23d, "Dave Herriott shoulder-checked you in the back is being investigated. Management has looked into the allegations and management has taken the appropriate action." Because they'll never tell you what the action is right, they just tell you … [crosstalk 00:25:10]

Sam vitaro:      I'm looking for language that says they directed Dave to stay away from you..

George:          I have an email from Chuck Monie that says he spoke with Dave and … Let's see, what's that?

Sam vitaro:      I'd like to see that email because I really searched for any evidence that he was directed to stay away from you.

| George: | Okay. |
|---|---|
| Sam vitaro: | I'm wondering if if's an error or if you simply ... |
| George: | No, no, it's very clear. I wouldn't say it if I didn't have the email, trust me, I'm not ... The way I'm under the microscope I don't ... |
| Sam vitaro: | I assumed that. |
| George: | I wouldn't do anything without .. |
| Sam vitaro: | That's why I was surprised. |
| George: | And then my attorney provided me with some other documentation to back that up, which he can give you, I guess? Or I can give you where it's located and you can find it yourself, or he can give it to you. That's what he was supposed to be here for. |
| Sam vitaro: | Yeah, no, I'll ... |
| George: | Through discovery, the discovery process. |
| Sam vitaro: | I want anything you have. And, take your time. |
| George: | Oh, here you go. |
| Sam vitaro: | Yeah, go ahead. |
| George: | Like I said, I threw this together in about four hours. |
| Sam vitaro: | Well, I can show emails that say the contrary. |
| George: | Okay. Well, that would be different. Anyway, this one come from Charles Monie, right? |
| Sam vitaro: | Yes. |
| George: | April 27th, "Management previously responded," I'm not going to read it all. |
| Sam vitaro: | Okay. |
| [00:26:29] George: | Previously responded, and all this, "regarding your concerns about Mr. Herriott because there was insufficient evidence, Dave Harriett and yourself occurred back" whenever "we have not issued Dave Herriott any direction to stay away from you." Well, I think I have something that shows that's not exactly true. |

Sam vitaro:            I'd like to see what you have though, George.

George:               It says, "however, he has been advised of my concerns and has agreed to do his best to avoid any unnecessary contact with you."

Sam vitaro:            That's a little different than what you said in the request, isn't it? You said "Management had directed him to stay away from you," and I'm . . .

George:               Is this a wording thing again? That I'm ...

Sam vitaro:            No, I don't think it's a wording thing, it's a thing of trying to figure out whether you were truthful in that application.

George:               That's - in my layman's term, Chuck Monie directed him to please avoid me and stay away and don't bump into me.

Sam vitaro:            Where do you find that, George?

George:               That's what I read when it says, "he has been advised.

Sam vitaro:            He's been advised of what?

George:               He has been advised of my concerns.

Sam vitaro:            Yes.

George:               About bumping into me, and of course I wrote Dave Herriott an email too saying, "stay away from me," right?

Sam vitaro:            I saw that.

George:               Okay. He agreed to do his best to avoid unnecessary contact.

Sam vitaro:            Okay.

George:               I'm not sure there'd be any necessary contact, but you know what I mean?

Sam vitaro:            Anything that says he was directed to stay away from you.

George:               He had a verbal counseling.

Sam vitaro:            Anything that says he was directed to stay away from you.

George:               No. I'm not going to probably find the words, "management directed Dave Herriott to not shoulder-check you," in that level of detail. I read it as a layman, that when I read this, hopefully, a rational person will say, "yes, this person was obviously told that I had a concern and he was," what word do I use besides directed? He was ...

Sam vitaro:     Ordered is a good word.

George:         Ordered is military. I'm prior military and I don't think you guys can order anybody anything [crosstalk 00:28:22].

Sam vitaro:     You're wrong on that.

George:         I'm sure.

Sam vitaro:     Order is a word that is used in the civilian world.

George:         I'm just saying, I'm military, right? An order means something to me so I know that word. Where a request, a direction, I can't think of a word to use besides direction. He was ..

Sam vitaro:     Are you suggesting that request and directing are the same?

George:         Yeah.

Sam vitaro:     Okay. That's fine.

George:         That's what I'm saying. I don't know what word to use. I'm not a legal person trying to write something. I'm reading something going, in my mind, this tells me hopefully a normal person that Dave has been advised, which means he was talked to, he was ... I say counseled, verbally counseled ... Some people say, "that's not counseled, that's talked to." Okay, well, in my layman's mind, he was advised to my concerns, besides the email that I sent him saying "please stay away from me," and he agreed to do his best to avoid.

                This is what I told even like the judge. I feel that, I think I said it earlier, I feel that some assurance, because of these emails, some assurance that Dave Harriett will avoid me on base is in place. I feel that assurance that he probably will avoid me. But, they've also cautioned me, Monie, that that doesn't protect you off-base. That's why in that little thing I said, basically I'm just asking for the same, there's no harm - just if he sees me, just avoid me. Make it an effort to avoid me. I make effort to avoid him. He makes effort to avoid me on base. Let's do the same thing out in public, you know. Because I saw him several times where he, kind of, did some things and I'm like "Come on." That's all it meant – I mean, yes, he was advised to, oh, here we go. Charles Monie's statement and Nora Williams EEO report, item 42. That's all I've got as a note here.

Sam vitaro     Is it your representation that if I look in that EEO report, it will support your use of language that you were directed – that he was directed . . .

George:         Yeah, according to my attorney, too, he believes that if someone is verbally counseled, that is an official direction. "I verbally counseled Dave Herriott to stay away from you." That's an order, that's a direction.

160817_004_combined                                      Page 15 of 145

| | |
|---|---|
| Sam vitaro | All right. Could you read the language about someone being verbally counseled? |
| George | Oh, no, that's in here. |
| Sam Vitaro | You don't have anything that says he was verbally counseled- |
| George | Yes- |
| Sam Vitaro | . . . to stay away from you? |
| George | Yes. |
| Sam Vitaro | Where is that? |
| George | It's here. It's Nora Williams EEO report, item 42. |
| Sam Vitaro | Okay, you're going to have to provide that, okay? |
| George | Okay. Well, it might be easier, well, my attorney can do it but he's on honeymoon. I mean, I can do it- |
| Sam vitaro | Yeah. |
| George | But he has to give it to me. We have the same attorney, Nora has the same attorney as I am, so he says there's no conflict there. I don't want to bother him on his honeymoon because he has a really nice, he has a really important out of office message saying, you know, "It better be an emergency." So, if it's okay, I don't, I think it would be easy for you, being, of course, hired by the agency to look at her report, item 42, and see that wording. |
| Sam vitaro | Okay. |
| George | I can get it for you but- |
| Sam Vitaro | That's from Mr. Monie? |
| George | Yes. This is Charles Monie's statement. it says right here, this is all I wrote. "See Charles Monie's statement." See, we tried to do this really fast because we didn't have a lot of time to research it and the attorney is off on honeymoon- |
| Sam Vitaro | Yeah- |
| George | I was just doing this, as he said, if you have a question, "See Charles Monie's statement." I think that interviewer was Matt Trauer. I think Matt Trauer was the person who interviewed her and it's item 42 where Chuck Moonie verbally counseled Mr. Herriott to stay away from especially me. With that information, I believe any |

160817_004_combined                                    Page 16 of 145

|  | normal person would say, legally, logically, that Mr. Herriott was directed, counseled, informed, advised, to stay away from me. |
|---|---|
| Sam Vitaro | Okay. Yeah, I'm just reading from an April 27, 2016 e-mail from Mr. Monie to you- |
| George | Probably the same one. |
| Sam Vitaro | Probably the same one, maybe but it certainly wouldn't support what you're claiming. This is one where you write to Mr. Monie and you ask him about- |
| George | Oh, yeah- |
| Sam vitaro | . . . verbal counseling. |
| George | Yeah, that's the initial, that's the thread. |
| Sam Vitaro | Yeah, you think this supports what you're claiming about Herriott being directed to stay away from you? |
| George | I understand you gave Dave Herriott a verbal counseling to keep clear of me. After the command investigation of him assaulting me, please verify that you can assure my safety and he will abide by your verbal counseling. |
| Sam vitaro | What was his response to that? |
| George | Well, that's his response. |
| Sam vitaro | What does he say in that response? |
| George | Well, that's what I just read. |
| Sam vitaro | I know. I'm looking at the paragraph, "Regarding- |
| George | Oh, this one. The second one here? |
| Sam vitaro | The paragraph beginning with regarding. |
| George | Yeah, "We have not issued Dave [Harriet 00:33:37] any directive to stay away from you," is what he says. |
| Sam Vitaro | Yes. What does that say to you? We're talking about whether Dave has been directed to stay away from you- |
| George | Right. |
| Sam Vitaro | He's saying, "We haven't ordered him to stay away from you- |

| George | I know. He says that here but, here, he says he was so which one is the truth? |
| Sam Vitaro | Well, I don't know anything about the . . . |
| George | Well, yeah, you've got to find out. |
| Sam Vitaro: | It sounds like you don't know either? |
| George | No, I do. |
| Sam vitaro: | Oh, you do? Why don't you represent on this tape what that says. When I look at that, what is it going to say? |
| sam vitaro: | It's, the best from my recollection, right, from reading it, seeing it, that in his statement, Charles Monie says, "I have verbally counseled Dave [Harriet 00:34:25] to not bump into people, or not hit people," something like that. "Particularly Mr. Karl |
| Sam vitaro | Not bump into? You're talking about a directive to stay away from you and that's quite different, isn't it? |
| George | Well, no, like, from my layman's term, that's what I read into it. I mean, you're getting into this legal minutia of wordsmithing that I'm not able to answer because this is just, at my level, remember I'm out of my range, here, what do you say? I'm out of my class or something- |
| Sam Vitaro | Out of your league is what I said. |
| George | I'm out of my league, here, okay? Here you go, I'm out of my league. |
| Sam vitaro | I wasn't talking about using words like "directing." |
| George | Well, that's, you have a mindset of a legal judge. |
| Sam vitaro | I look at the cases, and the cases also- |
| George | Yeah, I have a mindset of an engineer technician- |
| Sam vitaro | I see. |
| George | Who has been abused for 6 years and when I read this, I read, "He was counseled to not bump into me," ergo, if you don't bump into me, you stay away from me. I mean, how else can I explain it on a simple level? |
| Sam vitaro | Yeah, I just said, "Yes," to you that that's not a reasonable interpretation but we'll leave it at that. |
| George | That's not a reasonable interpretation? |

160817_004_combined

**000161**

| | |
|---|---|
| Sam vitaro | It's not. |
| George | Well, I guess that's something for the courts to find out. |
| Sam Vitaro | It is something- |
| George: | Yeah. |
| Sam vitaro | For me to figure out and analyze and I promise to you, I will do that, okay? |
| George | Okay. Well, I mean, just so we understand that, from my perspective ,my engineering construction manager's perspective - compared to your judge, legal lawyer perspective, if I'm sitting here and I read this, or somebody else, a normal person, I'm not saying that you're not normal but, you know, a normal, average person reads that, this man shoved me so hard that I stumbled in my [inaudible 00:36:23], fell forward into Nora with a shoulder check that I filed a complaint against him, which they investigated and found just cause to issue a ticket for assault, that they then decided, of course, that- |
| Sam Vitaro | Probable cause- |
| George | Probable cause, okay, - these words, you know? Okay, probable cause so they gave him a ticket. The judge said they're all too minuscule, we can't prove all these things are intentional, of course. That's fine but I still got my concerns to management, management answered my concerns by saying, "He's been verbally counseled to stay away from you," or excuse me, "verbally counseled to not bump into you," which I read, mentally, as just "stay away from me." I have given him an e-mail saying  to stay "15 feet away from me, please." We, really, actually I think we do a pretty good job of staying away from me each other now because he parks somewhere else, now, on his motorcycle, and if we see each other on the crosswalk, we go different ways. It's working so management has made me feel, at least on base, that's it's effective. |
| | You know, whether he was counseled, advised, he didn't promise anything but whatever the legalese words, the words here that I use show that it was effective in preventing more interaction between us, which is the whole goal of everything. |
| Sam Vitaro | So, your representation is the only reason you sought this protection order was because the agency order, or directive, to Mr. Herriott only included the workplace- |
| George | Yeah. |
| Sam vitaro | And, you wanted something broader, is that- |
| George | Well, not broader but I'm only protected on federal base. I've sent e-mails, I've got these e-mail, too, that I sent to the legal people here asking about a protection order |

160817_004_combined                                                    Page 19 of 145

and I guess they don't have them here, I guess you can't get a protection order on base. Through other communications, I was, like, "Well, what do you do?" They said, "Well, bring your concerns up to management."

Sam Vitaro — Yeah.

George — Which is what I did. Management addressed my concerns, it took forever but they addressed my concerns, they assured me that he's going to stay away, they assured me that he's going to not bump into me, which is the same as staying away in my opinion, but they assured me he was going to stay away from me and then, but that's it, that's here on base.

Now, once we get off base, I'm walking around town and he's doing stuff, I can't call the sheriff and say, "Hey, my boss told him to not do this," and the sheriff would go, like, "Well, that's federal base, we can't enforce anything. You need to get a protection order for off base," and that's all it was. I just was asking for the same protection, the same respect of not deliberately harassing me off base as he has been directed, advised, requested, counseled to do on base. That's as simple as I can make it from my layman's mind, it's just, you know, if you don't shoulder check me on base ... If he shoulder checks me on base now, I have all this saying, "Hey, look. You promised not to do this, you were told to stay away from me and you still did it."

Okay, but in town I don't have that protection, he could still do whatever he wanted so the whole point was just simply to get, now that this investigation was just done, and what really confuses me, probably, is, you know, he says here "We have not issued Dave Herriott any directive to stay away from you. That's maybe not how I read it. When you read Van Woudenberg's e-mail that says "Management has taken the appropriate actin" they won't tell me what the action is , that's always the canned statement, right? Management has taken the appropriate action. What action was taken – they're not going to tell me, but if no action was taken they usually say something, right? They'll say we found no merit in your case, we found no claim, they say something that just shuts you down. But that this says management took appropriate action so I ask what action did they take?

Sam Vitaro — I don't think that stands for what you're reading into it- which is that the appropriate action was that he was directed to stay away from you. Indeed, I've confronted you with a couple emails which say the opposite.

George — Right, but I use the same logic. I don't see where your email makes my thought process any different.

Sam Vitaro — I'd say because they're in writing and they express the views of Mr. Monie.

George — It says management took action, what action did they take?

Sam vitaro — They looked into it. They counseled him, they didn't counsel him to stay away from

|  | you ... |
| --- | --- |
| George | Well they counseled him to not bump into me. Isn't that the same? |
| Sam vitaro | No it's not. |
| George | How can he not ... |
| Sam Vitaro | We're going round, but counseling someone, or even directing them not to bump into you is very different from directing someone to stay away from you. |
| George | But that's in your mind. That's not in my mind. |
| Stan | Okay, can I get the date of Mr. VanWoudenburg's email? |
| George | His email was from March 23, 2016. |
| Sam Vitaro | No it was April . . . |
| George | No, this one. March 23, 2016. |
| Sam Vitaro | It depends on the one ... |
| George | This is VanWoudenberg's email to me saying management took appropriate action. |
| Stan | Okay, so that was 3 what? |
| George | 3/23/2016. |
| Stan | 16, okay. |
| Sam vitaro | The earlier email that I showed Mr. Karl ... |
| George | Then after this happens, the email thread I asked Mr. Mooney on April 26th . . . |
| Sam vitaro | Okay, so Mr. Mooney's came after Mr. VanWoudenberg's. |
| George | Yes, so this is March and then this is April. It takes a while for this stuff to trickle down to you and through Freedom of Information Act I have to pull information out and data mine it and try to find out what's going because nobody's giving you anything, right? |
| Sam Vitaro | I don't know if I can pull it out, but I thought one of the reasons you went to court was because the agency had refused to direct Mr. Harriet to stay away from you. Would that be inaccurate? |
| George | Oh yes. Yeah, my claim was, oh I think it's recorded in court, they have a court |

reporter. You can look and I say the same thing. I say, "Your honor, the agency has assured me to the best of their ability that Mr. Harriet will stay away from me on base. Stay away from me, not bump into me on base. I'm just asking for the same protection off base." If you want I can FOIA you that transcript because I'm sure it's in there, it's recorded. That's how simple it was. Base gave me, for lack of a better description, some assurance. We've got it covered if anything happens again. If anything happens again, please call us or security. We promise you you're covered; we get it, we know. We're going to appease your concerns.

Now, for you guys a little background just real quick ...

| | |
|---|---|
| Sam vitaro | I think we've got to move on. |
| George | Well no, this is important. |
| Sam vitaro | What I'd like you to do is to give me anything that you have that says that the agency directed Harriet to stay away from you. |
| George | You mean that actually uses the word 'directed'? |
| Sam vitaro | They could use a similar word like 'ordered'. To the extent that the word like 'request' is used, it's different from  . . . |
| George | You didn't say request, you said advised. Is that not usable for you? Advised isn't usable? Counsel isn't usable? |
| Sam vitaro | It isn't a question of being usable to me, it's different from directed. |
| George | From my novice engineering-type aspect, the reason this concerns me very highly still, especially off-base, is because I was in a bad motorcycle accident in January, my hips, my pelvis was completely broken and I'm all screwed and bolted together, and I can't run or move fast. If Mr. Herriott shoulder checked me in this condition, when I would have fallen forward and moved my foot out really fast to break my fall, I could have probably, according to the x-rays, I probably could have damaged that steel plate and that pin in there because your instinct when you're falling is going to be to move your foot out in front of you so you can break your fall. That kind of acceleration, with the kind of damage I have now would be very bad. So if he does anything I can't really get out of the way fast, I can't move fast, and if he pushes me over and I fall, just the simple act of falling could really do a lot of damage to my hips now. That is why I want protection off base too, because I can't escape. It wouldn't take much to break me. If this breaks again, I'm going to be in a wheelchair for life. It's important to know that. |
| Sam vitaro | Okay, so what you're saying is that you were only requesting the court to order Harriet to stay away from you off the base? |
| George | Right. |

160817_004_combined                                                Page 22 of 145

| | |
|---|---|
| Sam vitaro | Could you look at the first page of the request? |
| George | Where are we at? |
| Sam vitaro | Right here. |
| George | On the temporary? |
| Sam vitaro | Yeah. |
| George | It's a big thick one. Okay, not the first page ... |
| Sam vitaro | It's page 1 of 6. |
| George | That's 1 of 2. 1 of 6, okay. |
| Sam vitaro | Do you see the fourth block down? |
| George | Stay away? Yes. |
| sam vitaro:: | Do you see what's checked? |
| sam vitaro: | 75 feet distance from work place and other locations, my personal space. |
| sam vitaro: | Yes. |
| sam vitaro: | Yes. |
| sam vitaro: | What are you asking for there? |
| George | It was supposed to be residence. |
| sam vitaro: | Oh, you made a mistake? |
| George: | Yeah, the workplace was already covered. |
| sam vitaro: | So you should have checked the residence box? |
| George | Yeah. |
| sam vitaro: | This is a mistake? |
| George | Yeah, this is just a temporary. I didn't even notice that. If you look, I see where you're going with this, saying I was claiming this was going to be on base and you can't do that. |

160817_004_combined                                          Page 23 of 145

| | |
|---|---|
| sam vitaro: | What do you mean I can't do that? |
| George | I can't ask a civil court to protect me on base. |
| sam vitaro: | No, no, that's not what I'm saying. Believe me, that's not what I'm saying. I'm just trying to figure out what you're saying because you just told me ... |
| George | See this was residence and I was supposed to do residence again. See it has workplace and residence? Right? "Exclude from places from residence", but it doesn't check workplace there. Stay away from and I was supposed to do residence here too. |
| sam vitaro: | What are you reading from? I'm sorry. |
| George | The same one. The same page. Page 1. See this one? It says 'exclude from residence' and then it was supposed to do 'stay away from residence' also. |
| sam vitaro: | I see. Doesn't the box, the bottom box "other locations, my personal space" cover residence, you think? |
| George | No, that's not what she said. |
| sam vitaro: | That wasn't your intention? |
| George | No, the place where you file this, she was asking what my intent was. I said, "Well I don't want him to physically touch me, to hit me or anything." She says, "Check this and just put 'my personal space'," which is like 4-5 feet around you. Of course, I didn't mean it to be my personal space while I'm on a federal base, I just meant my personal space in town. Stay away from my personal space. Again, this was filled out right there in real time. You can see this is checked residence, not workplace, the other one said workplace and I know, and the judge that gave me this order, also wrote in there, the temporary order, she clearly wrote in there not to include base. |
| sam vitaro: | She did. |
| George | That's what I'm trying to say. |
| sam vitaro: | She just disagreed with some of the things on your petition. I think that's the way I might interpret that. |
| George | I think she was being careful to not try to appear that she was trying to protect me on a federal base. I think she was making very, very clear. She's probably experienced in that because I'm sure there's a lot of people that do that. They might come in and ask a protection order for coworkers and she's probably very used to saying, I'm just guessing ... I'm sure she's very, very conscientious about making sure she clearly said, and she told me that too. She said, "Now understand, this is not valid on base." I said, "No, no. We've got base covered. I got these emails that we got base covered." |

| | |
|---|---|
| sam vitaro: | You got what emails that you got base covered? |
| George | The ones that I interpret that as he was directed to stay away from me, I feel that was covering me on base. |
| Sam Vitaro | Which emails would they be? The ones  . . . |
| George | The same ones we talked about. The ones where he, [inaudible 00:50:08], said that he'd- |
| sam vitaro: | Said "I'd counsel him"? |
| George: | i'd counsel him. |
| sam vitaro: | I've taken appropriate action. |
| George | I've taken appropriate action. I've advised him to stay away from you. |
| sam vitaro: | Just so I understand, you read into appropriate action that he was directed to stay away from you? |
| George | No, I read into appropriate action that something, a verbal counseling, a punishment maybe even. Some kind of punishment. They don't tell you, they won't tell you. I've done this before where I've said I need something and they come back to me and said, "We investigated the guys that you said were sleeping in your cubicle. We investigated that and we found no merit to your case." I'm like, okay, whatever. They always tell you that. When they say something cryptic like the appropriate action has been taken, but generally, in my mind, means that some action was actually taken. The appropriate action was taken. Not that it was investigated because it shows the investigation was complete and because of the results of the investigation, appropriate action was taken.

They won't tell you what it is so you've got to figure it for yourself. By the time I read that he was advised to not bump into me, he was told to stay away from me. I interpret that as the appropriate action. That we counseled him to stay away from you. I also wrote him an email, you probably have that. I wrote him an email saying please stay away from me. You're being informed and trying to seek a protection order from you. |
| sam vitaro: | As I recall, it was an email to a couple people. |
| George | To Herriott and the chain of command. |
| sam vitaro: | You had, in the bottom of it, something like, "Mr. Harriet," and something directed to him specifically. |
| George | Yeah, I request 15 feet around me. |

| | |
|---|---|
| sam vitaro: | I think we are getting far afield from this issue of what directed means. |
| George | I'm just using a layperson. When I read that something, appropriate action was taken, he was advised, counsel and directed. |
| sam vitaro: | I'll just let you in on the way I would analyze that I would analyze that and, maybe you are right. I would analyze that the way a reasonable person would read that. When I'm making my recommendations to LT CMDR Pitcairn as to whether you intentionally misrepresented things on there, that's the way I'll analyze it. Would a reasonable person view a request the same as directing someone. If you had any additional documents, for example, you made reference- |
| George | I can get that one. |
| sam vitaro: | Yes but- |
| George | Is that it? For the protection order, is that the only thing that stuck in their craw that they think I falsified something or I made a false statement? |
| sam vitaro: | I'm going to ask you some other things about it, too. |
| George | The first one is that they are asking about is they think that I implied he was directed ordered to stay away from me when he said he wasn't? |
| sam vitaro: | When they refused your request to direct him to stay away from you. |
| George | They refused my request? |
| sam vitaro: | Yes. |
| George | When did they say they refused my request? |
| sam vitaro: | I just read you Mr. Monie's response. |
| George | He didn't use the word refused my request. |
| sam vitaro: | We're getting a little far afield of that. What he said was, "We are not directing Mr. Herriott to stay away from you." |
| George | Not directing, but like I said, I've got ... |
| sam vitaro: | I want to see the other stuff. |
| other: | I've got the other stuff that says he was counseled. If [inaudible 00:53:51] . . . , verbally counseled to not do something- |

| sam vitaro: | George, you've made that point a number of times. |
|---|---|
| George | You're beating a dead horse here, I'm just telling you, this is- |
| sam vitaro: | We are beating a dead horse. The only thing I want you to be clear on, I want to be clear on what you're saying about the stay away block – You're saying you made a mistake. |
| George | Yeah, you can see that it was residence up here. It was residence up here in the workplace. Stay away, even me at my limited knowledge, the whole point of this was to get the protection. I can give you that, and there are transcripts, too. The whole point of that was to get the same protection that I felt on base, off-base. I would not ask a county judge to give me protection from my workplace on base. Because, they wouldn't do it, they couldn't do it. They would explain to me they couldn't do it. |
| sam vitaro: | What do you mean they couldn't do it? Why do you think they have that box, there, on the form. |
| George | This is for outside. This is not a federal form. Anybody can fill this out. The judge, knowing that I was on a federal base, Judge Paha however you pronounce the name is, she recognized. She said, "you are on a federal base, right?" I said yes ma'am. She said, "This doesn't work on a federal base." I said, I understand that. I got my protection on federal base. |
| sam vitaro: | That's on the transcript? |
| George | It should be. |
| sam vitaro: | Could you get that to me? |
| George | I can. It's going to take a while because I've got to do a FOIA on it, so who knows. Transcript, just to say that I felt okay on base and I wanted the same protection off-base of court. I don't know if they do a transcript on the . . . |
| sam vitaro: | I thought you said there was one. |
| George | There was one on the court, the hearing. They have a court reporter on the hearing but I don't know if do a court reporter on a temporary- |
| sam vitaro: | They probably don't. |
| George | You can see, the way she wrote it, she knew. |
| sam vitaro: | I don't interpret it that way. |
| George | She wrote, "This does not apply on base." |

| | |
|---|---|
| sam vitaro: | Yes, that's how she interpreted it. She made a ruling. She didn't go along with ... Another person might say she didn't go along with your request. |
| George | Yes, because it was the wrong box. She recognized it, I missed it, she caught it. |
| sam vitaro: | No, maybe because she thought that even though you requested it, she didn't want to do that, or she didn't have authority. |
| George | No, she explained to me why she couldn't do that. |
| sam vitaro: | That's not in the transcript? |
| George | If there is a transcript of a temporary, then it would be. How can you argue that I tried to get something on a workplace just because I mis checked the box when the judge recognized by asking me where I worked, where my work was? Does it show where I work here, anywhere? Does it show, just out of curiosity, does it show anywhere that I work on base? She would have had to ask me where I work. |
| sam vitaro: | I think you identified a whole bunch of things about parking on base. |
| George | She would have recognized that it was on base and she would have said, "Oh, you said workplace, but I can't do that for you." |
| sam vitaro: | Remember, that box only related to your telling me. I pointed out that box only because you told me you were only requesting relief for your residence. |
| George | I didn't even know, I didn't even catch that. |
| sam vitaro: | I started with what the meaning of directing is. That's one of the more important aspects of this. I'm telling you that because I want you to get me anything you have that suggests that the agency indeed directed Mr. Harriet- |
| George | What word do you want to see? Because, as I said, from my- |
| sam vitaro: | Why don't you talk to your attorney? |
| George | From my aspect, this is how I interpret it. How can I be chastised for not interpreting something the way you interpret something? |
| sam vitaro: | I'm just giving you the option. I explained to you how I would analyze this- |
| George | Seriously, what words would make you feel comfortable that a rational person would believe that is a direction or a command, an order. |
| sam vitaro: | I'm just going to say this one more time, the word order is the same- |
| George | Order or direct? |

| | |
|---|---|
| sam vitaro: | Order or direct. Request is quite different. |
| George | He didn't say request, he said advised. |
| sam vitaro: | Advised is quite different. |
| George | In your mind. Do we agree with that? In your legal judge mind, these things come naturally and my little engineering technician mind ... If my . . . |
| sam vitaro: | As I explained to you- |
| George | If my boss tells me- |
| sam vitaro: | I'm going to base my decision on the case law. This issue of whether you intentionally misrepresented as something that's addressed by MSPB law. I look to MSPB law. That's how I look at it. It's not a question of just opinion. It's a question of case law. |
| George | If my supervisor verbally counsels me – I advise you - not to use a government vehicle again, that's not a recommendation. That's an order. I would take it as such. |
| sam vitaro: | To the extent that you have something that's stronger than what you talked about and something that is sufficient to rebut what I pointed out to you in that April 17 Monie email where he says, "We're not directing," then I want to see it. |
| George | Would a verbal counseling be direction? |
| sam vitaro: | It would not. It would not. Without knowing more about what went on in the counseling. |
| other: | That's what I'm saying. I don't know anymore, either. I'm assuming. I am making assumptions based on my background that if my boss tells me, "I advise you, through this verbal counseling, to not shoulder check him again," I'm pretty sure that's an order  not to shoulder check him again, otherwise I'm going to be in deep doodoo |
| sam vitaro: | We are getting far away from this. To the extent that he was even ordered to not shoulder check you again, that's different from a direction to stay away. I don't know how I can explain that any clearer. |
| George | Well that's because my mind doesn't work like a judge's mind. I read that as being okay, that's why I feel comfortable. |
| sam vitaro: | George you underestimate yourself. |
| George: | But that's how I feel comfortable. Appropriate action was taken, we advised him not to do these things. He's going to stay away from you is how I read that. That gives me the comfort that he's been told to stay away. If I didn't have that comfort I would keep pursuing it. I want you to say, "I order Dave [Harriet 01:00:36] to not shoulder |

|  | check you." You know? |
|---|---|
| sam vitaro: | Okay. |
| George: | I didn't ask for that because my interpretation was it's been handled. |
| sam vitaro: | Okay. Let's focus on a few more things in your request. I'm interested in, again, question 5. I'm interested in the parts of question 5 that have to do with the parking claims you made. |
| George: | Yes. |
| sam vitaro: | You're making those as to the parking lot that's adjacent to the trailers. |
| George: | Yeah, well you got cross . . .; |
| sam vitaro: | Right. |
| George: | What are you going to do? |
| sam vitaro: | When you talk about South and North I think you made reference to that. Is the South area the area that's closest to the trailers or farther away? |
| George: | See this is what I was giving to the judge. That's why I have to have all this. Just so you'll see - this is the trailers. |
| sam vitaro: | Can I have this by the way? |
| George: | If you want. |
| sam vitaro: | I do. |
| George: | Okay. |
| sam vitaro: | Yeah. |
| George: | You should have all that. |
| sam vitaro: | I don't have this. |
| George: | Okay. |
| sam vitaro: | Yeah. I do have ... No I don't even have this. |
| George: | Ramps . . . |
| sam vitaro: | I don't have that. |

160817_004_combined

Page 30 of 145

George:        Do you want that?

sam vitaro:    Yes.

George:        Okay.

sam vitaro:    I do.

George:        Yeah that's why I circled under it. This is-

sam vitaro:    Okay.

George:        This is where I normally park, here.

sam vitaro:    Okay.

George:        Now he parks down here.

sam vitaro:    Okay.

George:        Somewhere.

sam vitaro:    Okay. Did you know that he had two witnesses set to testify at the second hearing-

George:        No I didn't.

sam vitaro:    As to the permanent.

George:        No I didn't know anything.

sam vitaro:    Yeah.

George:        [crosstalk 01:02:13] By then-

sam vitaro:    Those two witnesses were going to testify that your explanations here don't make any sense because he has this BMW motorcycle which he parks away from where you park.

George:        The only thing I found out after the fact-

sam vitaro:    Yes.

George:        When they gave me this stuff was supposedly some other guy has exactly the same motorcycle.

sam vitaro:    As you?

160817_004_combined                                            Page 31 of 145

**162**                                    000174

George:        No as him. As they do.

sam vitaro:    As Herriott?

George:        I don't remember who it was, you should have that though. He says that he thinks, now I'm just going by memory from what they told me in court because I didn't have any time to present anything because they gag ordered me. Can't do nothing. Couldn't present any evidence. They said that this one guy – now he wasn't there, he just had a statement, this one guy has a motorcycle that's like a year off or something from Dave's. He parked by me some times and leans into me. It's possible that I mistook him ... I mean it is possible that I mistook him as Herriott because I don't know the license plate number. I don't know what the license plate number is.

sam vitaro:    Okay.

George:        But okay.

sam vitaro:    Who is this other person?

George:        I don't remember.

sam vitaro:    Okay.

George:        They have it in their thing, their case. That kind of – the light bulb went on - like oh wow, that's true. I didn't look at it as there's possibly ... Oh you want it [inaudible 01:03:36]

sam vitaro:    Yes, thank you.

George:        There's possibly two people that have matching motorcycles and he parks there because it's a unique bike. It's an expensive bike. A unique bike, you know.

sam vitaro:    His bike you mean?

George:        Yeah his BMW.

sam vitaro:    Yeah.

George:        It was fairly new. His old BMW was kind of cool but he didn't ride that as much. He used to park that by me all the time. You can ask him that too. He used to park his old BMW by me all the time but that's really recognizable because it's an old one. Kind of like a classic.

sam vitaro:    That was before all this happened.

George:        Well, yeah but there's been some issues ongoing. The reason he shoulder checked

me is because of all the issues in my claim. There's been a lot of intimidation that just culminated in a physical push. When that statement was read that this guy says, "I have this bike and I park by George sometimes." I went, "Oh, I didn't think about that. That is possible."

sam vitaro:     How did you become aware of that.

George:         In the court room that day. They had some statements they let me read.

sam vitaro:     Oh the agency brought in statements?

George:         Yeah.

sam vitaro:     To the effect that there's someone else who has the same bike-

George:         Apparently very similar. I'm not sure if it was exactly. I think it's a model year off or something.

sam vitaro:     Okay.

George:         Even though I'm a motorcycle guy there's probably some subtle differences I could've ... If I knew the bikes I would know about. I'm not a BMW guy. I got a [inaudible 01:04:57] on that and I was like, "Oh wait, you know what, yeah." If there's an identical bike that two people have identical bikes and he parks next to me. There is ... without knowing the license plate number or the vin number, there is a possibility that I misinterpreted that as being Dave Herriott.

sam vitaro:     Okay.

George:         I call that an honest mistake.

sam vitaro:     Okay.

George:         I wouldn't have guessed. I didn't even think ... It didn't even cross my mind that two people who work in the same little location have exactly the same bikes.

sam vitaro:     Did you ever report any of these to management?

George:         Oh yeah, well maybe not exactly line by line by line but just in generalities. The harassment, the this, the that, that he parked in front of me. I was kind of concerned with . . . when I say he parked his truck kind of close to me. I was a little concerned because another person's Jeep had popped out of neutral and rolled into my bike and crunched the front end.

                So, I was a little bit gun shy about somebody in a big truck like that pulling up so close because even if you're trying to do it for intimidation purposes. I get it. In a truck you might be more than intimidating, you might actually make contact or knock

it over and I didn't want that to happen. I'm like, "okay, I get it you're intimidating me but let's not risking pushing my bike over just to intimidate me." Because it's already been backed over by ... What was his name? Jeremiah Sperry's' (?)  Jeep. The wind blew it back on my-

sam vitaro:      You know what-

George:          I was concerned about ... So that kind of stuff was  brought up.

sam vitaro:      Yeah, what concerns me though that I've read a lot of stuff, George, that relates to this case. Maybe 2 feet of things. A lot of it has to do with stuff you've written. You're very particular, you make a lot of complaints and that's fine. What would surprise me though from reading that is that I don't remember seeing anything that relates to many of these. For example there are some instances that occurred in Poulsbo. There's an instance that occurred in a class. There are all these instances that occurred in parking and I'd like you to explain to me why if those were occurring and given how frequently you bring matters to the attention of the agency, you didn't bring those matters to the attention of the agency.

George:          Well I did. I did.

sam vitaro:      Or that you brought them to the attention and give me some documentation-

George:          Well I-

sam vitaro:      . . . that shows that.

George:          What if I don't have any? Or some of the emails, I might be able to dig up something but there's been a turn over of supervisors. There's a loss of a supervisor's computer, hard drive data, lost log data. So why FOIA stuff that I can't get?

sam vitaro:      But what would that have to do with [crosstalk 01:07:50] whether or not you have documentation.

George:          Well because like some of the emails I might have sent, if I can't find them because I lost them. I know they went to him so I would FOIA his to get them. But Actually-

sam vitaro:      But my guess is you're pretty good at saving your emails.

George:          If they save but then in the MCI (?) there's been some things  . . .

sam vitaro:      You've had some things of yours not saved?

George:          Yes.

sam vitaro:      Things that are related to ...

George:      Well just bulk things, re-imaging my computer, we call it tech refresh. We call it a tech refresh when we come in and evaluate, "Oh yeah, messed that up. Messed this up." We lose stuff. It happens because of this encryption software is what they claim.

sam vitaro:  Okay.

George:      Anyway, stuff that happened off base like in Paulsbro, I don't think it'd be appropriate to talk to my bosses on base about something that happened off base. All they would do is tell me, "Oh that happened off base. We don't control that." Obviously all the stuff that happened off base I wouldn't complain about. Some of the other stuff the happened, I did make little notes or call them or tell them something or verbally say something. I also didn't nitpick on every minute of my day that somebody did something to me. You know?

sam vitaro:  It's not a question of nitpicking. I mean you six or seven instances of parking issues.

George:      Yeah well over a long period of time.

sam vitaro:  You didn't bring any of those to the attention of the agency?

George:      Yeah.

sam vitaro:  I just need to see the documents-

George:      Well I-

sam vitaro:  That's all. You're pretty good-

George:      Let me see if I can find something.

sam vitaro:  You're pretty good at submitting documents. I want to see them.

George:      Let me see if I can find something. [inaudible 01:09:18] a little bit. Docs, emails on any area of complaints.

sam vitaro:  Yeah. Were there any witnesses to these? The parking instances.

George:      I don't know. None that - would just be walking with me and I would make a comment. "Look at him. Look what he did."

sam vitaro:  Yes.

George:      Yeah.

sam vitaro:  Okay.

George:      I only notice them when I'm walking back and forth to do stuff so unless somebody

|              | would be there with me. |
|--------------|--------------------------|
| sam vitaro:  | Any instances as to the Poulsbo stuff? |
| George:      | Well no I was by myself. |
| sam vitaro:  | Okay. How about the dates when some of these happened? |
| George       | Yeah, I didn't have those dates available, because this was filled out right there, live, so I didn't have those dates available. I could probably find them if I wanted to, but I don't know if I have them. |
| sam vitaro:  | Where would you find them? |
| George       | Just in emails, stuff that I would make a complaint or something, or if I took a picture, like he's parking too close to me on my phone. |
| sam vitaro:  | Did you take pictures? |
| George       | Yeah. |
| sam vitaro:  | Oh. Could I get those? |
| other :      | If I find them. My phone, you know. |
| sam vitaro:  | Your phone what? |
| George       | My phone had to be reset because Verizon reset it, the encrypted card, but I think I have some, because I have a picture of my tire getting slashed. My tire was cut. |
| sam vitaro:  | Yeah, I'm more interested- |
| George       | I know, but I have all those pictures that may be – but on a photo I would have taken of that. The photo would have the embedded date and time and stuff on it, so I can look, but other than finding the email, or being able to recover the photos, because Verizon has automatic backups, so I'll see, but some of that stuff's pretty old, and then one of my memory cards for my phone got corrupted where it wouldn't record anymore, so I lost whatever's on that memory card. |
| sam vitaro:  | Did you take notes, for example when you would observe what you believed to be Dave's motorcycle was parked too close to yours. |
| George:      | Did I take a note? No. |
| sam vitaro:  | You didn't take notes, like a journal? You didn't keep a journal? Okay, so there's no journal evidence to support anything. |
| George       | No, I don't generally do a journal, like a daily journal and stuff, unless it's something |

160817_004_combined

Page 36 of 145

**167**                              **000179**

|  | really egregious, and then I'll write something down and I'll make a email complaint or something, like one of the complaints was I was, just an example, I walked in the restroom to use the restroom, so I'm standing at the urinal, and Lieutenant Commander Holzner comes up, and I just looked over, and I'm like yo, and he says, you know, so then I look at him, and he goes staring at me can be considered harassment. |
|---|---|
| sam vitaro: | Yeah, that's one thing I wanted to ask you about. |
| George | I'm like oh Jesus, so then I made a complaint, because okay, I can't even go to the bathroom without being hassled? Then, on something like that, I would send an email saying just to document this, Holzner did this to me today. I can't even go to the bathroom without being harassed, so that kind of stuff I would document just because I can see they're just always going after me, but if it's parking to me too close or something I'll make a note I'm concerned. |
|  | Most of that was if he hits me, I want to show it's not the first time that he's parked that close, and if he knocks it over ... I do that out in Paulsbro too. If somebody parks one of their cars too close to me or something, and it looks like I got to open the door and dent it, I'll take a picture of both cars sitting there in the parking lot, and how close they are, and how close this guy parked next to me, and if I come back and there's a bog dent in the door, I got his license number and his car description. |
| sam vitaro: | Would it be accurate to say then that you would have taken a picture of these parking issues, especially the ones having to do with parking too close to you? |
| George | Maybe. Probably. I'd say probably, but I don't know if they're on that card that got corrupted, because that was a long time ago, so that card got some problems. I use that same card that I had on my phone for the camera sometimes and for a little quad copter sometimes, and the formatting software of all those things screws it up I think. |
| sam vitaro: | This was pretty recent. It sounds like the corruption occurred a while ago |
| George | Oh no, the corruption, this thing's probably corrupted now anyway, but that happened, and I tried to back up. I tried to do an online backup, so I'll look. If that's the case, I made a note, I will look, but I can't promise you anything. |
| sam vitaro: | Just so we're clear. |
| George | Yeah, just because if I can't find something, I don't want to be told that I'm meticulous at documenting everything and therefore obviously it didn't happen because I didn't document it, because I don't document everything. I just document stuff that concerns me, or if I feel like it's harassment or if it's something different. When they sliced my tire, I took a picture of it. |
| sam vitaro: | You felt this was harassment. |

160817_004_combined                                                              Page 37 of 145

| | |
|---|---|
| George | Yeah. |
| sam vitaro: | Why didn't you document it or take a picture of it? |
| George | I did. I think I did. |
| sam vitaro: | You think you did. Okay, great. |
| George | I didn't email ... I mean, if you walk a week in my shoes, you would see what goes on daily. If I wrote and complained and emailed and documented everything, I'd never get any work done. It's just like why we're here now. This is just eating up more and more of my time because I can't ... It's just one thing after another. This is just retaliation from me trying to get a protection order on him. This is just payback. |
| sam vitaro: | What is? |
| George | This whole, this whole little zoo here thing, you know. |
| sam vitaro: | You think that the administrative investigation here that's being conducted is payback for your attempting to get a restraining order? |
| George | Yeah, it's EEO retaliation, it's payback for getting a restraining ... I tried to get a restraining order, protection order, excuse me. I tried to get a protection order on a guy who assaulted me and shoulder checked me, right? Who shows up? I get a letter on a Friday that I don't even see until Monday the day of the courtroom that says you got a gag order on you, you can't produce witnesses, you can't produce any documents and then there's the ... who was there, this Jamal Whitehead guy. The Justice Department sent a letter. I mean DC is there to represent him. He's got three lawyers there. |
| sam vitaro: | I think he had two, didn't he? |
| George | Two or three, there was one in the back too. |
| sam vitaro: | I'm not sure there were three, I've heard there were two. You believe there were three? |
| George | I think there was three, yeah. |
| sam vitaro: | You believe there were two from Justice and one from the agency? |
| George | No, two from Justice, or one from Justice, one from the agency and a personal lawyer. |
| sam vitaro: | Okay. |

| George | Even the judge is like, whoa, what did you do? I'm like no kidding, that's a lot of horsepower here for little old me, you know. |
|---|---|
| sam vitaro: | You believe that that was exceptional that Justice appeared? |
| George | Yeah, they didn't appear for the two guys in front of us. They had two NAVFAC people right before us. |
| sam vitaro: | Do you know if requests were made for an appearance? You have to make a request, just to key you in on the process. |
| George | I don't know. |
| sam vitaro: | You have to make a request for Justice under the Federal Tort Claims Act to represent you. They look at the request and my experience has been that they almost always grant them, if you've acted within the scope of your authority. |
| George | I didn't know that assaulting somebody was in the scope of his authority [Laughter] |
| sam vitaro: | Well, they don't just look at the claims, George, they don't just look at the claims. |
| George | Wouldn't you kind of think that's odd to have such kind of horsepower there? |
| sam vitaro: | I don't think it's odd at all. |
| George | Really? |
| sam vitaro: | I've been around the block on this issue a lot. |
| George | Well, my attorney seems to deal with this a lot on the Seattle side and he says you can't get these people out of their glass towers over there for anything, so for him to show up to defend Dave Herriott with two other lawyers, so three lawyers defending Dave Herriott That kind of horsepower gets pulled out? He said something's up. |
| sam vitaro: | Well, remember one lawyer was from here. One lawyer was a lawyer that Herriott apparently paid for and one lawyer was a Justice lawyer who came in based on the Federal Tort Claims Act. All I'm telling you and I'm not sure it's even germane to all of this, all I'm telling you is that those kinds of requests for representation in those kinds of cases are granted very frequently. Justice has a whole organization that deals with representation issues. |
| George | Well, I'm just saying apparently the two NAVFAC employees that were before me either didn't know they could do this or that guy wasn't worth protecting as much as Dave Herriott was. |
| sam vitaro: | I wouldn't necessarily say that Dave Herriott was worth more in protecting, I would just say perhaps- |

| George | He brought witnesses, he's got a statement, they put a gag order on me that I couldn't produce my evidence. Guess what, with no evidence, I didn't get the protection order, did I? Because they said you can't provide any of this evidence. You can't provide the police report, you can't provide this, you can't provide any documentation from work, you can't have any witnesses from work. So I sat there and the judge says what evidence you got, I said none, here's a gag order. Okay, case closed. |
|---|---|
| sam vitaro: | Did your attorney make an argument? |
| George | My attorney wasn't there. I didn't have an attorney for that. Yeah, for that I didn't have an attorney. I made an argument that they had all this stuff they gave me the day of the trial that I didn't get to review and I said I want a continuance. The judge, who just happened to be replaced that Thursday from the judge who was supposed to be there, he said no, you're going forward. |
| sam vitaro: | Okay. |
| George | Out of all that, nothing happened. The bottom line is there is no protection order, nothing happened. |
| sam vitaro: | And there's no direction by the agency for Harriet to stay away from you? |
| George | Well, there is in my opinion, that's why I wanted the same protection off base. |
| sam vitaro: | Okay, have you complained about that, then, that the agency is violating their directive to him? |
| George | No, he's been okay. He's made an effort to stay away. |
| sam vitaro: | Okay. |
| George | I don't have any complaints with the agency. That's what I said, I think it's working. I think he knows to stay away from me and I feel that and I say that in court. I say I just want the same protection off base as on base, that simple. |
| sam vitaro: | Would it be accurate to say he's been advised it would be wise for him to stay away from you and not directed to stay away from you? |
| George | Based on your interpretation and those words, but no, it wouldn't be accurate in my mind. In my mind, he was verbally counseled to not bump into anyone especially me. To me, if that was given to me by a supervisor, you know, I would take that as a direction or an order. |
| sam vitaro: | To stay away from you. |

160817_004_combined

000183

| George | Yeah. Not just an off the cuff comment. Oh, by the way ... if you're verbally counseling somebody, there's- |
|---|---|
| sam vitaro: | You don't see the difference between someone suggesting or advising you to not bump into someone and someone advising you to stay away from someone? You don't see the difference? |
| George | Well, no, I'm kind of thinking, if you're advised not to bump into me, it's kind of automatic that if you stay away from me, you won't bump into me. |
| Sam Vitaro | For example   . Let me give you an example  . . . |
| George | I asked 15 foot. |
| sam vitaro: | If the advice is for someone not to bump into you, you would interpret that to mean if they're within 15 feet of you, that they're violating that? |
| George | If they wrote to me an email like I did, I said, "I request you stay 15 feet away from me," and then I get some evidence that says he was verbally counseled to not bump into me, and then I look at that and go, "Okay, I feel pretty safe that they have covered it, that they have directed him, advised him," whatever. They have informed him to stay away from  . . . to not bump into me and, therefore, I feel like that was covered on base. Now I just wanted the same thing off base. |
| sam vitaro: | I'm going to move on to another area, but I don't agree with that. |
| George | Of course not. |
| sam vitaro: | I'd like to see ... |
| George | Well no, come o  . . . |
| sam vitaro: | I'd like to see any evidence that you have, for example, the evidence, the statement that was at the bottom of a page that might be different from what I have and which may clarify this meaning of directing. |
| George | It's going to say ... Off the top of my head, it's going to say that Charles Monie verbally counseled Dave Herriott] to not bump into anyone, especially me. Is that satisfactory for a ... ? |
| sam vitaro: | That seems to be not satisfactory, but I'll take a look at it and I'll consider what you said. |
| George | Also consider that if somebody at my level, GS-11, if my supervisor verbally counseled me to not bump into someone, that's pretty much an order. That's a verbal counseling. |
| sam vitaro: | I understand what you're saying. Usually these things are interpreted from the |

160817_004_combined                                                    Page 41 of 145

|  | perspective of a reasonable person. Would a reasonable person look at it that way? That's how I view these things. I'll consider what you said. I'll look at the case law, and I'll make a finding on that matter and a recommendation. |
|---|---|
| George : | How would I not believe that's the intent if I'm saying I feel protected now on base? I feel protection order was ... I think that's how I interpreted it. I interpreted it that way because now I feel protected. If I didn't feel protected, I would [crosstalk 01:22:46]. |
| sam vitaro: | Even Monie saying to you, "We have not directed him to stay away from you?" |
| other : | Yeah, but I have something else that says he was verbally counseled, so that nullifies that statement. That's a pretext. |
| sam vitaro: | I see. |
| George : | That's just a pretext. That's a lie. |
| sam vitaro: | I see. I'm not so sure. |
| George : | I'm just saying it's a lie. |
| sam vitaro: | It depends on the date of this other thing that you say. It depends on what it says. Let's move to some documents. |
| Stan | Can I take a quick 5? |
| sam vitaro: | Oh yeah. Sorry. |
| Stan | I'm sorry. I'll be right back. [Break] |
| sam vitaro: | While we were off the record, George mentioned that he had some performance appraisals and awards that would give me a better picture of him. What I asked him to do was to get those to me. |
|  | What I wanted to do now, I kind of finished on the request for the protection order, and I wanted to begin showing you, George, some documents. Because one of the things I'm asked to look into is whether or not you communicate disrespectfully. Part of that has to do with emails. The first one I wanted to show you is this December 5 email ... |
| George : | This year? 2015? |
| sam vitaro: | Yeah, 2015. December 5, 2015, and it's a response to Chuck Vancleave's FOIA request. It looks like it may even be a modification or a denial. Mr. VanCleave sends you something December 2, 2015, related to a request you made, and he makes a determination which is not entirely positive, talking about how it's unclear exactly |

160817_004_combined

what you need and some other remarks, all of which I think are professional. I'm not suggesting that's not professional.

What I'm concerned about is how professional your response is. Let me just show this to you. I want you to take a look at it.

George :   Let me see what he said first.

sam vitaro:   I have some others from Mr. Van Cleve, too.

George :   6 attachments from Christopher Murphy. I was asking for ... Apparently Christopher Murphy provided the EEO investigator some attachments that I didn't get in my file, my EEO file. They wouldn't give them to me, so I did a FOIA to get them because they should be part of my EEO results of the investigation.

sam vitaro:   Why don't you read the first couple sentences?

George :   . . . this is . . . Okay. You don't have my FOIA, actual FOIA, that shows what I asked for. He just has a little snippet of it, that I was seeking a copy of 6 attachments. He says that my response must be perfected. In reading your request, it's exactly unclear what you're looking for. Just what he put here is, my request was I'm looking for 6 attachments that Christopher Murphy emailed or provided to the EEO investigator related to Throughput reports, labor reports, and alleged statements made about his retirement, and he says that's not clear enough. Basically, that's not clear enough.

sam vitaro:   Okay, why don't you read your response?

George :   Understand also that me and Mr. Vancleave have been going on for years back and forth about FOIA requests and such.

sam vitaro:   Okay.

George :   I wrote back, "Mr. Vancleave, your letters are always entertaining, I'll say that. I'm beginning to look forward to your excuses more than the actual information these days ... " because we banter. "So, Here's a thought. I know I'm not a knowledgeable EEO official like yourself, but by simply going ...

sam vitaro:   He's really not an EEO official, right?

George :   I meant to say FOIA official. I'm not a knowledgeable official like he does to handle these things.

sam vitaro:   What do you put in the letter? Does it say FOIA?

other :   No, it actually says EEO.

sam vitaro:   So you made a mistake. You weren't being sarcastic because you were requesting

|  | EEO documents? |
|---|---|
| George : | No. We were talking EEO documents, so ... |
| sam vitaro: | You weren't being sarcastic? |
| George : | No. I said, "I know I'm not a knowledgeable ... " Until I just read it, I'm like "Oh, yeah, okay." "I know I'm not a knowledgeable ... " it should say "FOIA official, like yourself, but what about simply going to Chris Murphy and asking him, 'Hey, Chris. Can I get a copy of the 6 documents you sent to EEO investigator?'" Because that's kind of what he usually does, right? |
| sam vitaro: | I don't know. |
| George : | Well, I know. I'm asking for him to give me Chris's documents that he gave the EEO investigator on this date about these things. He's like, "Well, that's not clear enough." I'm like, "Okay, why don't you just go ask Chris?" Anyway, the Throughput reports and all this stuff. It says, "Just a wild thought about how an unknowledgeable person like myself would approach it. I would just go ask." I got a smiley face. We banter. "I think my request is pretty clear, though." |
| sam vitaro: | Now you get pretty serious. |
| George : | No, again, I'm just not bantering anymore. I'm just like, yeah, "I think my request is pretty clear, though, and a knowledgeable official such as yourself could've found this with very little effort. You just ask Chris." |
| sam vitaro: | You don't find this sarcastic? |
| George : | No. |
| sam vitaro: | You don't? |
| George : | Well, no. I don't write sarcastic or disrespectful emails. |
| sam vitaro: | Oh, you don't. Okay. |
| George : | Not in my opinion. |
| sam vitaro: | Okay. Again, I view it from the context of the reasonable person. |
| George : | Obviously, if you're trying to build a case about being disrespectful or sarcastic or anything, you're going to look at it with those glasses on. |
| sam vitaro: | I'm not trying to build a case. |
| George : | No, I'm saying the agency, whoever. You've already got a prejudged notion of this. |

160817_004_combined

|  | You've already been told this is disrespectful and this is how you're going to look at it. You don't know the bantering has been going on for years with this. We all know how dangerous emails are because you don't have body language and flexion. |
|---|---|
| sam vitaro: | We do know. |
| George : | We do know that, right? I kind of make an effort ... And we actually go to schools that try to teach you how to write emails and stuff. |
| sam vitaro: | Were you making an effort in this letter? |
| George : | To what? |
| sam vitaro: | To be careful. |
| George : | Yeah. Because it's Chuck. We email, we call, we talk. |
| sam vitaro: | You've been dealing with him for years, right? |
| George : | Yeah. |
| sam vitaro: | Can you produce 1 letter from him that banters in the way that you suggest you were bantering? |
| George : | I don't know. |
| sam vitaro: | I'm asking you. |
| ~~George :~~ | ~~I'm telling you, I don't know.~~ |
| sam vitaro: | If you can, I want to see it, because that would be important. That would give some context. |
| George : | Again, there's some that ... A long time ago he says, "I'm not going to take your emails from the government computer, I'm going to take them from your home computer only." I'm like, "Oh, you can't do that." It's whatever. He goes, "Well, I made an administrative decision in my office." I'm like, "Okay, I got you." To me, that's banter. He made an administrative decision. In other words, it's my ball and bat and I can do what I want. That's the kind of banter. |
| Sam Vitaro<br>George: | I don't look at that as banter in the way you're looking . . .<br>That's how you look at it. This is how I look at it. Now, if you're going to want to make anything here with a smiley face, this being sarcastic or not banter or being disrespectful, there's nothing I can do to convince you because you've already made the determination. |
| Sam Vitaro: | No, if you can show me letters from Chuck Vancleave . . . |

160817_004_combined                                            Page 45 of 145

| George: | I just gave you an example and you said you would not consider that as banter. |
|---|---|
| Sam Vitaro: | . . . that he said he made an administrative decision? |
| George: | Yeah. |
| Sam Vitaro: | You think that's . . . |
| George: | He quoted it, "I made an administrative decision to not take your emails." |
| Sam Vitaro: | You think he's bantering there? |
| George: | Yeah. He's a FOIA officer. He can't make administrative decisions on how to answer a FOIA. There's laws. He didn't stop taking my emails from work. |
| Sam Vitaro: | He didn't stop, but he made clear to you that he thought it was inappropriate for you to use your government computer on government time, I guess too, to send him FOIA requests. |
| George: | Which is not inappropriate. There's no policy against it, is there? |
| Sam Vitaro: | I don't know. |
| George: | There's no policy against it. |
| Sam Vitaro: | You tell me. |
| George: | I'm telling you, there's no policy against it. We've been through this. We've already investigated that. I've been through numerous investigations about wasted time. All I can do is come up with everything that I show them, every time, over and over again. |
| Sam Vitaro: | Do you have any letter or determination that says that you can use your government computer to make FOIA requests and you can use government time to make FOIA requests? |
| George: | Technically, yes. |
| Sam Vitaro: | You do have some information as to that? |
| George: | The FOIA document, the FOIA laws themselves says any electronic means can be made. It doesn't say that you can't make them from government computers, government . . . |
| Sam Vitaro: | I'd like to see whatever you claim your position is on that and I'll consider it to the extent that that's even an issue. |

| George: | Anyway, just reading this, it's just banter. I'm trying to get real clear with him but still be kind of funny. The six attachments of Christopher Murphy, hint, this is the responsive person to ask, Christopher Murphy, he emailed or provided an EEO investigation. Hint: Marie [Row-a-show 01:32:14], that's the person who it went to. I even gave him the street address, the suite number, Fairchild, Blackberry phone number, everything, the Throughput reports and all that stuff. Please let me know if this is possibly pleasantly perfectly perfected enough [Laughter] |
|---|---|
| Sam Vitaro: | What so funny? |
| George: | You know, all the Ps; please let me know if this is possibly pleasantly perfectly perfected enough and I hope you have been entertained by this perfected request as I have been with your not perfected letters. Smiley face. |
| Sam Vitaro: | What was your intention of using the Ps? I think that's called onomatopoeia. |
| George: | Yeah. A perfect perfected request. A perfect perfection. I was joking around. |
| Sam Vitaro: | How do you think he reacted to this? |
| George: | I don't know. Just smiley face. |
| Sam Vitaro: | I've talked to him. |
| George: | He didn't say anything about it to me. He didn't say this was rude or disrespectful. We go back and forth. I thought we had a pretty good relationship with doing this kind of stuff. Am I wrong? Is he . . . |
| ~~Sam Vitaro:~~ | ~~He told me that that particular email, as well as some others I'm going to show you,~~ upset him. |
| George: | He didn't tell me. What's the first thing, right, if I send you an email that's upsetting, you should tell me. I didn't take this as a joke, and then I explain it to you like I explain it to him. I'm sorry, I was doing this. I know emails can be kind of touchy that way maybe. If you look at them wrong or you think something's wrong or you think we're adversarial, then you might read it wrong. The first thing is you approach the person. You say I thought this was whatever. This has been, what, over six months, seven months, eight months? |
| Sam Vitaro: | I'll show you some others. |
| George: | Still, if he felt that way, he can call me, he can talk to me. We'll come over. We'll talk. Now I'll apologize and I'll just say, all right, I won't banter like that in email or something. I'll just keep it stiff. |
| Sam Vitaro: | Haven't you told him that you're not going to talk to him and that you want him to communicate with your lawyer? |

| | |
|---|---|
| George: | Chuck Vancleave? |
| Sam Vitaro: | Yeah. |
| George: | No. I don't think so. I send FOIA requests to him still, so I don't– |
| Sam Vitaro: | I know you send FOIA requests, but if he just wants to call you and talk to you, that's okay? |
| George: | He called me yesterday to talk to me. |
| Sam Vitaro: | It's okay though? |
| George: | Yeah. |
| Sam Vitaro: | No problem. You've never told him that I don't want you to call me, I want you to communicate to my lawyer? |
| George: | I don't know for sure. If he was calling for something that my lawyer was working on, then it would be appropriate for him to talk to the lawyer. He called, I think it was yesterday or the day before yesterday. |
| Sam Vitaro: | I think he did call you yesterday. |
| George: | He called me yesterday. I didn't say talk to my lawyer. We talked about it. He said, "It's just too hard to search this Trim system, we can't do it." I said, "Okay, send me something saying you just can't do it and we'll move on with whatever." |
| | I guess the point is, seriously though, if he's serious and he really thinks that's not banter and not with the smiley faces and all, that's not what its intent was, I will apologize to him and go talk to him and tell him that's not what I meant, sorry. Why didn't you talk to me? Why didn't you tell me something? |
| Sam Vitaro: | I don't mean to suggest that this is the only letter. He's filed any number of letters of yours. I'll show them to you. |
| George: | I'm sure he did. If he doesn't tell me that my wit is offensive, I don't know it's offensive. |
| Sam Vitaro: | That's the way you interpreted this; this is just your wit. |
| George: | Yeah. |
| Sam Vitaro: | "Your letters are always entertaining. I'm beginning to look forward to your excuses more than the actual information I asked for these days." |

160817_004_combined                                         Page 48 of 145

| George: | Yeah. |
|---|---|
| Sam Vitaro: | "Okay, here's a thought, I know I am not a knowledgeable EEO official" … |
| George: | It should have been a FOIA official. |
| Sam Vitaro: | You weren't being sarcastic? |
| George: | No, obviously … EEO was on my mind because I was asking about the EEO stuff, so I probably just typed EEO. |
| Sam Vitaro: | You're just being playful here when you say, "I'm used to playing your games", games in capital … |
| George: | Yeah. |
| Sam Vitaro: | … to deliberately delay." This is all playful? |
| George: | Yeah. He does it all the time. That request, in my opinion, that request was pretty clear. I want this information from that person that was given to this person. This is early on, he always did this perfected request thing. We went back and forth over it and back and forth, back … the games, the games to delay to do this stuff. Okay, let me know what wording you need to do this.

I'm trying to be very, very perfected now. My stuff has gotten a lot better because of him. He's told me, "You need to get very detailed." |
| Sam Vitaro: | This is kind of late in the game. This is December 2015. |
| George: | Yeah, but I'm getting very detailed. I'm getting very detailed. The point is, I'm getting detailed. |
| Sam Vitaro: | He thinks you're getting sarcastic. |
| George: | I gave him all the details and he still said it was not perfected enough. I'm like, "What other information can I give you? I've got the name, the person, the person to contact, the responsive party. I've given you everything, the street address, the phone number and the email address." I've perfected that as much as I can short of mailing him a Ouija board or something. I don't know what else I can give him.

Again, seriously, if he really thought that why didn't he … It's like getting a Christmas fruit cake. You don't tell somebody you don't like fruit cake. Every year, you get the stupid fruit cake. If he doesn't tell me that my wit, my banter, my whatever is really offensive to him, I obviously will just think that it's okay. |
| Sam Vitaro: | Have you named him in any complaints? |

| George: | I think so, yeah. |
|---|---|
| Sam Vitaro: | I see. |
| George: | I'll have to- |
| Sam Vitaro: | You think that might be one of the reasons he stays away from you? |
| George: | No. I was told he's just afraid that I might get mad at him or something. I assured him that I- |
| Sam Vitaro: | You were told by whom? |
| George: | Nora Williams. |
| Sam Vitaro: | Nora's already talked to you about this? |
| George: | No. No, this is a long, long time ago. When I first started FOIA, Nora was union person. I said, "Can I ask, who's the FOIA person?" He said, "Vancleave." I said, "Okay, I can ask him." He goes, "He might be a little gun shy of you because he knows ... vancleave of anybody would know exactly what's going on. He gets to see all the stuff I ask for. He gets to redact, all the stuff that he doesn't want me to see. |
| | All the evidence I try to get comes out as a big old giant black sheet of paper. He gets to read that stuff and go, I'm not giving that up. He has to redact it all, but in redacting it, he has to read it. He, probably out of everybody in the entire command, he probably knows more about what's really going on, why we say the vendetta against me. He probably knows more of what's going on by anybody because he has to go in and read all these emails and all these documents and all this traffic and all these investigations that I ask for. |
| Sam Vitaro: | I've read some of the correspondence between the two of you. It looks to me like you're suggesting that he's part of a conspiracy against you. Would that be accurate? |
| George: | Yeah. He blocks everything. I have, through discovery, I've got FOIAs that were redacted by, totally, right, and then the unredacted version. The redactions that he puts on a FOIA, I don't know if you guys are familiar with FOIAs, but when you put a redaction on a FOIA, there's some laws that you can legally redact this because of that law. He redacts it saying, "I'm redacting this because of that law." Then when you get the unredacted version, and you can see what is in there that's been redacted, then you can see that he uses the wrong law to redact that FOIA. |
| Sam Vitaro: | Maybe he made a mistake. |
| George: | Thousands of them? |
| Sam Vitaro: | You think he's made thousands of mistakes with you? |

160817_004_combined                                         Page 50 of 145

George:         Yes [Laughter]

Sam Vitaro:     Who's he involved in a conspiracy with?

George:         I'm sure command's pressuring him not to give ... my opinion ... I would guess, and there was some stuff we learned in depositions

Sam Vitaro:     Like what?

George:         I don't know if I can tell you. Depositions is an ongoing case. A lawyer would have to let me know if I can tell you.

Sam Vitaro:     I'm not going to-

George:         In other words [crosstalk] Stuff I learned in depositions from people saying what he said, what Chuck said to somebody, because they get the post. That backs up my thoughts, my suspicions that he doesn't want a target on his back either. He's between a rock and a hard place. I feel for him.

Sam Vitaro      You've actually made complaints about him, right?
George:         Yeah, because he redacted stuff. I claimed he redacted stuff illegally.

sam vitaro:     Do you think he's in a conspiracy with HR? What's your belief?

George:         Well, my belief is he's between a rock and a hard place, and if he releases stuff legally, command is going to come down on him with a ton of bricks. To protect his own self, his job, not have a target on his back, he's going to do command's bidding. Here's the great catch about FOIA. When you ask for something and they redact it all, and they tell you what law they used to redact it, you have no way of knowing if that law was legally applied, because what you would need to see is what's under the redaction to find out if the redaction law was appropriate to use. It's a beautiful thing. You can redact whatever you want, because you have no way of knowing what was under that black ink. That could be very critical to my case, and he could redact it using a completely illegal law, and there's no way to prove one way or the other.

sam vitaro:     So, your belief is he's complicit with the command?

George:         Not voluntarily. I believe he's between a rock and a hard place, that he knows, he sees what's going on. He can read all of this stuff. He can see all the stuff that he's redacting, and I'm just guessing, he probably knows that I really shouldn't be doing this kind of redaction, but if I give this up, command is going to have a hissy fit, because it proves his case. I think he's between a rock and a hard place, and he just has to do what he has to do.

sam vitaro:     Let me show you this second one. It's an e-mail – e-mail traffic between you and Chris Murphy, and Chris Murphy is a lead.

160817_004_combined                                        Page 51 of 145

George:        Yeah.

sam vitaro:    What I wanted to ask you about is it seems to me what you're saying in your e-mail is that you're not going to meet with Chris Murphy, who is the lead, unless there is a witness present.

George:        Right.

sam vitaro:    Is that, this is an April 27, 2016, and so is that your position? Any time Chris Murphy wants to meet with you, he has to have a witness present?

George:        Not he has to have a witness. Because of all that's been going on, we have an active case against them right now. Just like this, right, we need witnesses, [inaudible 01:42:56] whatever, recording. We need witnesses, right? Well, they won't let you record it, they won't let you video tape it, they won't let you audio record it, of course. By direction from attorneys, it's like quit meeting with people in their office behind closed doors where they can say you did stuff, and you have no way to prove you didn't. They lied about, they're habitual liars, right?

sam vitaro:    [inaudible 01:43:22]

George:        That's why. If you're going to meet with Chris Murphy, you stand outside of his door, you keep your hands in your pockets. You have like Kathy Lunsford sit there and listen to the conversation, so if anything happens, and then when I leave, I go back and I'll pass by Kathy or Brian or Alina (?) , I'll say, "Did you hear anything disrespectful, did you see any motions from me? Did you see anything? Was there any conversation here?" And they'll go, "No, absolutely not," I'll say, "Okay, remember, remember this date, because if it comes up, I want to have you as a witness, don't forget this. That's the kind of scrutiny I have to work under all the time now. I literally have to be outside of his door with my hands in his pockets and say stuff where other people can hear it, so if there's a claim, I have a witness.

sam vitaro:    Let me know that I understand this. Your position is you will not meet with a management official, or even in this instance, a lead, without a witness?

George:        If possible. Of course, I mean, if you're walking in the parking lot and they just catch you off guard, you can't do anything, right?

sam vitaro:    What if they ordered you to meet with them?

George:        I would suspect it's foul play, I would ask for a union representative, I would suspect it's for disciplinary actions and I would have a witness.

sam vitaro:    If it's for disciplinary action, there's no question. You would have.

George:        I believe everything is disciplinary now. If they just ask me to break a dollar bill, I'm

worried am I going to give them the wrong change. This is what I have to put up with.

sam vitaro:   Do you understand how difficult that makes supervising you?

George:   They don't seem to have a problem supervising me at all. We meet, we have our meetings. There's nothing that has changed. They don't wait on me.

sam vitaro:   Do people stay away from you?

George:   Co-workers or management?

sam vitaro:   Co-workers and management.

George:   I don't think so.

sam vitaro:   You don't? Okay.

George:   Yeah. Russ Lund stopped me just today in the break room and asked me to take over Brian Cullen's outreach coordinator job for a couple of days while he's on vacation or something, right? We didn't meet with witnesses, but it just so happened there was people in the break room. I'm comfortable as long as somebody is there to hear, because I think some of your stuff you're going to talk about is like when Holzner said that I laughed when he walked by. Now, if I had a witness with me there, then I could say something, but now, it's like if you just accidentally pass people, they can say whatever they want, and they do say whatever they want, because they have a vendetta against me. This is the environment I have to live with every day.

sam vitaro:   As to Russ Lund, he's your supervisor, right?

George:   Yes.

sam vitaro:   It's my understanding that you won't even go into his office and just sit down, that you will meet with him by standing in his doorway.

George:   I'll stand in the doorway, yeah.

sam vitaro:   What's the reason for that?

George:   Because I was accused by management, any time we're alone, in the bathroom, Holzner is saying [inaudible 01:46:14] whatever, walking somewhere, he said I was walking, we haven't got to that yet, but apparently, I was walking somewhere and I laughed when he walked by. Apparently that's an evil thing to do. I don't even know what that's about. In my history, what I've seen and what I've been able to prove through my attorneys and stuff are these people are habitual liars. They will lie about everything. Keith Moss told some whopper stories after I got Dave Herriott in trouble for the assault.

| | |
|---|---|
| sam vitaro: | No, I know. |
| George: | Bam, right away, retaliation. Keith Moss, six to eight months ago I did something, apparently, that rubbed him the wrong way, which I denied it ever happened. The agency's own witness denied it happened, but yet, they still moved forward with it, okay? That's what I'm saying- |
| sam vitaro: | A two day suspension. |
| George: | Yeah. This is my work environment. This is why I've been trying to leave. I've asked to leave. |
| sam vitaro: | How about Mr. Lund? He just got there in May. What has he done to you? |
| George: | He's been hyper-surveillant of me. He's counseled me twice, I think, if not three times. |
| sam vitaro: | Yeah, so you won't go into his office unless someone is with you, even if he just wants to talk to you about some performance issue. Has nothing to do with discipline. Is that what you're telling me? |
| George: | Every time management- |
| sam vitaro: | No, no, is that what you're telling me? |
| George: | I'm telling you. Every time management wants to talk to me in their office and all that stuff, I look at it as a pre-text to something else. [crosstalk 01:47:42] |
| sam vitaro: | I know how you look at it, but what you're telling me is you will not go into Mr. Lund's office? |
| George: | I'll try not to. |
| sam vitaro: | If he orders you to go in? |
| George: | If there's nobody around, and he says, "Come in here and talk to me," I look around, and there's nobody that can hear it, I will try to stand in the door with my hands in my pockets. |
| sam vitaro: | If he says, "George, I just need to talk to you about some of your projects," so it's not discipline, "And I want you to come in here and sit down." |
| George: | Oh, no, they've done that before, that's how they get me in there. |
| sam vitaro: | You wouldn't go in, then? |
| George: | I would be very cautious, because that's the pre-text they use to get me in there |

160817_004_combined                                                      Page 54 of 145

|  |  |
|---|---|
|  | every time. |
| sam vitaro: | I see. |
| George: | Brian Van Woudenberg called me in the same thing, "I just want to talk to you about a couple of projects and the gate key " I walked in there, he goes, "Oh, letter of caution, bam, here you go, here's all your stuff." I'm like, "Hey, I thought you were talking to me about the gate key?" No, it wasn't about the gate key, it was a pretext to get me in there with nobody around, so then he can make all kind of claims. He claimed I flipped him off. |
| sam vitaro: | My und has just been there since May. |
| George: | Yeah, and I kind of asked, I said what turnover did you get that you are monitoring my motorcycle in the parking lot to see if I'm gone or not gone, or if I'm doing this? He told me a bunch of stuff. This, again, is ongoing. We have ongoing legal action involving Mr. Ross. I'm not going to say too much that maybe I not should say, that's why my lawyer should be here. Yes, basically, you have to understand that looking at the trivial minutia that I'm being written up for to build cases against, then, on top of lies, these people lie. They will make up stories, they will change stories, they will lie. Mr. Pitcairn changed his statement. We got e-mail traffic showing he's going to change his statement to match what it should be so it looks better, so it looks worse. Yes, if I can avoid it, because I will be very, very careful that I'm being called in on a pretext.

You can't comprehend that, maybe these guys can't comprehend that either, but when you've been through it time and time and time again, you get a little [inaudible 01:49:40] like every time you want to talk to me about  something behind closed doors, there better be a witness, because something is going to happen. They're going to say, what if I walk in there and they just all of a sudden slap a book in their face and get a bloody nose and start screaming and say, "George just punched me," I ain't got a chance in hell. They will haul me off in cuffs. That's the level that I have, that's the work environment I have to endure everyday. |
| Sam Vitaro
George : | It's not just managers and leads that you have some difficulty dealing with, is it?
I think so. |
| sam vitaro: | Oh it is? |
| George : | Yeah, unless there's some co workers that say something that I don't know. |
| sam vitaro: | There are some co workers and I'll confront you with some of that. |
| George : | Okay, but I don't know. |
| sam vitaro: | Here's an incident involving Chris Eckley, he's a co worker, right? |

160817_004_combined

Page 55 of 145

| George : | Oh okay, Chris, yeah. |
| --- | --- |
| sam vitaro: | Yeah, do you recall the recent incident where he was asked to provide weekly status reports? |
| George : | Weekly ... Let me see. |
| sam vitaro: | Yeah, why don't you just take a look at that. |
| George : | Oh yeah, see this is what I was saying. This is Chris Eckley verbally saying, right? He says ... This is Ross, okay. "When I asked George Karl for my weekly status of his projects, he said no, no, no change and walked away. Cathy Lunsford, Brian Cullen, Tim Garrett, Brett Hall were witnesses. I will add no change and try to get these close outs through [inaudible 01:51:08]," which I've already updated. I always do that. "George came across as abrasive during our short discussion prior to him walking away." What you don't see is what I was doing. The words are not ... Well, they're not exactly those words but they're close. I'm putting on my boots, so I'm like ... it says, "Do you have any changes to add?" He just asked me, "Your weekly updates, do you have anything to add?" I said, "nope." He goes, "What about the worm? Do you have any lifts or anything?" I said, "No." He goes, "All right." Then, I put my boots on and walked away. That's all that happened. |
| sam vitaro: | Is Chris an overly sensitive guy? In your experience? |
| George : | I don't know. I don't know him real well at all. |
| sam vitaro: | I see. |
| George : | I mean, the only time I've ever had any problem with him at all is when he jumped in on one of my projects and started contacting a customer behind my back and it's [crosstalk 01:52:04] |
| sam vitaro: | Was it behind your back? I thought you had agreed to it- |
| George : | No, no, he says I agreed to it so it wouldn't look like he was behind my back but it was behind my back. We have George evidence of that now. That's all come full circle, that he says, no he's doing it on his own but we have Chris Murphy saying, no I directed him to do that and step in on your project. We have that loop totally covered. |
| sam vitaro: | Your conflicts aren't just, getting back to the point, aren't just with management- |
| George : | Well it is except for - Chris jumped in in on one of my projects under direction of Chris Murphy, too many Chris's. Chris Eckley jumped in on one of my projects under direction of Chris Murphy and when I asked Chris Eckley "where you told to do this?" I was going to go talk to Chris Murphy, say, "Hey Chris, don't have Eckley jumping in on my projects because I need to know. I'm the COR. I'm the contracting Officer's |

160817_004_combined

representative. I need to know the status of those projects at all times. If he's off talking to a customer, a client, a producer, if he's off talking to somebody behind the scenes, I'm not in the loop. He's on his own. He's rogue."

Chris didn't say that, Eckley, Eckley said, "No, I'm doing this on my own." Then I wasn't going to go to Chris, Chris Murphy, I went back to Eckley and said, "Well, don't. Don't do this. Don't contact my customers. I'm the COR." Then I wrote to Brian Van Woudenberg saying, "Please have him not interfere with my projects because I need to be on top of them. I can't have him just sticking his nose into things like that. That's not my ... I got a COR letter. It's a big project."

| | |
|---|---|
| sam vitaro: | It's not just Chris. There's some other- |
| George : | Who else. |
| sam vitaro: | John Aune, for example. |
| George : | John doesn't talk to me at all. |
| sam vitaro: | Didn't you try to do some fact finding with him? Went into his office and asked him for information about something that he and Chris Murphy had done? |
| George : | Yeah but that's not a conflict – I asked him a question. |
| sam vitaro: | I see. |
| George : | Chris Murphy has used the ... Let's not focus on the questions ... Me talking to John- |
| sam vitaro: | You just asked me which other employee . . . |
| George : | Yeah, I know but let's focus on why I asked John the question because Chris Murphy has used the government vehicle, allegedly, used the government vehicle to bring his dogs out to Indian Island to drop them off at a vet because they have cataracts. To me that's like, well with all the stuff going on in my world, if I had done that I would have been fired. |
| sam vitaro: | Do you see any problem in doing these individual fact findings with co workers? |
| George : | I was at ... Van Woudenberg asked me to find out more dates and times. So I didn't- |
| sam vitaro: | Why don't you send me something that suggest that Van Woudenberg directed you to get more information. |
| George : | I denied it. I said, "no, I'm not doing that because you're going to write me up for bothering people." |
| sam vitaro: | You weren't relying on Van Woudenberg then? |

| | |
|---|---|
| George : | No, I mean, when he did that. I wrote that up because- |
| sam vitaro: | No, no, what I just heard you say was you were going to see John Aune because of Van Woudenberg telling you you needed to get some more information, now you are telling me- |
| George : | After I told Van Woudenberg about what I had heard, he said, "Well, go ahead and ask him." I said, "Well, now that I see what's going on, I'm not going to play in the pen." That's what I ... I just went in there and said, John, I heard that you and Murphy went ton Indian Island and I have the report, the vehicle check out report, but it's like this thick." I said, "Can you narrow it down and tell me what date it is that you did this?" He said, "I don't recall this happening." I go, "Okay, thanks." And I left. |
| sam vitaro: | He ordered you out of the office didn't he? |
| George : | Who? |
| sam vitaro: | John Aune |
| George : | No, Aune? |
| sam vitaro: | Excuse me? |
| George : | John Aune. |
| sam vitaro: | I'm sorry I don't have the proper pronunciation ... A-U-N-E. |
| George : | Yeah, no, it was his cubical. |
| sam vitaro: | In his cubical? |
| George : | Yeah, I went and I sat down with him and I showed him the report. I said, "Can you help me narrow this down-" |
| sam vitaro: | Didn't see he say, "Well, then you can get out of here?" As you asked him the question? |
| George : | No, he said, "I don't recall that." |
| sam vitaro: | Okay, there's a conflict. |
| George : | What? |
| sam vitaro: | There's a conflict between what I've heard and what you are saying. |
| George : | Oh, you mean a difference. |

160817_004_combined

sam vitaro:      A difference of opinion.

George :         Yeah.

sam vitaro:      How about Tim Garrett? Didn't you go in . . . He sits near you right?

George :         Yeah, I asked him about Murphy taking his boat out.

sam vitaro:      Yeah, didn't you even talk about suing him and getting your attorney involved in a deposition with him?

George :         No, not suing him. Not at all. No-

sam vitaro:      You didn't say anything about your attorney and a deposition?

George :         Yeah, he asked me if he was on the list to be deposed. I said, "yeah, it's a ..."

sam vitaro:      You didn't say to him that he was he on the list?

George :         To be deposed, yes.

sam vitaro:      You told him that he was on the list?

George :         No, he'd asked me, "Am I going to be involved in all this stuff going on?" I said, "You are not involved in any way except to be asked questions in a deposition. Did Chris Murphy and You go-" again, look at what we are focusing on-

sam vitaro:      No, no, no. Let's stick with this first.

George :         No . . . [crosstalk 01:56:42]

sam vitaro:      I'm asking you ... You need to hear this. I'll let you do this-

George :         You need to understand why.

sam vitaro:      I need to ask you to be clear on this.

George :         Yeah.

sam vitaro:      Your position is that you responded to what Tim was asking you, is that what you are saying?

George :         Yeah, because he's trying not to be involved with a whole bunch of stuff but he sits right there, so he hears everything.

sam vitaro:      You didn't ... You know unilaterally, without him asking you for information, do as

|  | you did with John, and ask him for certain information, again about Chris Murphy and his helping Chris Murphy. I think it had to do with a vet, in that instance. |
|---|---|
| George : | No, it was about was Chris taking ... Chris took Tim Garrett out of the office and they went down to Hood Canal to pull his boat out of the water on company time- |
| sam vitaro: | You didn't approach him and ask him about that? |
| George : | Yeah. |
| sam vitaro: | You did? |
| George : | Yeah. |
| sam vitaro: | So he wasn't asking you? |
| George : | No, no, about being deposed, yes. You asked me about being deposed or being sued or something, right? That's a separate- |
| sam vitaro: | That's a separate- |
| George : | That's a second discussion. |
| sam vitaro: | Okay, I'll ask you about that but as to this discussion ... |
| George : | Yeah, way back when I asked Aune if he could help me narrow down when he and Murphy went to Indian Island, he just said, "I do not recall that episode." I'm like [crosstalk 01:58:01] |
| sam vitaro: | It sounds like there are 2 incidents- |
| George : | No 3. |
| sam vitaro: | 2 incidents involving Tim Garrett- |
| George : | Yeah but I'm going to fill you in with the background. So, I'm being attacked for doing silly stuff, right? I'm trying to show disparate treatment, so my intent is to show disparate treatment, so I just asked ... People are volunteering stuff, "Oh, you need to ask about Murphy getting his boat out of the water." |
| sam vitaro: | Who's volunteering that? |
| George : | Oh, I don't remember. Just people in the ... Office talk, just people say stuff. Sometimes I get a note just left on my desk, you know? |
| sam vitaro: | It's entirely appropriate for you during duty hours to just go into the offices of your co workers and ask them questions like you asked John and then you asked Tim? |

| George : | Yeah, they talk about fishing, hunting, and boating. It's not offices, it's cubicles. They'll spend hours in the morning talking about the Seahawks and what happened over the weekend and stuff, so all I did ... I'm just trying to show disparate treatment. I'm trying to build my case and they're really trying to block me. That's why all of this is going on because they are trying to block me from building my EEO case- |
|---|---|
| sam vitaro: | Tim is trying- |
| George : | No, the agency. That's why- |
| sam vitaro: | You don't think Tim and John are involved in any of this? |
| George : | No, Tim and John ... John did the, "I do not recall that incident." In other words, yeah you did it but you don't want to talk about it because you'll get a bulls eye on your back, I get it. That was it. I said, "All right, thanks,"- |
| sam vitaro: | Why don't you explain the 2 situations involving Tim? |
| George : | Well, Tim, it was the same thing. I said, "I heard that Chris Murphy and you went to get his boat out of the water. I'm going ..." I didn't say all of this, right, but in my mind, I'm going to use these kinds of disparate -  ... Look at what Murphy can do in the office compared to what I can do, right? I mean, if i grind the pencil sharpener too long, somebody will fuss at me because I'm distracting them because of this vendetta. Like I said, this is the environment I have to endure. |
| sam vitaro: | You expected them when you went in there, for example, to incriminate themselves? |
| George : | No, they are not incriminating themselves. They're just saying Murphy is the lead. Murphy is going to be the one that says, and if Murphy comes up tom me and says, "I want to go on your project. We're going to go do this." I go, "Okay.", because you can't say no, right? |
| Sam Vitaro<br>George: | Well, I'm not sure you can't say no. Most people would say no.<br>No, because they don't want to get a target on their back. They see what's going on. If you step on Murphy's ... Murphy is the master chief, the command [crosstalk 02:00:24]. |
| sam vitaro: | You didn't want to get Tim and John in trouble. |
| George: | No. |
| sam vitaro: | Okay. |
| George: | No, and I asked [crosstalk 02:00:28]. |
| sam vitaro: | You think that their reporting that, for example, after perhaps they would |

acknowledge it, you think reporting that wouldn't get them in trouble?

George:        No, because there is an actual law that says that basically people can't, coworkers who are coerced through a subordinate, you know, like, if the supervisor came and said, "You've got to go do my laundry.", kind of thing, right-

sam vitaro:    Where's the law, by the way, that says that?

George:        Okay, I'll get that one. Coworker and say, lead forces them, that will jog my memory. Anyway, that's another-

sam vitaro:    [crosstalk 02:01:11] as to the two incidents involving them, too.

George:        That's the thing. It was about the same time, maybe even the same day, because somebody left this thing on my desk, going, "After all they're doing to you, look at what Murphy gets away with." I went, "What does he get away with?" Then, you read all this stuff and [crosstalk 02:01:26].

sam vitaro:    Who left it on your desk?

George:        I don't know, just a sticky. I have a yellow sticky pad on my desk.

sam vitaro:    Someone just left it on your desk, that Murphy had done all these things?

George:        Yeah, they wrote on my sticky. They said, "Ask Aune about dogs and going to Indian Island and ask Garrett about getting the boat out of Hood Canal."

sam vitaro:    Does that typically happen that someone puts a sticky?

George:        Yeah, over the last few years, because they see what's happened. They've seen the attack of me, but they don't want to-

sam vitaro:    Which employees would see it, and hand you something?

George:        I don't know, maybe everybody.

sam vitaro:    Maybe Norah Williams?

George:        Could be Norah, could be anybody, because the offices are these cubicles, right-

sam vitaro:    It couldn't be Tim and John.

George:        Could be.

sam vitaro:    You think they want to be investigated?

George:        Well, they might see what's going on. They might have knowledge of what Murphy

gets away with and I don't. They might want to say ... They're not going to say, "Hey, come ask me about Murphy.", because there's a big target on his back.

sam vitaro: Just so we're clear, you think it's appropriate in a situation like that, during duty hours, to just go into their office and do an investigation.

George: No, I wasn't doing an investigation. I walked around the corner of the cubicle and said, "Hey, John, when Murphy and you went to Indian Island, does he bring his dogs with you and stuff. Can you help me narrow down the date of this so I can see which vehicle he checked out?"

sam vitaro: What were you intending to do with that information?

George: Give it to Brian Van Woudenberg to show that Murphy gets away with murder, and I am getting attacked like I'm getting now.

sam vitaro: That's not an inquiry or investigation?

George: No.

sam vitaro: Okay.

George: We don't do it like that. I was asking a question. It's nothing more than asking whether or not you like the Seahawks or what the Seahawks did. I'm not doing an investigation to see what team he likes.

sam vitaro: As simple as talking about football.

George: It's as simple as talking about football and it lasted, what, whatever it takes to say, "Hey, John, can you help me?" It lasted 10 seconds. He goes, "I can't recall that situation.", so I left, and then, I asked Tim.

sam vitaro: What are the two situations involving Tim-

George: I asked Tim the same thing. I said, "Tim.", first, I'd like to find out is it true, because, if it's not, then it's done. I said, "Hey, Tim, I've heard that Murphy asked you to go with him to get his boat out of the water at Hood Canal, so he could drive the boat, and you could drive the trailer and stuff and you could put it out somewhere else, right?" He goes, "Yeah. Yeah, we did." I said, "Okay." I said, "I just wanted to know."

sam vitaro: You're saying Tim admitted to that?

George: Yeah.

sam vitaro: That's different than what I've heard.

George: I'm saying, yeah.

| | |
|---|---|
| sam vitaro: | What did you then do with that information? |
| George: | I gave Van Woudenberg a list of how come Murphy can do all these things and not get in trouble, but if I sharpen my pencil too long, somebody complains that it made too much noise, seriously? |
| sam vitaro: | In the information that you gave to Brian, last name too hard to pronounce, right. |
| George: | We call him BVW, there's no insult there, it's just because it's such a long name, we call him BVW. |
| sam vitaro: | Did you indicate when you gave him that information that Garrett had confirmed some of that information for you? |
| George: | I don't know. I'd have to look at the email. |
| sam vitaro: | Could you get that to me? |
| George: | Wait. I might even have it. I'd have to look to see. |
| Speaker 3: | Those to Van Woudenberg? |
| George: | Yeah. Basically, then the second time was ... I'll look for it, I might have it, I might not. I'll look for it, but basically, the second time was, I wouldn't say recently, but I'd more recently, when he asked basically, "Hey, now that you're going through the legal deposition stuff, am I going to be called about saying what I know about Murphy and the boat thing?" I said, "Well, you're on the deposition list. Just say what you know." He goes, "Okay." He was going to try to keep out of it. He was upset about coming to this, too. |
| sam vitaro: | Yeah, you two had a discussion about this, too, didn't you? |
| George: | He told me that he was called as a witness and he'd been trying to keep out of it. |
| sam vitaro: | Did he suggest to you that you had roped him into your stuff now? |
| George: | No. I think he felt that way, and that's what he was trying to avoid. He doesn't want a target on his back. He's looking for work, too, looking for a job, too. He's going to get out, because he sees what's going on. |
| sam vitaro: | Do you think he's looking to get out because of anything you've done? |
| George: | I don't know. Well, I hope not, because I'm the one helping him do his USA job setup. I helped him set it all up and how to search. He asked me to come over sometimes and ask him what documents he has to do. I don't know. From what I can tell, no. He sees just what's going on and doesn't want any part of it, and, unfortunately, |

because he did go with Murphy, and we all know that he had to go with him really. You can't say anything, because then you'd get Murphy mad at you. Then his life will be like mine.

sam vitaro:   Do you have that email that you gave to Brian?

George:   Yeah, I'm looking to see.

sam vitaro:   Yeah. You think it may have included the information that you got from Tim?

George:   Well, it'll say that Murphy and Tim went to get the boat. I don't know if it'll say if Tim admitted to it or not.

sam vitaro:   Wouldn't you typically do that?

George:   What?

sam vitaro:   If you're trying to support a claim, and I assume that's what you're trying to do, by sending this to Brian, wouldn't you typically say, "Tim's already acknowledged this."?

George:   No, I bulleted it. I just did bullets. I'm not doing an investigation. I just asked him. It's not to get anybody in trouble, it's just to show disparate treatment, right?

You've got to ask yourself, the focus is always - what's amazing to me and my attorney. The focus now is on me asking somebody about something somebody did. The focus isn't about Chris Murphy, time card fraud, using government vehicles, using government workers, coercing people to go do stuff. Him and Joe Harvey went out and he forced himself to go with Joe to Port Angeles so he could stop by the Marvin Shields cemetery, you know?

So, the focus isn't on Chris Murphy's abuse, time card fraud, vehicle improper use. The focus is on George asking about it to show disparate treatment. See how that's kind of weird? We don't focus on the real problem, we focus on me pointing out the problem and bringing it to the surface. We don't want those problems to surface, because then it will show disparate treatment.

Let's think about that for awhile. Why am I, let's go back with it all, all of it.

sam vitaro:   I don't want to go back.

George:   No, no, I'm saying, all of this. Ask yourself why?

sam vitaro:   George, George, what you're doing is, I'm asking you very specific questions.

George:   Yeah, but you don't-

sam vitaro:   You keep going back to the past. Let me ask you-

160817_004_combined                                      Page 65 of 145

| | |
|---|---|
| George: | Don't you want to know what the 'why' is? Why did I ask them? |
| sam vitaro: | George, I have so many statements from you already. I have copies of these various investigations. I have copies of the investigation, for example, on your claim of hostile environment. I have very recent statements from you. I can get all of this, okay? There are very specific responses that you can give to these emails. We don't need to keep going back to the past. |
| George: | You've got to ask, these guys should know why am I asking? Did I just, all of a sudden, did I say, "You know what?" One day, I'm going to find out if Chris Murphy took his boat out on the water." I don't just come up with that. |
| sam vitaro: | I think what you're doing now— |
| George: | It goes back to— |
| sam vitaro: | I think you're impeding this investigation. I'd like you, as much as possible, to listen to the questions that I'm asking you. Okay? |
| George: | Because you don't want to know the facts? |
| sam vitaro: | I know the facts. I know the background. I've read just about everything you have written. I just want to get simple responses. |
| George: | Don't you— |
| sam vitaro: | To these things. |
| George: | Don't you ask yourself, "Why?"? |
| sam vitaro: | I do ask "Why?" That's why I asked you, at the beginning of this, to submit to me information that you have that I don't have that will give me a different picture of you. That includes your performance appraisals, any awards that you've gotten. The other stuff, I've seen the documentation, okay? It's a very simple question I asked you about going into someone's office . . . |
| George | I told you. |
| Sam Vitaro: | And inquiring . . . |
| George: | It's important to know the why. |
| Sam Vitaro: | You've made the point. You've made the point about why. And, I guess that's my concern. |
| George: | If I didn't have a vendetta against me . . . |
| Sam Vitaro: | That's my concern. |

160817_004_combined                                          Page 66 of 145

**197**                                               000209

| | |
|---|---|
| George: | . . . I wouldn't have to do any of this stuff. |
| Sam Vitaro: | That's my concern. |
| George: | I wouldn't have to fight back. |
| Sam Vitaro: | George, I really want you to stick to what I'm asking you. To the extent that you need to supplement what we're doing, you can submit anything you want and I will read it. |
| George: | Isn't it important for them to hear that your focus is on my actions and not why my actions are being ... You think I care that Chris took his boat out of the water? I don't care! I do care if they're going to charge me with petty crimes, and let him get away with that. |
| Sam Vitaro: | I'm going to give you the fourth document. I'm going to ask you about that one. |
| George: | This is CMDR. Holzner to Ross, videography/photography. |
| Sam Vitaro: | What's the date of that? |
| George: | June 10th, this year. |
| Sam Vitaro: | What does he claim you did? |
| George: | It says, "On 24, May at 12:15 I was returning to T75 Alpha, the buildings over here, [inaudible 02:11:21] and I pass each other, we passed in the crosswalk. I remember that. Crossing [Stage 02:11:27] Street. He pulled out a cell phone and appeared to be recording video or taking pictures of our exchange, pointing what I assumed to be a camera phone at me and following me as I passed. I simply said, "Good afternoon, George," as we passed about 5-10 feet. He felt uncomfortable with that. I smiled when I greeted him." |
| Sam Vitaro: | Do you recall that incident? |
| George: | Yeah. |
| Sam Vitaro: | What's your view of what occurred? |
| George: | My phone was in my back pocket like it is now and it vibrated. When I come out of the building we get signal low. Usually by the time I come out of the building by the time I get to the parking lot or the crosswalk the signal is strong enough that if I have text messages or something it will vibrate, it will finally catch. So ... Timing. He was walking across, I was walking across, my phone vibrated, I pulled it out. And, because of the sun, I don't know – I'm sure you guys use the phone, it's 12:15, so the sun's over my ... I'm going there, he's coming back. The sun's over my shoulder so I'm trying to move the phone where I can see the keyboard to enter my code so I can |

look at the text. That's it. This is what I'm talking about, why I need a witness.

Sam Vitaro:
So George, when he talks about following him with the camera as you passed, what you're saying is that it had to do with the direction of the sun.

George:
Probably. We were walking across. I just remember it ... We were walking across and I see him coming. No big deal, we smile. I pulled my phone out because it vibrated and of course I can't see anything because the sun's over me. I'm trying to get that sweet spot and tilt it down. He just goes by. I don't think anything. There's nothing to it. Do I have to now go, "Don't pull your phone out when somebody's walking by you." This is the ridiculousness of what I have to put up with and why I'm so paranoid about even working here. I've been trying to get a new job, I've been asking to get out of here, and they won't let me.

They won't let me leave! They want to crush me,  they want to fire me, so I can't retire. That's the whole vendetta. If I'm this person, why not let me get another job? Why not reassign me somewhere? I've got tons of email traffic between me and the agency and Peck and everybody saying let me go. If this is the person you really are portraying, why would you keep me here? Why would you not let me go somewhere else or reassign me somewhere, get me out of your hair? Ask that. Why won't they let me go? This is the ridiculousness. I pull my phone out, I'm trying to get my phone in there. The timing of it, I don't think about that stuff.

Stan
[Crosstalk 02:14:10] the target?

Sam Vitaro
Holzner, H-O-L-Z-N-E-R.

George
I don't even begin to comprehend the thought process of my phone rang, don't automatically pull it out because the sun's over your shoulder, because Holzner's coming and he'll think I'm recording him. You guys know cell phones, you can't pull it out and record somebody that fast.

Sam Vitaro:
What's your view of Lieutenant Commander Holzner in relation to yourself? Do you think he's involved in an effort to ...

George:
Absolutely.

Sam Vitaro:
[Crosstalk 02:14:42]to get you.

George:
Yeah. We've got depositions. I suspected at first. Of course he knows what's going on. I'm saying back in November, December of last year because one of the things in my comments was Holzner came up to my cubicle in front of some witnesses and said, "We're going to push your TDY package out, because Van Woudenberg's on vacation, I don't want nothing to do with you, I'm just waiting to retire, I'm just pushing your garbage out, and I don't want nothing to do ..." I think at that time he really didn't want anything to do with me or participate or anything. He just wants to go about his business, be quiet, not say anything, and not get a target on his back

because Commander will come after him too.

Sam Vitaro:     Why do you think he was trying to distance himself from you?

George:          He knows what their agenda is, he knows what their goal is. He's in management. He's my second level supervisor and he doesn't want any part of it.

Sam Vitaro:     You think it may have to do with something you're doing that he finds unacceptable or distasteful?

George:          No, because he would write me up or counsel me on it. He's my second level supervisor. If there's something I'm doing the whole point is to tell people what you're doing wrong so you can stop doing. Just like Vancleave. If Vancleave felt I was really being rude, then for God sake tell me. I think we're just bantering. I'll go there today and apologize to him if ...

Sam Vitaro:     Please. The last thing I want you to do, by the way, is to go up to John, Tim, or Vancleave and seek to initiate discussions with them about what we've talked about.

George:          I'm just saying ...

Sam Vitaro:     If I get back to you, if you want me to ...

George:          If you think I should.

Sam Vitaro:     No, it's not my decision.

George:          I didn't know they felt that way.

Sam Vitaro:     If you want me to I will go to VanCleave and I will ask him if it's okay.

George:          Yeah.

Sam Vitaro:     And then I'll get back to you and you can do that.

George:          I think we should do that with everybody. If they really feel this way, I think you should ask them. That's the policy here. If somebody's offended by somebody or being rude you should immediately, that's the policy, right? You should immediately address it, not 6 or 8 months later.

Sam Vitaro:     I think, from the body language, and perhaps even what some people have said to you, Tim Garrett didn't like a couple of these things, and John didn't like it. You have a difference of opinion about what John said.

George:          They don't portray that to me, they don't tell me ...

Sam Vitaro:     John says he did.

160817_004_combined                                              Page 69 of 145

| | |
|---|---|
| George: | All he said was I don't recall that incident. |
| Sam Vitaro: | What he told me was that he in effect ordered you out of the office. [Crosstalk 02:17:20] There's a disagreement . . . |
| George: | He may think that. |
| Sam Vitaro: | I really want to hear your position. You did a good job with this last one, you gave me your position and it made sense, the way you took your cell phone out. That's what I want to hear. |
| George: | That was easy to remember. Some of the other stuff ... |
| Sam Vitaro: | Your position's getting lost by going back to all this stuff. |
| George: | You see what I mean? This is what I have to [crosstalk 02:17:49] As trivial as that is, how do you remember this stuff? How do you remember what you did or what your intent was or what your actions were? |
| Sam Vitaro: | You remembered it, George. |
| George: | That was easy, that was recent. That was just recently. |
| Sam Vitaro: | I'm mostly asking about recent stuff, George. |
| George: | When you go back to Aune and that stuff, that's a long time ago. |
| Sam Vitaro: | Not too long, according to them. It's not back in 2014, for example. |
| George: | You know what I mean? If I wouldn't be under such attack I wouldn't have to prove disparate treatment of me. |
| Sam Vitaro: | George, it's an administrative allegation. Certain allegations have been made about you. I'm asking questions about those. I'm trying to figure this out. You've got to help me. |
| George: | I'd like you to understand the why's. Without the Why's it all looks bad, right? |
| Sam Vitaro: | George, my guess is I've read more than you about this stuff. That's my guess. I understand the why. |
| George: | All right. |
| Sam Vitaro: | How about this one? |
| George: | Murphy, July 12th. This is fairly recent, to Ross Lund. "I was walking through the |

160817_004_combined

parking lot around 8:35AM. George and Brian were coming from the direction of 1101. I was to the right of George, walking towards my direction staring at me with a large smile, moved away from Brian Cullen so he made sure I saw him." I'm trying to picture this. This is Murphy talking. Murphy was walking through the parking lot about 8:30 in the morning. Me and Brian Cullen were coming from the direction of ... He was going towards 1101, we were coming from 1101. He was to the right of me walking towards my direction. "I was to the right, and George Karl was walking towards my direction staring at me with a large smile, and moved away from Brian Cullen so he made sure I saw him." I don't know what that means. Me and Brian were walking back and we were talking.

| | |
|---|---|
| Sam Vitaro: | Do you remember the incident? |
| George: | No, not really. We may have passed or seen him. |
| Sam Vitaro: | You don't recall anything like that? |
| George: | Well, I mean ... |
| Sam vitaro: | He claims you were staring at him, doesn't he? |
| George: | He says he was staring at me with a smile. If I'm walking towards him it doesn't say how far away I was. I'm walking towards him, I looked up I see Murphy walking or something, so I'm looking at him. |
| Sam vitaro: | Do you remember this then? It sounds like you remember it. |
| George: | Maybe. We pass a lot. So, I don't know. [crosstalk 02:20:29] |
| Sam vitaro: | I guess what you're saying is you weren't to the extent that he thought you were staring at him you weren't staring at him. Is that what you're saying? |
| George: | Staring at him with a large smile smile. I was talking to Brian. We might've been talking about some fight. I don't know. I'm looking at him. |
| Sam vitaro: | What you're suggesting is you weren't intending to make him uncomfortable? |
| George: | Murphy? [Laughter] |
| Sam vitaro: | Yes. |
| George: | Nobody makes Murphy uncomfortable by a stare. Murphy's a big guy. |
| Sam vitaro: | We're talking about 1101 and staring. |
| George: | No. I probably made eye contact or looked. Of course I'm going to look at him. When you look at somebody you look at him. |

| Sam vitaro: | Let me tell you another thing Vancleave told me. Now we're talking about 1101 and Van cleave and staring. He says that about 2 weeks ago or so he was in the cafeteria. You were against the counter kind of, and he was at the end of the line. You looked at him, he said, and stared at him for what he said was 2 minutes. And, he felt so uncomfortable that he had to leave. You remember anything like that? |
|---|---|
| George: | I might've looked. This happens several times. Today, this morning, I saw him in the cafeteria this morning. |
| Sam vitaro: | I know but stick with this. |
| George: | I can't tell you I remember it happened because I don't remember. It could happen today, it could happen a month ago. |
| Sam vitaro: | Would you stare at him for 2 minutes? |
| George: | No. I can't stare at somebody for 2 minutes. |
| Sam vitaro: | That's the answer then George. |
| George: | It makes no sense that [crosstalk 02:22:07]. |
| Sam vitaro: | I'm not sure it doesn't make sense. He said that you did it. He said he felt uncomfortable. He said he felt so uncomfortable that he left the cafeteria. |
| George: | [crosstalk 02:22:19]. |
| Sam vitaro: | I'm asking you whether you recall being in the cafeteria with him? Do you recall that? |
| George: | I recall we are in the cafeteria together numerous times and numerous occasions. |
| Sam vitaro: | You don't remember anything like that? |
| George: | I don't remember him walking out, but I don't watch him. I don't watch what he does. |
| Sam vitaro: | Do you remember staring at him? |
| George: | No. I might've looked at him and probably got a uh, you know? |
| Sam vitaro: | And that wouldn't have been for 2 minutes? |
| George: | No, 2 minutes? No. Why would I stand there for 2 minutes and look at somebody? |
| Sam vitaro: | Okay, fine. |

| | |
|---|---|
| George: | This is a theme I see they're trying to do. I don't know what the staring is. I make eye contact with people and maybe they seem uncomfortable. Again, if that's the case before you write me up or accuse me of stuff can't you just tell me now that I know that my looking at you is uncomfortable I will correct my gaze and not look at anyone. |
| Sam vitaro: | That's often a very good argument about people needing to tell you. |
| George: | Just tell me. |
| Sam vitaro: | I agree with that. The extent that it plays out that ... |
| George: | Knowing what I know now, whether it's true or not or he's lying, if that's how he feels then I will make an effort to not ... I do have to look at him for a split second to recognize him, but after that I will do whatever I can to make him not feel uncomfortable. |
| Sam vitaro: | Number 6, this is an email from you to Holzner. It looks like, and correct me if I'm wrong, you're doing another little investigation based on something that you heard in a meeting. Why don't you take a look at it. You guys okay? |
| George: | Data request. I was requesting data for my suspension meeting. I just [inaudible 02:24:07] "please provide me with all documentation from any meetings that he attended related to me or anyone. Please provide me the list of people you were referring to when on May 28th you stated there's a whole list of people above me and below me that are involved in this with Lisa Anderson and was she ... |
| Sam vitaro: | Why don't you clarify what's meant by that statement, by the whole lot of people. Who was he referring to? |
| George: | That's what I was asking him. That's what I'm asking him. At my suspension meeting, what do you call it, a pre-suspension meeting. |
| Sam vitaro: | You're replying. |
| George: | My pre-suspension meeting - that Lisa was there. |
| Sam vitaro: | Lisa? |
| George: | Anderson. |
| Sam vitaro: | Who's Lisa Anderson? |
| George: | She's the girl that was here that I have complaints about. |
| Sam vitaro: | The union person? |

160817_004_combined                                             Page 73 of 145

| George: | The union representative. We have this meeting. We walk out of the meeting. We went outside right there by the trailer. Lisa and I were talking. She was in awe that what she just experienced was crazy, what they said. About that time Cmdr. Holzner came walking out. I said, "[inaudible 02:25:16]" I said, "Cmdr. Holzner just said that you reported me being over at 1101 watching this outbrief meeting. Why did you say that? What's going on? Why is that a concern? I don't get it."] "I wasn't there." I said, "You weren't there?" Lisa's like, "[inaudible 02:25:37] just said you're the one that said that I was there." He goes, "No, I wasn't even there." I said, "Okay, well I guess that's all I need to know." He goes, "Look. There's a whole lot of people above me and below me involved in this." I'm like, "Well that's awfully ..." |
|---|---|
| Sam vitaro: | You didn't know what he meant by that? |
| George: | I assume he means there's a whole lot of people in the chain of command, the chain of command up and down. There's a whole lot of people, a whole list of people, above me and below me involved in this. To me that's the vendetta, the vendetta of them coming after me. I'm like, "That's a little scary." I said, "Why are there so many people involved in little old me?" It's just continuous. It's just non-stop. He never said anything. He just said, "A lot of people." I asked him, I said, "Can you please give me a list of the people that you say are a whole lot of people above me and below me?" All I can think of is the captain bound to him and then from him down to Van Woudenberg. |
| Sam vitaro: | You want all documentation from any meetings you attended relating to me with anyone? |
| George: | Yeah. Kind of like a FOIA request. |
| Sam vitaro: | The union was representing you on this, right? |
| George: | Yeah. |
| Sam vitaro: | Wouldn't they typically make that request? |
| George: | She refused to participate. |
| Sam vitaro: | On what basis? Did she think that was kind of out of line maybe? |
| George: | No. My basis is because her sister works in HR and they all know this stuff. The union's like, "Do not provide him with that statement. Do not provide him with that evidence. That's going to be against the command." If Lisa Anderson provided me the statement, because Holzner in his deposition never said that, but we have other people that say he did say that. Now it's a he said-she said. Lisa Anderson, being the union rep that was right there, she would not want to release her notes to me. When she finally did she says, "I don't recall what was said. I talked to a lot of people and I don't recall exactly what was said." I just call it convenient amnesia. |

| | |
|---|---|
| Sam vitaro: | You truly think that there's a vendetta against you? |
| George: | If you don't see it it scares me that you don't. Yes, I do. [Laughter] |
| Sam vitaro: | I don't think it's a laughing matter. |
| George: | No. |
| Sam vitaro: | I'm asking you a question. |
| George: | I'm so out of this. It's either break down and go nuts. |
| Sam vitaro: | What's been done to you in terms of discipline? |
| George: | Suspension and then all of these investigations, letter of cautions, you know. |
| Sam vitaro: | You've gotten a letter of caution. You've gotten a letter of counseling. You've gotten a 2 day suspension. |
| George: | So far. |
| Sam vitaro: | In many years, right? |
| George: | I'm trying to keep my nose clean. This is the level they've got to reach to - to find something. Don't you get it? This is the minutiae. He was walking across the parking lot and he pulled his cellphone out, right him up. |
| Sam vitaro: | I don't get it as far as this administrative investigation is concerned. I've seen some stuff that's very worthwhile in terms of an investigating. I don't know how it plays out. I don't know if it plays out in your favor or in favor of the agency. I can understand the allegations from what has been alleged. I don't view this investigation as part of any vendetta. |
| | Let me show you this one, number 7. Excuse me. I thought you were looking at me. |
| George: | I'm sorry. |
| Sam vitaro: | That's okay. |
| George: | My eyes are dry. I was ... This is to, 2014? |
| Sam vitaro: | I don't typically go back that far. There are a couple ... |
| George: | Questioning about retirement, okay. I remember this. December 12, 2014. [inaudible 02:29:38] I probably assume. Basically what happened December 12, December 2014, I got a FOIA to see who's all retiring just to prove some of this stuff to my attorney. |

| | |
|---|---|
| Sam vitaro: | To prove what? |
| George: | To prove that this is the minutiae that they go to to try to write me up and build a case on me. |
| Sam vitaro: | You were trying to get information on when they would retire. You were asking them questions weren't you? |
| George: | Yeah. In December a lot of people had reported that they were retiring out of the blue. |
| sam vitaro: | What was your purpose in doing that? |
| George : | To ask them if they were going to retire. |
| sam vitaro: | For what reason? |
| George : | For Chris Murphy's reason was Chris Murphy is my patient zero. He's the one that started all this. He's trying to get rid of me. He's trying to fire me. Holzner wouldn't do it. Holzner needs a spinal insert. You know? You have all those statements from me. |
| sam vitaro: | I do, yeah. |
| George : | I know that. I know all these things. I know they're after me. I know they're gunning for me so I asked Murphy. In December everybody was saying they were retiring in January almost. There's a huge amount of people that are suddenly retiring. I'm like, "Okay. Hey Murphy." |
| sam vitaro: | You were hoping that he's going to retire. |
| George : | Yeah. I'm like, "Hey Murphy. Are you going to retire next year with all these other guys?" He says, "No. I got like four or five years, six years or something left." I go, "Okay." |
| sam vitaro: | It wasn't just Murphy. |
| George : | No. I asked Van Woudenberg too. |
| sam vitaro: | Wasn't there even someone else? |
| George : | There were a lot of people, yeah. In that other trailer, there was a whole ... The other trailer- |
| sam vitaro: | No, no, no. A lot of people you were asking about when they were going to retire. |

George :              Yeah, because there were so many people retiring I'm like, "I'm going to be the only
                      one left standing here?"

sam vitaro:           You were asking about Chris Murphy because you were hoping that he was going to
                      retire.

George :              Yeah, I was kind of hoping because he-

sam vitaro:           Who else were you hoping was going to retire?

George :              Nobody else. I was just curious because so many people.

sam vitaro:           So for Brian?

George :              Brian just got there so I thought if he was going to retire already why they put it in
                      there. It was just kind of a curiosity thing.

sam vitaro:           But, you believe that Brian was part of the vendetta. Don't you?

George :              Now I do. Early on I think he was ... Because he just got there. I don't know. I have to
                      look at the dates and times to see when it looked like and through some depositions
                      that I may be able to give you. Mr. Van Woudenberg admitted to a lot of things that
                      back up my vendetta claims. I'll see if I can give those to you from my attorney when
                      he gets back. Basically it says here Van Woudenberg's writing [inaudible 02:32:03],
                      who is my third level supervisor, that Chris shared this discussion [inaudible
                      02:32:08] with me. I was sitting at his desk. I dropped in and asked if he was eligible
                      to retire. I answered no and he left. Done.

                      As I understand it, I asked Chris Murphy the same thing, "Hey Chris. Are you going to
                      be able to retire? Are you retiring with all these guys?" He was, "Nah. I've got six or
                      seven years." I said, "Oh, okay" and I left. Now he added, or somebody added here,
                      that Chris went back to my cubicle and asked me what I meant by it - I guess like
                      what you're asking me. That's when George told him he planned to sue him. Chris
                      would have to provide his exact statement.

sam vitaro:           I think this one actually may be a statement that's helpful.

George :              He said, "Oh, yeah. I remember these emails. I've seen them in my discovery. That's
                      when George was leaving.

sam vitaro:           What's the date of that one? I'm sorry.

George :              December 15th.

sam vitaro:           That's a email, the one that's at the top there that's a December-

George :              December 15th.

sam vitaro:      Fifteen and it's an email from Chris Murphy?

George :         From Murphy to Van Woudenberg yeah.

sam vitaro:      What does Murphy say in terms of the situation?

George :         He says on Friday by 11:00 George came into my office, It's a little bit different from what Van Woudenberg says, but George came into my office and asked when I was retiring. I told him seven or eight years, all this is kind of close from memory. He asked me when I was going to retire, I said seven or eight years and then he left. That's it. I then asked him why he wanted to know when I was retiring. He says he asked me that when we were walking out of the building and Van Woudenberg says he asked me that when he came in my cubicle. Well see, in my cubicle there would be witnesses. Outside the building there wouldn't be witnesses so he probably changed his story. My belief, my belief only. Pretty much, he said he was going to sue me and it would be best if he retired and I'm not the only person on the lawsuit. Then he says, "Now, I believe this is threatening and intimidation and I have lost sleep over this and it's always on the back of my mind."

sam vitaro:      Let me just ask you though whether that's an accurate portrayal of what you said to him.

George :         No. All I said was, "Are you retiring with everybody else?"

sam vitaro:      You didn't say anything about suing him?

George :         No.

sam vitaro:      You didn't say anything about it would be best if he retired?

George :         No.

sam vitaro:      You didn't say anything about that you're the only person on the lawsuit?

George :         No. I didn't tell him about my lawsuit. I'm not sure what that means, but I didn't talk about a lawsuit. It's as simple as that. A whole lot of people were retiring and when I saw this I FOIAed to see how many people were retiring. There's a whole bunch of people retiring.

sam vitaro:      I'm missing the point of how many people are retiring because you've acknowledged that there were some people who were retiring that you weren't-

George :         [crosstalk 02:35:04]

sam vitaro:      No. I'm interested in why you were asking the question and if you feel-

160817_004_combined                                          Page 78 of 145

George :        Well, for Murphy it was just because I was kind of like-

sam vitaro:     It sounds like you were asking Murphy the question because you were hoping that he would retire.

George          I was kind of hoping that he'd be gone in January, yeah.

Sam Vitaro      It sounds like you're asking Brian for the same reason.

George :        No. It just so happened that Brian was office ... His office is right there. As I was going right by I just kind of what did that, "And you?" He goes, "What?" I said, "Are you going to be retiring too? You just got here. Are you going to be retiring," because I wanted to know if there's going to be a new boss. There's a little bit of the thought process in there but it's way back from whenever. I was trying to get a quality step increase from one boss and then a new boss came in, like [Dave Harriet 02:35:46] and then I asked him for a quality step increase. He denied it but then he moved. He said, "You can't ask me. You've got to ask your new boss." I'm like, "Every time I get a new boss, I got to start my clock over again for a quality step increase."

                I went through Vern Turner then Dave Herriott, then Brian Van Woudenberg. You just got here. I'm trying to build this thing for a QSI. Are you going to be retiring too? I got to start with another new boss? Ironically, Ross Lund. I got a whole new boss. So I see four new bosses. Each one of them resets the clock for my QSI performance evaluation. It's like chasing a moving target. I'm like, "Come on guys! Somebody stay long enough to get me an evaluation that I can then have a rapport with and try to get a quality step increase.

                He just got there and it just so happens that their offices are like four feet apart. You just take two steps and you're there. When I walked by I just kind of popped my head in there and said, "What about you? Are you going to be retiring?" He goes, "No, I can't retire. I'm going  forever," jokingly about it. Jokingly. I go, "Okay." I'm just like, well, he just got there so please don't retire. We heard good things about him actually. He really has some good, heard good things about how he might change things around.

sam vitaro:     Brian?

George :        Brian, yeah. I do feel bad for him because he got kind of tied up into the recommendations that HR directed him and led him down a path.

sam vitaro:     You don't think he's part of the vendetta?

George :        I think he's a puppet, is the best description. I think he's doing what he has to do, just like anybody, like Garrett and Aune and everybody else. They're doing what they have to do and not get a target on their back. I think he doesn't like it and that's maybe why he went to another job. I don't know. He left. He went to another job. He didn't like - my opinion - he didn't like doing what he had to do. During the

|  | depositions, we kind of got that out of him that he moved on because he didn't like being HRs puppet which backs up the vendetta thing. |
|---|---|
| sam vitaro: | I'm going to show you this email. It's an email from Keith Moss. You and Keith have had some issues. He's another co-worker. |
| George : | No. Not until I wrote up his- |
| sam vitaro: | But you had some issues. Is it accurate for me to say right now you've had some issues? |
| George : | Only after I charged [Dave Herriott, his friend, with assault. |
| sam vitaro: | You've had some issues, the two of you? |
| George : | Only after- |
| sam vitaro: | Fine. |
| George : | It was a very, very, very, very good working relationship before then. |
| sam vitaro: | Okay, but this is another co-worker that you're crosswise with- |
| George : | He's not a co-worker. |
| sam vitaro: | He's not in your organization. |
| George : | Yeah, he's not a co-worker. |
| sam vitaro: | He works on this base. He works in a different- |
| George : | [Laughter] If you want to be … If he works for NAVFAC we're all co-workers, yes. |
| sam vitaro: | He works in the trailer next to you, doesn't he? |
| George : | Yeah, but that's … He's not … We're not co-workers. |
| sam vitaro: | We just have a difference of opinion. |
| George : | We don't interact at all, very, very rarely. |
| sam vitaro: | He's not in your organization. He's in a different organization. |
| George : | Yes. We don't interact. It's very rarely that we interact at all. He used to be in our trailer. |
| sam vitaro: | Yeah, you've interacted a couple times because you filed an EEO complaint against |

160817_004_combined

Page 80 of 145

|  | him, haven't you? |
|---|---|
| George : | Because he said stuff that didn't happen. |
| sam vitaro: | I see. Well, let me show you this. This is more recent. I don't know if this is the subject of a complaint or not, but this occurred ... I'm not going to ask you about the two day suspension stuff. There's some things in there that have to do with him. |
| George : | Yeah, I think so, maybe. |
| sam vitaro: | Yeah. Two things. Two of these items. |
| George : | Two of his accusations. |
| sam vitaro: | That went back pretty far. Was that September 2015? |
| George : | I don't recall. |
| sam vitaro: | That's when it was. That's when the notice was. The incidents themselves occurred even before then. |
| George : | Yeah. My attorney was kind of curious as why did this alleged incident occur like eight months before he complained about it and he only complained about it the day after I charged Dave Herriott with assault, and they're good buddies. |
| sam vitaro: | I'm not so sure. I'll take a look at that. |
| George : | That's just from the timelines. |
| sam vitaro: | Okay. I'll take a look at that just from the timeline. |
| George : | The day after, twenty four hours after I charged his buddy with shoulder checking me, all this stuff came out about him asking me something in the parking lot again. |
| sam vitaro: | Not as to the two day suspension. The two day suspension was far before the shoulder checking, right? |
| George: | No, the ... |
| Sam vitaro: | The shoulder checking was when? |
| George: | I have to go back and look. |
| Sam vitaro: | What was the date? |
| George: | July-ish something. |

| | |
|---|---|
| Sam vitaro: | July of 2015? |
| George: | I think so, yeah, I'm not sure. |
| Sam vitaro: | Okay. |
| George: | Basically [inaudible], you're going to go there I guess, right, he asked me something about a coworker. |
| Sam vitaro: | No actually, I wasn't intending to go there. |
| George: | Okay, all right, well go ahead. |
| Sam vitaro: | As I said to you, as to the two-day suspension, as far as I'm concerned, those issues are dead. |
| George: | Yeah. |
| Sam vitaro: | Okay? You can't be penalized for those. You've been penalized for those. So I'm not ... unless you want to raise them, I'm not spending my investigation time on those. |
| George: | You probably should know that they falsified those documents. |
| Sam vitaro: | I've read everything, I know the argument, I know the Stone versus FDIC due process argument. I know it. |
| George: | Yeah. |
| Sam vitaro: | I know it cold. |
| George: | No, but I'm saying you did because they act like they didn't know anything about it until just recently and it's been a long time that I told them ... because Monie actually when he was doing it, I said, "You sure you want to write this up? This ..." He said, "I have to." |
| Sam vitaro: | It's very clear that you were making your position known very, either soon after or during that whole process. |
| George: | Yeah. |
| Sam vitaro: | There's no question as to that. So, just take a look at this [crosstalk 02:41:18], because this is a different one. |
| | You guys okay? |
| Stan: | It's fine once we get through this issue. |

| | |
|---|---|
| Sam vitaro: | Okay. |
| Stan: | That's fine. |
| Sam vitaro: | Okay, we'll take a break then. |
| Stan: | Thank you. |
| Sam vitaro: | Yeah. |
| George: | Yeah, I've never seen this one actually. Okay, this is when he gave me the finger and now he's saying basically he didn't. |
| Sam vitaro: | Okay. This is one where you claim that he gave you the finger, I think you may have even filed an EEO complaint as to that? Did you? |
| George: | I'd have to look back. |
| Sam vitaro: | Okay. |
| George: | To see if I ... This was pretty recent? |
| Sam vitaro: | This is his version. |
| George: | I think all I did was just inform Ross Lund that he just gave me the finger and may be, just like I always tell people, if you don't appreciate something, you tell me right? That I don't appreciate that. |
| Sam vitaro: | I'm not sure, but I think you may have filed an EEO complaint ... |
| George: | Yeah, I'll have to look and see. |
| Sam vitaro: | ... involving him. Yeah. |
| George: | I mean, he might be involved even because of the Dave Herriott for a couple of the [inaudible 02:42:27] lies. He got me suspended, but I'll have to look and see on this one if it was also filed because initially I was just documenting it, saying "Let's not be like junior high here." |
| Sam vitaro: | Your view on this one is that that didn't happen that way. |
| George: | Let me just read it real quick, I know this is what I said, basically that he'd give me the finger when he was going out the door. Followed him up, he opened the door, turned left down the stairs, briefly ... yeah, he held the door open for a few seconds ... of course the door was closing after he did it, but I did not turn, make eye contact ... |

| | |
|---|---|
| Sam vitaro: | Yeah, when you say this, speak up. |
| George: | Oh, I'm sorry. |
| Sam vitaro: | I just want the ... |
| George: | I'm just reading kind of reading through. I mean you can ... |
| Sam vitaro: | Read it ... read it ... |
| George: | I'm just reading ... |
| Sam vitaro: | Read it to yourself. |
| George: | I'm reading this and I'm just looking at ... Go ahead, yeah so, that's kind of what happened except he's leaving out giving me the finger. |
| Sam vitaro: | Okay. |
| George: | Yeah. |
| Sam vitaro: | So ... |
| George: | Pretty close except I say he gave me the finger on the way out as a little wave, hanging around the door kind of, I'm like ... |
| Sam vitaro: | Okay. I think I even have a statement from you that's why I think there might be an EEO complaint. |
| George: | Could be but there's an email that I wrote to Ross saying ... |
| Sam vitaro: | As to this? |
| George: | ... Keith just gave me the finger just so you know. |
| Sam vitaro: | That may be what I'm thinking of. |
| George: | Yeah. And so ... |
| | Then he came and asked me what happened and I go and so I told him what happened. I said, "Let's just stop." I just got back from my motorcycle accident. I had another job with GSA that got rescinded because of some other stuff that I'm claiming, because they don't want to let me out of this place. I'm trying to find new work, they won't let me. I'm trying to get reassigned, they won't reassign me anywhere. They won't let me go, they're blocking everything, they blackballed me. At this certain point, if I want to get a job somewhere else and they call up, you got to help me. If you want to get rid of me, you got to help me. Why are you so adamant |

160817_004_combined

|              | to not let me go anywhere? |
|--------------|----------------------------|
| Sam Vitaro   | I have no information they want to get rid of you. If I had to char- |
| George       | All the statements? |
| Sam vitaro   | If I had to characterize what they want, and I don't know if it's justified or not, they want you to change your behavior. That's all. Again, I don't know whether it's justified, and that's one of the reasons that I'm doing this administrative investigation. |
| George       | If it's that easy, if it's seriously that easy, want me to change my behavior, why is my behavior this way? You got to go back to the why am I doing these things? Why am I looking for stuff? Why am I asking people questions? Why am I going to be afraid to pull my cell phone out now? Why, why, why? |
| Sam vitaro   | The why works partly, but it doesn't work for example, with the new supervisor like Lund. He comes in in May and you're also the ... |
| George       | I already got two counseling sessions from him already. |
| Sam Vitaro   | Well, maybe you deserved them, I don't know. |
| George       | [Laughter] Yeah, I know. |
| Sam vitaro   | Maybe you do, I mean, I don't know. I don't think he's even brought those to my attention when I interviewed him. What were they involving, if you want to tell me. |
| George       | Yeah, we had some school, a class here. |
| Sam vitaro   | Okay. |
| Sam vitaro:  | You remember that? |
| George:      | I do. I do know that one, but he didn't do anything to you. All he did, it was a, I think, a time issue, wasn't it? |
| George       | He was wondering why I didn't come back after the class, I said, "Because the class was over at 3:30 and I'm leaving here at 4." |
| Sam vitaro   | I think it was the class was over at 2. |
| George       | No. No. He says it was, but it wasn't. |
| Sam vitaro   | I see. |

| | |
|---|---|
| George | Because we stopped and talked to the instructor and then there's also, if you want to get nitpicky, right? There's also the four hours I spent at home doing homework, off the clock. |
| Sam vitaro | People don't get credit for that typically? |
| George | Yeah, but if I don't do the homework for class, then it's a ... |
| Sam vitaro | He I think, was keyed into this by someone who was in the class right, who had returned and had returned to the work sight as I recall. |
| George | Yeah, yeah. |
| Sam vitaro | I'm just reading paper. |
| George | Yeah, no that's right. Somebody else decided to go back, but there's ... |
| Sam vitaro | But they were back at 2 o'clock as I understand. |
| George | They may have left early from whatever they were doing. |
| Sam Vitaro | I see. |
| George | I was in the class with the instructor, talking about stuff and doing some of the ... |
| Sam Vitaro | He didn't penalize you in any way, did he? |
| George | No, but it's just part of the super, uber surveillance and monitoring, telling me that he's watching my motorcycle, where I park, where I go, what I do. I'm like, "Really, who's directing you to do this?" He's got big book on me, he's already got a book that's full of stuff. Its just part of it. I'm afraid they're doing the same thing they did ... He's a new supervisor, he doesn't know much about things, just like Brian Van Woudenberg, then they don't know to go to Meranda Jackson at HR and she has no experience, no training hardly. She came from a title company. No HR background, and she tells them what to do. They just follow along. They get in trouble because they're breaking all kind of laws and stuff.

If they really want a change in me, stop doing this. Stop writing me up for crossing a crosswalk and holding my cell phone up. Stop telling me that when somebody's walking, I'm staring at them. |
| Sam Vitaro | Do you think you have any role in this and that may be it goes both ways? That they should stop doing some stuff and may be you should change some of your behaviors? |
| George: | How could I change? I walk up to a urinal and some guy's going to badger me and try to get me to confront him. I'm checking my cell phone on the road. I'm walking back |

with a coworker in a parking lot.

| | |
|---|---|
| Sam Vitaro | Okay. |
| George | These are all the thing ... I'm laughing or something, these are all the things I'm getting written up for. How do you change that without putting a bag over your head and not coming to work? How do you not interact with anybody? |
| Sam Vitaro | Okay, that was my little attempt to try to resolve this. |
| George | If they stop attacking me, I'll stop defending myself. |
| Sam vitaro | Okay. |
| George | How's that? |
| Sam vitaro | Okay. This is probably a good time for a break, right Stan? |
| Stan: | Great. |
| Sam vitaro: | We just took a short break. During the break, George gave me several documents having to do with commendations and awards that he's gotten. I wanted to receive these. I asked George for any others that he has, to include your performance appraisals. |
| George: | They're in there. The performance appraisals are in there, they're print out. |
| Sam vitaro: | Oh, okay. |
| George: | The awards are in there. |
| Sam vitaro: | I see. |
| George: | There's another one, that's the A pass. |
| Sam vitaro: | I see, okay, thank you. Okay, good. |
| | This is number nine in the corner there. Why don't you take a look at this one. |
| George: | Yeah. |
| Sam vitaro: | Again, that's dated when? |
| George: | November 10, 2015. |
| Sam vitaro: | You sent that to? |

| George: | To Keith Moss I said, "This is to officially inform you I've filed this [inaudible 02:49:28] reprisal action complaint against you for your role and participation in my clearly fraudulent suspension." |
|---|---|
| Sam vitaro: | Tell me why you're sending that to him. |
| George: | By direction of my attorney. |
| Sam vitaro: | Did ... I don't want to ask you about your attorney. |
| George: | The thing was ... |
| Sam vitaro: | You don't have to tell me. |
| George: | No, it's not attorney-client. The thing was the DOD/IG said, "You need to," and I cleared this with the attorney, "If you're going to do whistleblower stuff, the first they're going to do or say, it's not retaliation for whistleblowing, if they're goin to say we didn't know you whistleblew on us. If we don't know you whistleblew we can't retaliate against you. The thing was to let people know that you are coming out, you're standing on your soapbox like, "you fraudulently said I did things which led to my suspension." |
| Sam vitaro | It doesn't apply retroactively and tell your attorney this . . |
| George | No, no. |
| Sam vitaro | . . . except if you notify them, it's not going to apply to those things that were used in your two-day suspension. [crosstalk 02:50:33] |
| George | Right, for future things, just like now when he says that he didn't give me the finger when he did. That's all that was, just on the advice of my attorney to ensure to make sure that anybody that you have a claim, let them know about your EEO activity. You let them know about your whistle blowing activity because if they don't the first thing they're going to say is, "I couldn't have reprised against them because I didn't know I was on their list." You make sure that they know that you're on the list. That's all. |
| Sam vitaro | Is it the same for this one? It looks like that may have been the same rationale. |
| George | Yeah, Holzner, yeah. |
| Sam vitaro | What's the date on that one? |
| George | November 10th. Same date, right? |
| Sam Vitaro | Same date, and you're advising him to that you filed a whistle blower. |
| George | Yeah, whistle blower reprisal action against them, yeah. |

| Sam Vitaro | Okay. Were there any others of these that you sent to people? |
|---|---|
| George | If you don't have them, maybe not, because I'm sure they're going to give them to you, but I don't know. I just follow my ... |
| Sam vitaro | Actually, they didn't give these to me in the sense that they specifically gave them to me. I just pulled these out of the sheaf of documents that I had. |
| George | All right, well, probably it could've been ... I think it was people that are already aware and the people that are aware, that I have EEO complaints and whistle blower complaints, but anybody that was new, like Holzner was new to the complaints. He was informed. Keith Moss made what I call, he lied about an interaction. Then that became notification to him that I was going to file complaints against him. |
| Sam Vitaro | Okay. Let me show you number 11. This has to do with Kristin Hansen. Who is she? |
| George | I don't know who she is now, but she listed herself as the reasonable accommodations coordinator. |
| Sam Vitaro | This is a set of emails in the time period of late January, beginning of February. |
| George | Yeah, that was when I was recovering from my accident. |
| Sam Vitaro | Yeah, yeah. I think you were dealing with her in relation to that. |
| George | For reasonable accommodation, yeah. |
| Sam vitaro | Yeah. The top email is an email from her to Brian/Chuck. Who's Chuck? |
| George | Chuck Monie, Charlie Monie. |
| Sam vitaro | While I understand this is "normal" for Mr. Karl, his tone is unacceptable to me and I take his email to below, it's a typo, as threatening. I will not be spoken to either verbally or in writing in that manner. Why don't you take a look at this? |
| George | Can I see what I said? |
| Sam Vitaro | Yes. |
| George | Nobody told me about it though. Let's see. How far back does this go for? I'm following the thread to see what ... |
| Sam Vitaro | I think there's something in an email ... |
| George | Please complete sections one and two ... |

| | |
|---|---|
| Sam vitaro | Were you pretty demanding of her. |
| George | Of attached. I sent, please return the documents which you received ... |
| Sam vitaro | Why don't you read it to yourself? |
| George | I'm sorry. It's just a habit. I'm sorry. |
| Sam vitaro | I'm afraid that we have these ... |
| George | Can she or you show me which one she says is ... |
| Sam vitaro | Let's use the reasonable person test, okay? I'll try to pull out something. It looks like it has to do with a date that she set for you. You say it cannot be determined by simply setting a random future date. You explain what the doctors anticipate in terms of recovery. Nothing certainly wrong with that. Is already known I will not be returning to when I do return to a work status. |
| George | Yeah, I was going to have that GSA job, I thought. |
| Sam Vitaro | Okay. I have accepted a job away. [crosstalk 02:54:23] That's the reference. From the toxic, hostile and retaliatory environment NAVFAC Northwest has been, I am in the process of various lawsuits and working with several members of Congress to hold NAVFAC Northwest accountable for their actions along with other actions I cannot discuss but will come out shortly. I also have people investigating a recent link found to my accident and it could produce INCREDIBLY SERIOUS charges against three key people at NAVFAC Northwest. The third paragraph has to do with what you intend to do on Telework to avoid burning through leave and advance sick leave. |
| | You say a couple other things that don't seem to be a problem. Then you say, "Any actions taken against me or denied me that are even the slightest violation of law shall be," typo, you say, "meet with the most aggressive legal actions possible. NAVFAC Northwest ignorance of the law or misrepresentation of the law shall not be a defense. I am long, long done with the games, reprisal, harassment, hostile work environment, disparate treatment and egos at NAVFAC Northwest. Those responsible will be held accountable to the fullest extent of the law." |
| | If I'm reading this, and I'm trying to deal with the reasonable accommodation issue and setting a date, I'm saying to myself, "What the heck did I deserve? Why the heck do I deserve something like this?" |
| George | You've got to know the back history of all that though, all the delays and everything going on. |
| Sam Vitaro | It's to her. |
| George | Yeah, but I mean, she's causing delays and doing stuff and she's playing ... I've got an |

|  | active case with that too, but that's how it is. Of course, I was recovering and was probably on some pretty good drugs at the time too, but I was very emotionally down. The wife, we had a lot of ... It was an automobile accident where I was just about killed. |
|---|---|
| Sam vitaro | Sounds serious. |
| George | Then we're trying to get stuff. |
| Sam vitaro | Okay, okay. Do you understand how she might think this is more than she bargained for? |
| George | Not if she does her job, no. I mean, it was just basically frustration with - do your job, quite delaying. |
| Sam Vitaro | In effect, you're telling her, "You're screwing up." |
| George | Mm-hmm (affirmative) |
| Sam Vitaro | Okay. |
| George | She has no training. I mean, come to find out, once I did all this, she has no training. |
| Sam vitaro | Did you make a complaint against her? Yes? |
| George | Yes. |
| Sam vitaro | Is she part of any ... |
| George | Oh, yeah. I'm sorry, yes. |
| Sam vitaro | Is she part of an EEO complaint? |
| George | Yes. |
| Sam vitaro | Okay. I don't need to know what the basis is. |
| George | It was just the same thing, reasonable accommodation and delays and harassment. |
| Sam vitaro | It's a disability claim as well as, I guess, reprisal? |
| George | A delay, yeah. The reprisal and delay, yeah. |
| Sam vitaro | So. This is an email that you sent to Brian, or as you say, BVW? |
| George | Yeah. |
| Sam vitaro | It's a response to his not approving your request to attend CTC337? Is that training? |

| | |
|---|---|
| George | Yeah. Probably school. I'll have to see. |
| Sam vitaro | You then, in this one, launch into all this stuff about harassment and reprisal. I guess, as I read this, my question is, isn't this a little overkill for this denial of your training? That's what I'd like you to talk about and explain. |
| George | If it's just ... |
| Sam vitaro | Why don't you take a look at it? |
| George | I know what you're talking about. |
| Sam vitaro | It's a December 2, 2015 email. |
| George | No, I know what you're talking about. It's just, he's been, and I said, I'd been trying to get another job and did all this stuff, gross mismanagement. You can read all this. It's just building up the frustration of years and years of doing stuff and it's just another one of those schools, I guess, I was trying to get to pad my resume to go somewhere else and they won't let me go, you know? No, it's just frustration from yet another ... I mean, if nothing was going on at all, ever, I'd been denied schools before, but then there's been no malicious intent behind it or anything, but after years of doing stunts like this, I mean, it wears on you to where what's your rationale kind of thing. I think with the history that I'd been putting up with and examples like we've seen here today of being charged for walking across a parking lot and looking at somebody ... |
| Sam Vitaro | I'm just asking you about them. |
| George | Yeah, it's just frustration. |
| Sam Vitaro | Okay. Okay. Here's one, August 16, 2016, yeah. This involves a Mr. Richard Rake. Do you know who he is? |
| George | Not really. I mean, he was somebody that, I think, had some information on the helmet camera? |
| Sam vitaro | Yeah, just as background, you were stopped coming though the gate for your helmet camera. I think that was quite a ways back, wasn't it? |
| | 2014, late 2014? |
| George | August 2014, I was arrested. Arrested and charged with ... |
| Sam Vitaro | They had told you previously you can't come through, right? |
| George | No they said, "We don't think you can have a helmet camera on base." I said, "Well what do you think?" If you want to get into that a little bit real quick. |

| Sam Vitaro | Sure. |
|---|---|

**George** The only reason I even questioned it was because I said, "I'm an engineering tech and I know the rules on base and cameras are allowed," but it's allowed, you know so when they said that it threw me off because I said, "What, I've been coming through this gate for years."

**Sam vitaro** Well it's not the, excuse me for interrupting but it's not just an issue of on base. It's an issue of the entry points.

**George** See that wasn't ever said anything about it. There's nothing in the instruction that says except there, right? That's why the guy says, "I don't think you can come through," I don't think, you know? He asked this other guy, Harris, who has got the gold stripes on, must be like a Sergeant or something and he goes, "No, they don't have that promulgated yet, it's not out yet, just let him go." I said, "Okay," because I've coming through for years with this camera and we actually talked about it, we joked about it. What do you like about this one better than the Go Pro? We ended up talking a little bit. The gate guards, you know?

What happened was I explained it, I said, "Well look, I'm not trying to be difficult, I'm just asking because I'm an engineering tech and we have trucks, 18 wheelers, come on base all the time with dashboard cameras and GPS and all kinds of stuff," because the insurance companies record their trucks and they document all their stuff. I said, "If there's going to be a problem with that," I mean because if school buses come on, Kitsap transit comes on with cameras on, you know the taxis have cameras, "If that's the case, we need to put this out because there is going to be a lot of changes if you can't come on with a camera anymore because I've got trucks and taxis and people coming and going so I need to know, what changed?"

They go, "Oh, nothing has changed, we're just working through some stuff." I said, "Okay." That went on then they basically said the same thing, well we think there's a secret, there's a secret law that says you can't record at the Entry Control Points. I'm like, "Well, it's a secret law, how do you ...?" Put a sign up, there's no signs that said no cameras, right? I mean they put some now, right but there's no signs that said no cameras or anything so there's nothing to alert anyone about anything and people come and go all the time, with cameras, you know? I said, "If it's a secret order, then you probably should, if you can't tell anybody, put it up."

Well they kept claiming it was a secret order so I made a freedom of information request on this order and it came back with some Op-Ord number or whatever, you know?

**Sam Vitaro** It is indeed, it is secret, I think.

**George** It's a secret but they sanitized it so I could see it, right? That order deals with commercial photography, like Google Earth, you know? Do not let Google Earth cars come on base, driving on base and stuff, you know? That's how we ended up beating the whole ticket and everything too. The attorney is like, "No, you have no ..." The criminal

160817_004_combined

Page 93 of 145

| | |
|---|---|
| | charges, you know, "You have no order saying not to, you actually have an instruction that says you can and the Op-Ord that you're talking about is dealing with commercial photography with the Google Earth Street View vehicle." No, you probably don't want that on base but it's commercial photography not just trucks and people in the cars and school buses and taxis. They dismissed it all and they said, "Okay, yeah fine." |
| Sam Vitaro | The day that this all happened, putting aside what happened previously, they say you refused to remove the camera from you helmet and that's why you were detained or arrested. Is that true? |
| George | No, no I asked them, "Do I have to take it off when I come thought the gate?" That's what I do now and they said, "You have to have it off." I said, "It is off." "How do we know it's off?" You know? I said, "Well it's ..." These are the same gate guards, you guys might know but these are the same gate guards that, on my verbal word, they will allow me in the production area in SWIFPAC, Do you have any guns, knives, flammable materials, cameras, recording devices? No, enter and along that same line, it gets me to the production area, I can go down into the main limited area where the nukes are stored and my verbal, my verbal command, do you have any contraband, this that and the other thing? No, I get access to the main limited area. So, you can pretty much trust me when I tell you, because these are the same guards, they know, if I tell you it's off, it's off, it's no recording. |
| Sam Vitaro | Apparently you wouldn't demonstrate to them that it was off. |
| George | Yeah. |
| Sam vitaro | Do you know the concept of obey now, grieve later. |
| George | Yeah, we did. |
| Sam Vitaro | You obeyed? You said, "Here, it's off." |
| George | I said it's off and I did like this. I said it's off, I can pull it off, I pulled it off, I said it's off. I said this, the Go Pro doesn't have it but this one has a screen on it so you can see it. |
| Sam Vitaro | You're pointing it to ... ? |
| George | Pointing the camera, I just happened to bring. It has a screen on it. I said, "You can play it and see it and do stuff," right? Actually I played it back to show them when I'm coming in, when I'm coming in I turn it off, the recording, I turn it off about where the blue line is, [inaudible 03:05:23] somewhere around there, not exactly but depending on the traffic. They said, "Okay, cool, just have it off at the gate." I'm like, "Okay," but then they must have talked about it or something, right? Then they went back and forth with it and they said, "No, you've got to have it off your helmet." I'm like, "Okay but you just said off, it's off." |
| Sam Vitaro | Why didn't you just take it off your helmet? |

| | |
|---|---|
| George | Well it's because it's a pain in the butt with gloves, to try and get it off your helmet. |
| Sam vitaro | Why didn't you take it off your helmet rather then get detained? |
| George | Oh no, they detained me but I didn't have a chance to take off the helmet. When I came with it, the last time they came on, when I came on the next day, they said, "We have a memo to arrest you?" I said, "Why?" They said, "For your helmet camera." Ironically, there was a guy in camo who was right in front of me on his crotch rocket with a helmet camera. The Go Pro, looks like a Teletubby. I'm like, "What about him?" We got a memo to arrest you. I said, "Okay, fine." That's a whole other story. |
| Sam Vitaro | Are you saying, just to clarify … |
| George | This guy. |
| Sam Vitaro | Are you saying you obeyed what they wanted you to do? |
| George | Yeah, yeah. |
| Sam vitaro | Okay, okay good. |
| George | We actually met at the cop shop, at the police department, we actually met at the police department, we talked about stuff and doing this and all that. That's where they told me about the Op-Ord. I think we've got an op-ord that's not going to allow you to do that and I said, "Well can I see it?" They go, "Well, we probably can't." I said, "Well, I've got secret clearance and I've got a need to know, can you at least just show me the page?" They said, "Well FOIA it." I FOIAed it and it took a while to FOIA it but in the mean time they have the camera, they kept it so in the mean time I just let it go. |
| Sam vitaro | They detained you even though you did everything they wanted you to do? |
| George | Well they had a memo to arrest me, is what it was. I sat there for 3 and a half hours or so on the side of the road, waiting. |
| Sam vitaro | A memo to arrest you based on previous stuff, I guess? |
| George | Yeah, probably, based on, my attorney's opinion was it was an ego thing. There is no law because otherwise I would have a ticket, right? I would be in jail. There is no law that says you can't, there is a law that says you can. There is nothing that does anything about the gate, the Op-Ord doesn't talk about this, it talks about commercial photography like Google Earth or people taking pictures for sale, you can't sell pictures, you know? We went through all that, you know? We got an email that says, "Yeah, it's clearly an ego thing. Yeah they can fight about it over court." It was their version of it's my ball and bat and we're going to beat you down until you do what we say. What the law says, we're going to beat you down, right? |

| | |
|---|---|
| Sam Vitaro | You're observing it, now. You don't go through with it on your helmet? |
| George | No, just like I was doing before, I take it but now we have a new definition of off. I have it off, was have it off but now it's physically removed from the helmet and I just stick it in my pocket and then when I go through the gate, I put it back on and go through. |
| Sam Vitaro | Okay so this one. |
| George | This guy, it looks like he has a ... |
| Sam vitaro | I think it has to do with your request for information. |
| George | Yeah the DOD. |
| Sam vitaro | I think he's basically saying you misrepresented his position. |
| George | Whose position? |
| Sam Vitaro | Rick Rake's. |
| George | His position? I request, it is this part. Yeah I told him, I never told him anything about his helmet camera. |
| Sam Vitaro | I think that relates to ... |
| George | I just said, "I request reports or statements that Rake, this is like [inaudible 03:08:48] "I request reports or statements that Richard Rake says exist in relation to being stop for my helmet camera at that time frame." |
| Sam vitaro | What he's saying is that, as I understand it ... |
| George | Well he said that, he said that when I was with Ed McElvoy and they were doing the, Ed McElvoy investigation, Richard Rake was talking about that and his, the DD or whatever, the information he had on the helmet camera, you know? I think Richard Rake was the security guy. |
| Sam vitaro | Yes. |
| George | He had some information and so I said, "Well, what have you got, what do you know?" He said, "Oh I can't give you the information." I said, "Okay, I'll FOIA it," because that's how the game is played, right? You FOIA it. |
| Sam Vitaro | You, in a sense, disagree with what he is saying, right? |
| George | Well he's saying I never told him anything about his camera and he said he had information about the stop so I just asked to get the information. That's it. |

160817_004_combined

Page 96 of 145

| Sam vitaro | I think he's quarreling with your request. |
|---|---|
| George | They sent back something like, the FOIA request came back with, basically, we've searched for this and we don't have any documents [inaudible 03:09:57] but that's all I ever heard about it. |
| Sam vitaro | I think he's disagreeing with "request the report from you" – Request of Reports and statements that Richard Rake says exist in relation to me being stopped for my camera helmet. He's saying, I think that he didn't say . . . [inaudible] I never told him anything about his camera helmet. |
| George | At the meeting of course it was just that short. [inaudible 03:10:22] I can't give it to you. Well I'll FOIA it and he said [inaudible 03:10:32] I FOIAed it and Vancleave said  there were no responsive documents.  That's just a FOIA request. I wasn't making accusations. It's just the way I worded it. I didn't, Richard Rake says this exists so I better get it. I just said just the way I typed it. Richard Rake says this exists. I'd like to get it. If it doesn't exist, apparently it didn't, if it did they didn't give it to me. That's it. |
| | That's another example of the, I'm just asking for a FOIA request. Why is this blown into this big giant part of a investigation to … |
| Sam vitaro: | This is, I'm just looking to see if you have a response in here. Doesn't look like, so it's number 14. I'm marking these things. It concerns that restroom situation I think. |
| George: | Holzner? |
| Sam vitaro: | Yeah [inaudible 03:11:37]. |
| George: | This is the email I just talked about that I was standing there at the urinal and Holzner walked in and I looked over. It's habit. Somebody walks in to stand by the urinal you just kind of do a cursory glance at them. I just went, "Yo." |
| Sam vitaro: | Where is this happening? |
| George: | At the trailer - at our trailers in the urinals. I was standing at the urinal, he walked in. When somebody walks up to your urinal, you're shoulder-to-shoulder. There's no really personal space there. I just kind of looked over and went, "Yo." It was 3:35 in the afternoon. We were probably doing our home urinal break. He goes, "You know." When somebody says that "you know" I turned waiting for you know. I said, "Yeah I know what?" He goes, "You know?" He goes, "Staring at me," or something. "You looking at me while I'm in the restroom can be considered harassment. I just went, "Okay, zip up, pinch off, walk out. Don't say a word." That's what I informed command. That's what just happened. I can't even go to the restroom without this kind of stuff going on. |
| Sam vitaro: | So, this involves, I guess it involves some correspondence after your suspension where you're interested in getting more information about the decision and how it was made. Why don't you just take a look at that. You guys still okay? |

| | |
|---|---|
| George: | I have a few questions. |
| Sam vitaro: | I think it starts there. |
| George: | What was the actual date. Did you type up the suspension letter yourself? What's the actual date that you made the decision to suspend me? It says, "George you have the letter of my decision. It outlines the right to grieve it." I'm like, "Okay." I said, "Okay." I said, "I understand that part, but could you please answer my questions." The information's needed for my complaint that I'm filing. They ask you that. Who typed up the letter? What was the date? I'm asking him those questions. He came back with some kind of you have my letter. It outlines the right to grieve it. I'm not asking about that. I just need these dates for my complaint. |
| Sam vitaro: | For the EEO complaint? |
| George: | Yeah. What I think is odd that you guys don't go after Mr. Monie "George you have my letter and I'm not going to discuss this further." If I would've wrote something like that, my God. They would've been all over me. He's like, "You have my letter. I'm not going to discuss it further." I'm like, "Okay. Well I'm shocked by your response." It's very disrespectful. It has been the problem all along. Management treats us like dirt. |
| | It says what about putting the policies that put people first and be respectful. Employee morale's low, which is the [inaudible 03:14:46] survey - when the employee morale's low. People are leaving for other jobs. They're retiring suddenly [inaudible 03:14:49]. Shows a fractured culture, low in confidence in the supervisors every year. You have a systemic problem at NAVFAC. No communication is allowed. No open door policies. No respect shown for asking questions. It's a valid question. I'm very disappointed. I believe your disrespectful tone is just a continuation of EEO reprisal against me. Instead of making good faith to work through an employee concerns this is what you get. I really expected more as you had a perfect opportunity to stop all the reprisal once and for all because he's just come along as a new guy, as a new supervisor. In almost about 18 years of federal service I've never experienced a culture such as this. |
| | Sadly, but respectfully, George. |
| Sam vitaro: | I know you think that his response was not respectful, but how about your response to him? |
| George: | That's what it was. |
| Sam vitaro: | Do you overstate it, do you think? |
| George: | No. I'm trying to explain that he had an opportunity to stop this. There's a fractured culture. All the surveys show it - we have no open door policies. We don't talk to people. There's no communications. They just stomp on us if you're an EEO filer they'll stomp you down quicker than anything, so no. |

160817_004_combined

Page 98 of 145

Sam vitaro:     You weren't satisfied with his response? You had my letter and I'm not going to discuss further.

George:         Yeah because I needed those questions. Why not just answer the 2 questions? I typed the letter and the date was this date. What's wrong with that? What's wrong with just answering the question? I asked.

Sam vitaro:     You're going to get that in EEO right?

George:         What?

Sam vitaro:     The answers to those 2 questions if you want them?

George:         I don't know. The EEO discovery process, the agency is they get exception to everything we've asked for and will not provide any evidence because it would show exactly. I got 161 emails from them showing things all redacted. Even the dates were redacted. How can you redact a date? Their agency's not giving up anything that's going to incriminate them.

Sam vitaro:     This is - I mark it number 16 in the corner there. This has to do with your getting word about Holzner retiring and Brian letting people know that he's taking a position in Bremerton. Your response I guess as to Brian taking a position in Bremerton. Why don't you just take a look at that. It's an email. The email's dated December 7, 2015.

George:         This is Brian just giving us his ...

Sam vitaro:     Why don't you just summarize what you're saying.

George:         Brian just giving his notice that he's looking for stuff. I wrote to him, I said, "Brian, I'm actively applying for jobs in Bremerton too. Would you please let me know or would you please tell me what position you've taken. I don't want to be anywhere near you or worse end up with some sort of supervisory role over me again. I would not apply for any jobs if I know what shops or codes to avoid. I will not share that information with anyone. I just want to know to avoid applying for jobs that he would be my supervisor again." It sounds - I just want to know.

Sam vitaro:     At that point you were so upset with him that you didn't want to be supervised by him in any sense?

George:         I wasn't upset with him. It's just that I've got EEO complaints against him. He's attacked me. He's done false allegations. He's done libel. He shouldn't be ... The conflict of interest is [inaudible 03:18:38].

Sam vitaro:     That's not upset?

George:         No, that's frustrated. He shouldn't be my supervisor and in control of my career at any

stage of the game. The last thing I wanted to do was get a job where he follow him somewhere. If he could tell me what  shop or code he's going to at least something big that I wouldn't apply. Could you imagine if I applied for a job and I'd be back with him as my supervisor? That wouldn't go well. Of course instead of just letting me know he writes to Meranda, he goes, "Another for our discussion tomorrow on Wednesday." Why is that so unheard of, ridiculous to ask when we know what's going on, HR, Meranda, everybody? It'd be really nice to know what jobs I shouldn't apply for if he's going to be my boss again.

| | |
|---|---|
| Sam vitaro: | As you look at it - but from his point of view he doesn't think he did anything wrong. He thinks you're wrongly putting him in this whole conspiracy so that he's unable to ... |
| George: | He's falsifying a letter of caution. He's falsified documents. He's been their puppet. He's done everything ... He's had EEO complaints against him. He knows all this stuff. |
| Sam vitaro: | He's part of the vendetta then? |
| George: | He's part of the vendetta, but he doesn't want to be. That's my personal opinion because of the depositions and what was given, because he gave up a lot. He's not so afraid of a target on his back anymore. I think he needs to clean his soul. He gave up a lot in the depositions. I think what it is, this is why he left., because he knew what was going on, what was wrong, and this is the only way he could escape. Just like me trying to get another job, the only way I can escape is to get out, and the only way he can escape is to get out. Yes, he's part of it, but I think he doesn't want to be, that's why he left. But then I don't want to accidentally fall under him as a supervisor again, either. |
| Sam vitaro | Mr. . . . |
| George: | Van Woudenberg. Like I said, I'm not going to share it with anyone, I'm not going to do anything. I just need to know what code you're going to be so if I go to apply for a job I'm going to go, "That's the supervisor for that new job, I'm not going to apply there." It would be ridiculous to apply for a job with him as my supervisor again. |
| Sam Vitaro: | Here's another one, I think it's generally in that same time frame. It's an email that you sent to Monie December 4, 2015 beginning with, "I've already tried the ADR process," and where you get into a whole bunch of other stuff to include ... |
| George: | Yeah, they used the ADR process to gather information on me and then write me up and do stuff. |
| Sam Vitaro: | Why don't you just take a look at that. |
| George: | Does this go back to ... What day is it? By direction of my attorney I've notified ... Here you go, okay, yeah. This relates to those other emails about Keith Moss and Holzner, "By direction by attorney I've notified all involved parties that I have filed a disciplinary reprisal action, but this is simply  to inform all parties and eliminate the defense "I didn't know"  defense to a whistleblower reprisal claim. |

Sam Vitaro:      That's what you'd explained earlier.

George:          Pretty much. That's what my attorney said, "Probable cause was found that Dave
                 Herriott assaulted me and  was issued a ticket. Command took no action ..." Then at the
                 time, it took months. "They took no action to protect me. Instead they retaliated against
                 me for the report. Command refuses to relocate my harassers [inaudible] I again request
                 immediate reassignment away from my harassers. I also request command and its
                 agents stop harassment, frivolous investigations, [inaudible 03:22:44] hostile work
                 environment, and all other attempts to build fraudulent conduct performance or any
                 other cases against me where none would have exist had I not filed EO complaints."

                 "I have EEO complaints and whistleblower retaliation complaints against commanders
                 agents who continue to supervise me and continue to fabricate charges against me to
                 destroy my," previously at the time, "17 year career," now it's 18. "Conflict of interest,
                 gross abuse of management position authority, these people [inaudible 03:23:09] for me
                 for their personal gain and their personal vendetta against me. I request stopping all the
                 uncalled for attacks against me so I won't have the requirements to fight back ..." Which
                 is kind of what I talked about before. "To defend myself. Please cease and desist so I can
                 work on my projects without having to also deal with this constant hostile work
                 environment and harassment, request immediate reassignment outside of the influence
                 of my harassers, all of them."

                 "Let me do my job without enduring a hostile work environment and give me time to
                 find another employment away from NAVFAC's hostile influence. This needs to stop."
                 Then Monie just writes back, "I'm not interested in reassigning you to another part of
                 the organization. I'm offering to seek resolution through ADR." That's why I went into
                 the, "We've been through ADR and you've used all that information gathered in ADR."
                 Two days later I was written up line by line of everything that I gave up in the
                 ADR process, we're supposed to give up information going back and forth [inaudible
                 03:24:11]. Everything I gave up, they didn't even try to hide it. They counseled me line
                 by line by line exactly in the same order of what I gave up two days after I gave it up! I
                 was like, "I thought ADR was supposed to be private!"

Sam Vitaro:      What's the date on that?

George:          December 4th.

Sam Vitaro:      2000 and?

George:          2015.

Sam Vitaro:      2015. You were penalized since that time, were you?

George:          I was written up and harassed, but by penalized you mean suspended again?

Sam Vitaro:      Yeah, or given even a letter of counseling or a letter of warning, or a letter of caution.
                 Nothing's happened to you.

| | |
|---|---|
| George: | This was used to ... This is the date of the email. The ADR was used [crosstalk 03:24:56] earlier on and used against me. |
| Sam Vitaro: | What was the date of the ADR? |
| George: | I'd have to go back and look. |
| Sam Vitaro: | Much earlier? |
| George: | I think so. It was earlier, and that's what the letter of counseling and all that other stuff was based on. I go on to say basically, "I'll go on record the issue was that they was issued a ticket. I have emailed Captain Geronome requesting to meet with me and the attorney in an effort to discuss this hostile work environment, he never responded. I've already tried the ADR process, it resulted in the agency gathering intel on me and giving me a counseling session and counseling letter 24 hours later. Agency representative, Commander Leonard had a huge conflict of interest that boggles the mind." |
| | There's a story behind that one about me going to Afghanistan to look at some defective CB work that electrocuted the guy in the shower. I found all that was bad, and the DODIG wrote them all up and the cumulative thing was to take the commander there and boot him. What are the odds? The commander there was Commander Michael Leonard, my boss. Who would have known? A little bit of hate and discontent there from getting booted out of Afghanistan. He should thank me for getting him booted out of Afghanistan. The ADR was used ... |
| Sam Vitaro: | Why don't you read it to yourself. |
| George: | I thought ... |
| Sam Vitaro: | It's okay. |
| George: | Don't they want to hear it? |
| Sam Vitaro: | You can show it to Stan, if you wish. |
| George: | What's the complaint? I'm asking to go? I'm asking to leave? I'm giving him all ... |
| Sam Vitaro: | You're rehashing a lot of stuff, you're being accusatory. I'm just relaying this stuff to you. There's a theme here, you're very accusatory here in these letters, aren't you? |
| George: | I'm telling him what has happened. I'm informing them of the past. It's not accusations, it's proven fact. I'm not accusing that Dave Herriott got a ticket for assault, I'm stating Dave Herriott got a ticket for assault. That's not an accusation, that's a fact. |
| Sam Vitaro: | It's actually incomplete, isn't it? He got a ticket for assault and then ... |

George:        I didn't know at the time ... Maybe I didn't know at the time. I think that was earlier on, I'd have to look and see when I got the information.

Sam Vitaro:    I think you got the information before that.

George:        The facts are the facts. It's not accusatory, it is what it is. ADR was used against me, they did this.

Sam Vitaro:    The ADR part makes a lot of sense, that's the one part of the letter ...

George:        All of that  . . .

Sam Vitaro:    That makes a lot of sense.

George:        I'm just asking to get away, and here's why I want to get away and I don't understand why you won't let me go.

Sam Vitaro:    I've seen that in a lot of emails, you keep rehashing this stuff. The only new stuff in there is the ADR part, and I think that made sense.

George:        Some of this is rehashing because it didn't go to other people. If it went to Monie he moved from, he wasn't a public works department officer, he moved to [inaudible 03:27:40] spot he actually told us that he didn't know, "I don't know any of that history, background. [inaudible 03:27:47] has that." I rehash it with the new guy, I rehash it with Van Woudenberg, I rehash it with Ross Lund. I didn't yet, but I asked Ross. He goes, "You'll have to tell me about all that." I said, "You really want to hear the background on all of this?" He goes, "No, maybe not." I said, "Yeah, probably not." It's not rehashing, it's a new guy, I'm telling him here's why I want to leave and I don't get it, why don't you let me leave?" If the fly's in the house bothering you, open the door, let it out. My attorney and everybody else that I've talked with has come to the conclusion that it makes no sense to not give me a glowing review and get me out of there and help me find a job, unless they want to fire me. They want to build a case to terminate me before I can retire to have the ultimate revenge. Otherwise, what else makes sense? Why would they come up with these little things?

Sam Vitaro:    I don't know, that's not what I'm looking into. I'm not looking into, and I won't be able to figure that out as to why they won't give you a positive recommendation and get [crosstalk 03:28:55]

George:        And help me out. Why? They want to terminate me and they will keep me here under their thumb where they can do all this stuff. If I wasn't here none of this would have happened. It's all cause and effect. If not for this, that would not have happened. None of these emails would go out. If I didn't have ADR I wouldn't talk about this email. If I didn't have all these problems that they generate, I wouldn't have to fight back.

Sam Vitaro:    Why don't you take a look at this one? That has to do with your view that they're not letting you telework because of the suspension.

| | |
|---|---|
| George: | Medical documentation. Oh yeah. That's in writing, the telework agreement. |
| Sam Vitaro: | Didn't you actually telework? |
| George: | Yeah, but at the time I'm like, you're not going to let me telework because you suspended me? The law says if you have a suspension you're not eligible for telework. That's what I was told. |
| Sam Vitaro: | They cut you a break. |
| George: | They did. |
| Sam Vitaro: | That doesn't fit with the whole vendetta stuff. |
| George: | Yes it does. |
| Sam Vitaro: | It does. How does it do that? |
| George: | Because I called them on it saying that I'm going to now turn the fact that you can't give me telework is because of my suspension which was falsified documents to get me suspended. To avoid that causal chain, had the document not been falsified, had I not been suspended, I could be teleworking. They said "We better have him telework." |
| Sam Vitaro | What were they afraid about, the terms of the causal chain. You've been complaining about the 2 day suspension . . . |
| George | They falsified the documents. Why would you not complain about that? |
| Sam vitaro | No, I'm not criticizing your complaining. I'm asking you why you think they were caving in because of your concerns about the 2 day suspension? Why don't you look at that. I look at that and say, "Wow, you got a real break." The telework agreement says you don't telework because of a suspension. They gave you a break. What you're saying they gave you a break to avoid having to deal with this fraudulent suspension. You've been telling them about the fraudulent suspension. It hasn't made a change. |
| George | What hasn't made a change? |
| Sam vitaro | In them. They haven't changed their view. |
| Sam vitaro: | No. They didn't, I know this. |
| George | [crosstalk 03:31:19] They took the one claim was added to it [crosstalk 03:31:24]. |
| George | They took the evidence out of the official record trying to hide it. |
| Sam Vitaro | I guess what I'm asking you is why you don't look at this as giving you a break? |

| George | I guess I just told you. Discussing this with the attorney, why would they do this? It makes no sense, they would want to do this. The attorneys think like attorneys. They do this because if you go all the way back and you say, "Had you not falsified that document, had you not been suspended, then you would've been able to telework and then all that time that you lost and all that money you lost and all that is now claimable, back claimable because had this not happened then they would've been allowed to telework." They said what they did is they allowed me to tell a work illegally in order to not have that claim go back and support. |
|---|---|
| Sam vitaro | Go back to where and support? |
| George | Go back to the not being able to telework because of the suspension. They don't want the suspension to show a negative on me believe it or not. They wanted to do that and then they messed up. They were so anxious to shoot from the hip and suspend me. They wanted to suspend me no matter what. They had to. They falsified the document to make it look bad. They suspended me. They upheld it no matter what evidence I provided they upheld the suspension. Because I was suspended I lost money. I lost time and money. |
| Sam vitaro | Those 2 days? |
| George: | Yeah, I lost time and money. It doesn't matter how much. I had something taken from me. I had property taken from me by due process. |
| Sam Vitaro | That's where I think you better be careful. |
| George | My attorney's being careful. I had due process . . . |
| Sam Vitaro | 2 days might not be significant in relation to due process. It's a side issue. |
| George | It is when it's falsifying documents. Falsifying document. |
| Sam vitaro | That's pretty significant. |
| George | You disagree, those documents are not, I won't use the word falsified, but do you disagree those 2 documents are totally different and read differently? |
| Sam Vitaro | Those 2 documents are different because there's 1 sentence ... |
| George | That says I flipped off my supervisor. |
| Sam vitaro | It's in the original. |
| George | That's pretty ugly. |
| Sam Vitaro | The case was very complex on this. I understand the case law. Let me talk. |

160817_004_combined                                                    Page 105 of 145

| George | No, I understand. |
|---|---|
| Sam Vitaro | It relates to a case by the federal circuit having to do with due process and an agency relying on information and not giving the employee notification of that, and in effect denying them the right to respond. There are some exceptions to that. You have to show in effect it was material. I don't think you can be so clear about ... |
| Sam vitaro: | We think we can, so there you go. |
| Sam vitaro | Fair enough. |
| George | I'm not paying this guy $350 an hour to blow smoke up. |
| Sam Vitaro | Fair enough. |
| George | That's the thought process was because all of these things show a negative. You can go back up that chain and say, "How'd this one happen and that not happen and that not happen." They allowed me to telework illegally. In doing so it didn't really matter because during all this time I was not employed by NAVFAC [inaudible 03:34:28]. I had been hired by GSA. I had my GSA badge. I was ready to go to work. I had my start date. I had everything ready to go. They in turn let me telework. Why? To avoid all that, but also because then they could delay my telework, read it, let me burn up all my sick leave and let me burn up all my annual leave and then finally give me the telework. There's a plot. It's not as generous as you think it is. |
| Sam vitaro | I don't know. |
| George | It's a plan. |
| Sam Vitaro | I don't know but I guess what I'm suggesting to you that it can be read a couple ways. It seems to me you're inclined to read things in favor of this conspiracy and vendetta. |
| George | Do I have any reason not to? |
| Sam Vitaro | I don't know. When I look at all this ... |
| George | I was walking across the parking lot and he looked at me. Write him up. I have no reason to be suspicious that it's not a vendetta. Look what you presented here today. |
| Sam Vitaro | I think some of these things are this . |
| George | Why? Why are they credible? Why did I do it? You've got to ask yourself the why. I didn't just pull this that one day I'm just going to be the problem employee. It happened when I filed EEO complaints and whistleblower complaints. It flipped the switch like a light. |
| Stan | When was this complaint? Is it pertinent? Should I put this [crosstalk 03:35:51]. |

| | |
|---|---|
| George: | 2014, January 2014. |
| Sam Vitaro | I think, aren't you talking about the whistleblower [crosstalk 03:35:57] complaint? |
| George | The EEO [crosstalk 03:35:59]. |
| Sam Vitaro | Don't you go back to the whistleblower reprisal complaint in 2010? |
| Sam vitaro: | That's settled. They settled. |
| George: | I mean in terms of the complaint that you, reading all these papers it seems to me that you go back to that. |
| George: | No, the whistleblowing complaint was for the current one. |
| Sam Vitaro: | Not the old one? |
| George: | The old one. I whistleblew in 2010 for doing the fatality thing. Got NAVFAC in trouble and ruined my career. Never whistleblow or file EEO complaints. That happened. We fought that battle. We just settled in my favor like about a month ago. The other whistle blowing complaint was we filed an EEO complaint trying to help Joe Harvey. Joe Harvey's a traumatic brain injury. He's kind of slow and they were picking on him. He has ADA stuff.  He's too slow to help himself so I stepped up, help your shipmate. That's all they tell you right? Help your shipmate. I helped my shipmate. In helping my shipmate they attacked me. I just got to public works then. I got to Nora because Nora was the chief union steward, so I went to her to get the union to help not knowing that the union might not help. I thought they might do something. |
| | That's how Nora got her target on her back. That's how the whole progressive thing is. The whistle blowing complaint you might be thinking about is we whistleblew to Senator Murray and everybody on the planet that NAVFAC was retaliating reprisal against the EEO people. That's a second whistleblower complaint. The older one from 2010 on giving a testimony for the fatality. |
| Sam Vitaro: | That wouldn't be whistleblowing if it's retaliation because of EEO. |
| George: | We whistle blew that ... You have to look at the letter, right? You got the letter? |
| Sam Vitaro: | I do. |
| George: | You saw all the claims? |
| Sam Vitaro: | I do. |
| George: | That's all from all different people. There's everything in there about whistleblowing, but also charging EEO complaints, charging sexual harassment complaints. Nora Williams had this sexual harassment complaint. |

| | |
|---|---|
| Sam Vitaro: | We don't want to get into the other stuff. |
| George: | It was changed illegally. |
| Sam Vitaro: | We don't want to get into the other stuff. You shouldn't be getting into other people's EEO complaints on this [crosstalk 03:38:03]. |
| George: | We're all tied up. We all have the same attorney. We're all tied up together because it shows that the only 4 people that are being attacked, EEO complaint, fired. EEO complaint, constructive discharge. EEO complaint, suspended, getting ready to be terminated. |
| Sam Vitaro: | Who's that? |
| George: | Me. Then Nora next. |
| Sam vitaro: | I wouldn't presume that. |
| George: | I presume that absolutely. Please prove me wrong [crosstalk 03:38:29]. Let me get another job. |
| Sam Vitaro: | Let me ask you about this one. This is a July 12, 2016. |
| George: | Recently? |
| Sam Vitaro: | No, I'm sorry, it's earlier. It's Laura Foss having to do with discovery. It's something she sent to, I think Dave Peck. What I wanted to ask you about is - in what she flags is how you CC a lot of people on your emails to include your wife. Your wife weighs in on some of the things with a hee, hee, hee here. |
| George: | Hee, hee? Yeah. |
| Sam Vitaro: | What's that about? |
| George: | I don't know. I'll have to read that. I'll have to read it. I'll start back here. September 14th, 2015, were you aware [inaudible 03:39:29]. This is when I found out that the EEO office with NAVFAC had a memorandum of agreement with NAVFAC Midwest, that the 2 to avoid conflict of interest the 2 had to [inaudible 03:39:39] and share each other's. If you file EEO complaint with NAVFAC it's not handled with NAVFAC because it's obviously going to be just like it is, a conflict of interest. It would go to Midwest. Had the Midwest people had a complaint it would come to Northwest. I found that. I asked them why, Mr. Kirkpatrick was the EEO guy, why are you continuing to process Northwest stuff here when you have the memorandum of agreement that says you can't. That's the whole point of that agreement. It's to separate church and state, you know? He never responded, so that was on September 14. A month later I asked him, I said, Mr. Kirkpatrick, will you be responding to that question? I got it  . . . |

| Sam Vitaro | Yeah, I think the point is . . . |
|---|---|
| George: | I'm trying to find where ... |
| Sam Vitaro: | Wide distribution list on your emails. |
| George: | Oh, wide distribution list. |
| George : | Yeah. |
| sam vitaro: | I've lost ... |
| George : | Including having your wife chime in [crosstalk 03:40:32]. |
| sam vitaro: | I've lost, well yeah I'm getting to that to find out why she said, "Hee hee hee." Like something was ... But I've lost data on my computer, my Microsoft wonderful machine. I lost data on my cellphone card. I've lost ... She's got a Mac, it's a totally different machine so she's got a Macintosh. I mean I something or George, iMac Pro. For that kind of stuff, and Joe Harvey, I got some stuff blind carbon copied to Joe Harvey or whatever, right? What it is, if something happens where I can't find something or a machine crashes or something happens or somebody breaks in the house and steals it, I've got those emails at other places. It's like being in the cloud, I got them at other places. It's storage, think of it that way, it's like storage. Some places ... Some of the people I cc are people that ask me, like Congressman Mark Meadows from the House Oversight Committee, stuff. Government reform. |
| Sam Vitaro : | I know who that is. |
| George : | Yeah. He wants, he sent me stuff, he wants that information. He wants to see it live. My attorney, of course, I'll cc sometimes if it's stuff that he wants to see. I'm working with Congressman Kilmer Senator Murray, two people, Jim McDermott, Congressman McDermott. All these people want to see stuff, I mean. From a legal aspect, I'm sharing information because I want to show what's going on. I'm whistleblowing, I'm showing what's going on, keeping him apprised.

Then for personal stuff, like sending it to Joe or me or my ... I also send it sometimes to another address I have, just so it's stored in that Gmail file instead of the Hotmail file. Instead of on my computer, it's on somebody else's computer somewhere else. If something gets stolen or something happens, the house burns down, I'm that paranoid now because of all that's going on. Anyways so let's see what happened. He answers me, okay so he answers me, what date did you stop sending the information? I asked them what date, oh okay so I'm guessing ... |
| Sam Vitaro : | Remember my question had to do with the wide distribution list. |

George:          That's what it is. I'm guessing that ... Oh you also asked the wife and the hee hee hee.

Sam Vitaro :     Yeah. I mean it relates to that question.

George:          I'm guessing probably because I caught them doing intake here when they [inaudible 03:42:59] ... I'm just guessing. I had to look back and see because that's been a while. That's back in October 2014 so that's been a while ago. I'm just guessing was that the memorandum of agreement, she's just responding like ...

Sam Vitaro :     Hee hee hee.

George:          Yeah, caught him again.

Sam Vitaro :     You think it's okay for her to [crosstalk 03:43:18].

George:          She can do whatever she wants. She's wrote letters. I was told, after the fact, I was told she wrote letters to Monie, the OSC and everything. This is tearing her up. She sees her husband ... It's not - a wife, we say wife but she sees that this is destroying our life.

Sam Vitaro :     Do you want her to chime in? Is that why you're copying her on this?

George           If she wants to.

Sam vitaro :     Okay.

George:          No, I'm copying her on this - as, except for storage, she has a different computer, different hard drive, different operating system.

Sam Vitaro :     You want her to chime in if she wants?

George:          If she wants to because it's destroying ... It's more damning on her, I think, it's really affecting our relationship. Imagine six years of this stuff, right? Six years of just being dragged over the coals for all this stuff. Anyway, blind copying a number of people, yeah, okay. Is there a policy against doing that? I mean ...

Sam Vitaro :     I guess not .

George:          Blind copying people, having your wife ...

Sam Vitaro :     No, no but I see it, I've never seen it before so it's kind of odd to me. That's all.

George:          I mean for keep the wife informed because she's being affected by this.

Sam Vitaro:      There are other ways to keep your wife informed. You could just ...

George:          No, but I'm saying keep her informed but it also stores it on different drives.

Sam Vitaro :       That's a good explanation, I understand that.

George:            How come I didn't get this in my discovery? When I asked for all this information, I'm not getting all this in my discovery.

Sam Vitaro :       I don't know.

George:            My attorney will be very curious to see how you get this but I don't.

Sam Vitaro:        This is July 12th 2016.

George:            It doesn't matter. The discovery was all documents related to me and my case.

Sam vitaro :       I don't know, I don't know.

George:            You'll probably be getting a question on ...

Sam Vitaro :       Your attorney can, through you, I don't want to deal with your attorney directly, but through you, he can get a copy of that.

George:            Oh he'll contact the agency and ask them why you have information that we didn't get.

Sam Vitaro :       Just so the record's clear, it's an email dated October 14th 2015. Actually several of them, the chain begins October 13th 2015.

George:            '15? '14?

Sam Vitaro :       '15.

George:            '15, okay.

Sam Vitaro :       Yeah, yeah.

George:            That's my best ... Now some of this stuff, if it's old, I'm just guessing what my intention was at the time too. It's logically I think that's why I would have done that but I do it now, to this day, I still blind carbon copy stuff so it's stored everywhere. I got portable hard drives at home that, after I use them, I put them outside in a different building so if something happens, I've got the evidence.

Sam vitaro:        I'm just going to, to expedite this, I'm going to give you several. The highlighting on these is really highlighting from VanCleave. If you haven't gotten the sense already that he doesn't like some of your language in these things, that's why he highlighted these. I asked him, in the interview that I did with him, his opinion as to the quality of the emails from you. What he told me was he found them really disrespectful.

George:            Again, why didn't he just say something? I can ... I thought it was [crosstalk 03:46:43]. Let me see them.

160817_004_combined                                        Page 111 of 145

**242**                                                     000254

| Sam Vitaro : | George, you've made that clear. |
|---|---|
| | That's what I'm saying but you made that point a number of times, right? |
| Sam Vitaro : | This is an introduction to you're looking at these because I wanted to explain why he highlighted this, okay? Why don't you read them to yourself? I guess what I'd like to know is if it's an opinion shared by you, in retrospect, that maybe you went a little too far in fitting him into the vendetta or the conspiracy. As I understand it, you view him, perhaps, as part of this but not, as you said, a player. |
| George: | Not a willing player. |
| Sam Vitaro : | As you said earlier, not voluntary. |
| George: | Yeah. I think unfortunately he's stuck between a rock and a really hard place. That's just my opinion. I'm asking for ... |
| Sam Vitaro : | Why don't you read them to yourself for a second? You can share them with Stan, of course. |
| George: | What this is, he's making a claim ... |
| Sam Vitaro : | What's the date of that one? |
| George: | The date he claimed, November 12th 2015. |
| Sam Vitaro : | Okay. |
| George: | He says, this is VanCleave responding to my request for the Kalkines warning sheet, right? |
| Sam Vitaro : | Right. |
| George: | I guess that's how you pronounce it, Kalkines He says, "Attached is a copy of the Kalkines warning given to you at the interview." I didn't have a Kalkines warning given to me at the interview, that's why I'm having to do a FOIA. |
| Sam Vitaro : | Is that simply what you said there? What did you say? |
| George: | I said, "I was not given a copy of the Kalkines warning at interview. Please refrain from making claims you do not know about. I suspect you made that statement in an attempt to cover for the legal error Mr Logan did by refusing to provide me with any documents." |
| Sam Vitaro : | Why do you presume that now? I think that's the part that he finds ... |

George:         Why would he say that?

Sam Vitaro :    . . . Unacceptable. I asked him that.

George:         I found that was unacceptable.

Sam Vitaro:     I asked him that and he says, "My wording wasn't so great." That's all. Which you point out that's not true.

George:         I'm saying ...

Sam Vitaro :    What you've done is convert this into a motive.

George:         Yes.

Sam Vitaro :    He did that with intention. It wasn't a mistake and what I'm asking you now is why you believe that?

George:         That's what I believe. I believe command is ... He's on a rock and a hard place. I believe command is making him do all these little things. He's trying to put it in paper so somebody like you could come up, "Well this says that you were given the Kalkines warning after your interview." I'll say, "Well ... " That's  . . .

Sam Vitaro :    I would never say that if you think that.

George:         This says ...

Sam Vitaro      I would never say that if, in your response, you had just stopped by saying, "I was not given a copy of the Kalkines warning at the interview." Even, "Please refrain from making claims that you do not know about," is okay. I think the problem for him , and I asked him about this, is that last sentence. I suspect you made your statement in an attempt to "cover" for the legal error Mr. Logan did by refusing to provide me with any documents. Do not make this attempt again.

George          That's my belief again.
Sam Vitaro      Okay, okay fine.

George          That's my belief.

Sam Vitaro :    Your explanation is fine. I just wanted to explain to you why he found this disrespectful.

George:         Like I said, disrespectful is a very nebulous word. That is, like anything else, he said something that was wrong. I'm telling him it was wrong, don't do it again, I know what you're up to, basically. I know what you're doing, so don't try to cover for that with this little thing, because that'll show up somewhere later, saying that you were given a copy of it when you claimed you weren't given a copy of it. This one is just, is this ... Oh, this one just says ... What is this one from? This is from Schilling to Meranda. Oh okay, I see

|  |  |
|---|---|
|  | what it is. |
| Sam Vitaro : | Why don't you explain what it is? And what the - |
| George: | This looks like another part of the FOIA   . . |
| Sam Vitaro : | What's the date? |
| George: | On which one? |
| Sam Vitaro : | On the one you're reading from. Are there a couple dates? |
| George: | No, September third is me talking to VanCleave, and then ... Oh, okay, he was asking, it's for that perfected FOIA thing. I'm trying to figure out, because... I was asking, in one of the discoveries that we were trying to do for the case, they had claimed there was this ... A file called like Mister Two. They don't want to use my name, because then I can ask for all documents with my name, so they gave me a code word to avoid that. My thoughts. Mister Two document. Mistertwo.docs. |
| Sam vitaro | You're Mister Two? |
| sam vitaro: | I'm Mister Two. |
| Sam vitaro : | Okay. |
| George: | Exchange between Mister Two and me. To avoid using my name and it be searchable, they've given me a code word. I'm Mister Two. I found this out, so then I did a FOIA basically to get documents for Mister Two, because obviously the FOIAs were under my name, but now they're using a code word so I can't FOIA it anymore. Caught them at that. He must have said that my FOIA request was not perfected, so the request should have been very easy to address. This is me talking. I specifically asked for a copy of Mistertwo.docx that was sent in an email from Len Schilling to HR. A very easy electronic search of Mistertwo.docx on HR computer and email system would have taken mere seconds to find. If you go in your file, you can search for Mistertwo.docx. |
| : | I can't see where this wasn't perfected. It's another delay tactic. Therefore, I will say this is another obstruction attempt to do that and not give them the information with the date, the time, the email address. All of the minutiae where then they said it was destroyed or something. It was missing. |
| Sam Vitaro: : | Why did you presume that it was easy? |
| George: | Because it's a file. It's a Word document Mistertwo.docx. If it's on a file folder in a computer, you go to file manager and you type in search, Mistertwo.docx, and it searches your entire hard drive in seconds and says, "Here's the file." |
| Sam Vitaro : | If I'm accurate, and I'm remembering this, what Mister VanCleave said is it's not so easy |

as you think. That's his objection to this.

George:  You can see why I would think, working with computers like we all do, that if I asked you for a document called Mistertwo.docx, how hard is that to find in Windows Explorer?

Sam Vitaro :  I don't know.

George:  It's just, type it in and find it.

Sam Vitaro :  I don't know.

George:  It's easy. This is just another FOIA. He's awfully sensitive for a FOIA officer.

Sam Vitaro:  My guess is you ... I would not presume that he's so sensitive. I think some of these things are over the top.

George:  Oh no. I've seen some FOIA requests by agencies that are just brutal, like we will sue you and take you down and burn your house, and if you don't do it, because they don't want it redacted. I'm just [crosstalk 03:54:55]

Sam Vitaro :  I've seen that too. I'm not so sure I agree with that approach either.

George:  No. I'm just saying, comparatively wide. Comparatively wide, these are just ... Some of this stuff was banter, some of this stuff is a little frustration, like come on, how hard is it to search Mistertwo.docx. Put it in the search box.

Sam Vitaro :  Okay.

George:  A FOIA about all records and notes, whatever.

Sam Vitaro :  What is the date of that one?

George:  This one? September third, 2015. Basically just asked for all records and notes in regular office files. That would have a file cabinet. Not electronically. In a file folder. And computers and archives, but mainly file folders and stuff. With my name on it. George Karl, or Karl George, in any format, or any other code name given me. Trying to get that stuff. Please search HR files and cabinets and computers as below. I said, "Do not attempt to say this is not perfected, as you always try to do. You understand my intent, and I know how simple or quick this is going to be to search." It's just, search for my name. That's it. Search for my name.

Sam Vitaro:  In which record?

George:  File cabinet. Do you have a folder on me. Under K. Karl. A real file cabinet. Do you have a folder one me, or electronic files. Search George Karl. I'm sure they've got a folder on me. It'd be pretty easy, right?

| | |
|---|---|
| Sam vitaro : | It depends in which folder or file. I understand, for example, searching names in TRIM is not so easy. |
| George: | Yeah. We just found that out. That's when he called me. He called me and says, "Man, I'd love to help you out." We talked about it. Again, he talks to me. We talk. |
| Sam Vitaro : | But you weren't very responsive when he called you, were you? |
| George: | Yeah. I just did the Trim training. I said what's so hard about just searching a name? |
| Sam Vitaro: | I mean responsive in the sense of understanding that it was not so easy as you think it is. |
| George: | I think it's easier than he's making out. |
| Sam vitaro : | What reason do you have to believe that? |
| George: | Because I just did the Trim training. I went online and I did the training. The training tells you how to search for files. It tells you there's advanced searches and little searches. This is a huge database. You can't just ... You've got to know what you're doing, but it's still searchable. |
| Sam vitaro : | It's not searchable by name, apparently. |
| George: | No, it's not. |
| Sam Vitaro : | Yeah. |
| George: | No, but it's not. He says it is, but it's not. |
| Sam Vitaro : | It's not as simple as you originally thought, is it? |
| George: | No, it is. I went through the training. I saw it. It is that simple with advanced searches, but that's a whole different topic. |
| Sam Vitaro : | He says it's not. He's had 17 years. I question- |
| George: | Trim hasn't been around 17 years. |
| Sam Vitaro : | No, no. He has 17 years ... You didn't hear me finish. He has 17 years ... What's so funny? I don't understand? He has 17 years as a FOIA officer. He has 17 years as a FOIA officer, he seems very, very knowledgeable, and I guess what he doesn't like is you're assuming that all of this is very simple. |
| George: | Based on the training I just took, I see ... I took the training before I did this. I wanted to see, would it be simple? Because if it's hard, I want to know how to perfect it. He taught me how to perfect a request. |

Sam Vitaro :        In your view, it is simple.

George:             Yeah. I just took the training.

Sam Vitaro :        Okay.

George              Then, he called me and explained, "This is how they've got it set up. It's not really so simple as the training makes it out to be," so he's backing me up. The training says … What you know from the training is easy. I'm calling you to tell you there's some nuances here, and it's tribal knowledge. These people that do these things, Meranda and all these people at HR, they do stuff, but they don't really have a rhyme or rhythm about it, or pattern, so it's tribal knowledge. I said, like if Meranda wants to look up something from me, how would she do it? She obviously can. She's not going to look up 9,000 files and have to go through every one trying to find out what it is. She has a way. Obviously she has a way to find anything she wants, so I wrote to Meranda. I said, "Meranda, how do you search Trim to find stuff for me?" This was just recently I did this. She sent it over to Chuck, and Chuck says, "Well, it's kind of our own fault. We kind of really don't build it like we should. We don't put the file folders like we should. We put things in with categories," so they know, they just know. HR, they just know what they want and kind of how to find it.

                    I'm like, "Okay, well, can you have them do that for me?" They're like, "Well, it's really …" I said, "You're telling me this, if you search my name it comes up with 9,000 files. Well, if Meranda searches for something for me, does she have to go through 9,000 files?" He goes, "No." I said, "Well, there you go. Then, what is she doing so I can perfect my request to copy what she is doing to not pull up 9,000 George Karls?

Sam Vitaro          What VanCleave told me about this, for example, is this would produce 1,900.

George              Okay. 1,900 or something. Yeah. I knew it was nine something. Nine thousand.

Sam Vitaro          Nineteen hundred.

George              Okay, nineteen hundred.

Sam Vitaro :        Which then you would have to go through individually.

George              Yeah

Sam Vitaro          Okay. You think that's pretty simple.

George:             No, no. That's what I'm saying. When you explain it to me like that, I was like, okay, but wait a minute, Meranda's not going to pull out nineteen hundred files and have to go through them to find out which ones she wants. What does Meranda do to find something on me in that system? She's not going to look through nineteen hundred files either. What words, what does she do? What is her search?

Sam Vitaro:         Okay. We're getting far afield. Let me just …

George:             Do you see what I mean, that's if they can do it?

| | |
|---|---|
| Sam Vitaro: | Let me just say that his opinion is when you say this is all simple, is he doesn't agree with you. |
| George: | Now I agree with him. Now I agree, it's not what we were told. |
| Sam Vitaro : | I'm glad you agree. |
| George: | Yeah, the Trim training tells you if you do it this way, you can do it that way, but they don't do it that way. |
| Sam Vitaro : | Do you take anything away from that? |
| George: | What? |
| Sam Vitaro : | That maybe things aren't as simple as you think they are? |
| George: | No, just because this is how it's supposed to work. I did the training. I see it was simple. That way I could write my request, please do this in Trim like this. He gets it and he goes, "It doesn't work that way." He calls me to tell me that it doesn't work that way. I said, "Well I just did the training and it works that way." He goes, "Yeah, we don't do it that way." |
| Sam Vitaro : | Do you see how you wrote though? Do not attempt to say this is not perfected as you tried to do. You understand my intent. I know how simple, quick, and easy this is to search for. |
| George: | Because I did the training. He did, he called me and he goes, "Yes, the training makes you believe it's really easy, but unfortunately the gals at HR didn't put it in that way, so let me explain what the real world is." He explained what the real world was, and I said, "Okay, I understand that now." |
| Sam Vitaro : | I don't know that this needs to be a teaching system, or a teaching session. Isn't there another way to write that? I mean, you understand my intent and I know how simple and quick. I've just done the training, it appears ... |
| George: | I told her that. I told her that I just did the training. |
| Sam Vitaro : | I've just done the training and it appears that this is simple. That's what I would say. |
| George: | But that is you. |
| Sam Vitaro : | I would not be so accusatory. Yes, that's what I'm asking you. |
| George: | But that's you. I mean you haven't set in these shoes for six years of trying to get information from an agency that won't provide it, because it is so damning. The information is so damning to them, they redacted a date. It was all redacted. |

| | |
|---|---|
| Sam Vitaro : | Okay. |
| George: | You can't redact a date, you know. |
| Sam Vitaro : | Do you agree someone who hasn't experienced this stuff that you've experienced, would write this a little bit better? |
| George: | Six years ago, I would have wrote that differently. |
| Sam Vitaro : | Okay. |
| George: | Six years in these shoes, watching them not give anything but this kind of kangaroo court. Yeah, that's why I'm a little on edge all the time. I said, "Just give me the information. Just do your job. Give me the information. If it is difficult call me." Which he did, and we talked about it for awhile. He kind of explained it, and then I went back with him saying, "Okay, I understand." Meranda's not going to search nineteen hundred files either, so how does she do it? Let's do it that way. Tell me how she does it and we'll do it the same way. |
| Sam Vitaro : | Okay. I think you're agreeing though, as far as it being simple, it's not as simple as you thought from the training. |
| George: | From the training, and he agrees that too. He agrees the training makes it look a lot more powerful. |
| Sam Vitaro : | However you guys work it out is fine. |
| George: | No, we're good. |
| Sam Vitaro : | Okay. |
| George: | Okay. I asked earlier on this one. I was asking for some information about the executive steering board meeting minutes. That's when the union meets with the command, to get the meeting minutes from them. Again, somebody left a note on my desk saying you need to get these meeting minutes from this date. |
| Sam Vitaro : | This was another note where you ... |
| George: | I get a lot of notes. I've got a CD ROM of stuff sometimes. It's pretty interesting. |
| Sam Vitaro: | This was another one where the author was unknown? |
| George: | Yeah. |
| Sam Vitaro : | Okay. |

| | |
|---|---|
| George: | This note. |
| Sam Vitaro : | You have no sense of who was writing these notes to you? |
| George: | No. It could be anybody. If you got a note on your desk, just a [inaudible 04:04:21] note out of nowhere. It could be anybody in your whole office, maybe somebody not even in your office. Maybe it's somebody from over here and maybe that knows I have an in. Maybe somebody in HR is a double agent and then giving me information. I've got a CD ROM full of some pretty cool stuff. I don't know how they got that. Anyways, it's kind of my ... |
| Sam Vitaro: | You have a CD ROM about what? |
| George: | About a lot of stuff going on here with me, background. |
| Sam vitaro : | Why don't you give it to me as part of this inquiry? |
| George: | I have to go through my lawyer. |
| Sam Vitaro : | Why don't you? I'm making a request to you since it might be relevant. |
| sam vitaro: | Yeah. It's a lot of stuff, CD ROM, it's probably a DVD but, of data. I think I gave all of it to ... No, Peck should have it all. |
| Sam Vitaro: | Oh, he does? |
| George: | He should. |
| Sam Vitaro | Okay. |
| George: | It's hundreds of files. [inaudible 04:05:14]. |
| Sam Vitaro : | Tell me how I would be able to ask for it in a way that he understand it. |
| George: | Just ask him. He gave me a discovery on documents, a request for documents. That's ongoing, so as I get new documents, I've got to give it to him. Yeah, he's got five hundred plus, six hundred plus. |
| Sam vitaro : | Everything on the CD ROM has already been given to Peck? |
| George: | Mm-hmm (affirmative). |
| Sam Vitaro : | When your attorney disclosed the information to him, did he disclose it in a way that it was made clear it was coming from this CD ROM? |
| George: | No, it was just numbers. |

| | |
|---|---|
| Sam Vitaro : | Numbers of documents? |
| George: | Yeah. It was just numbers, like one, two, three, four, five, six, seven, eight. Just numbers, it's not a main file name. It's just numbers on documents. You've got to open it up and see what it is and make your own file name. |
| Sam Vitaro : | What you disclosed to him was the actual CD ROM? |
| George: | All the of the ... |
| Sam vitaro : | [crosstalk 04:06:06]. |
| George: | It's interspersed in there, because all the stuff on the CD ROM was just given. If there was a file name on it, it was just given a number. |
| Sam Vitaro : | Yeah. I mean did your attorney give Peck a CD ROM or did he give him the actual documents? |
| George: | No, a CD ROM. A CD ROM of ... Oh, no there's hundreds. One document might be four or five hundred pages you know. |
| Sam vitaro: | Okay. |
| George: | Whether they print them or not, I don't know. It's stuff like ... |
| Sam vitaro: | Well that's okay, I can ask him. I know enough to ask him then. Don't worry about it. |
| George: | All the stuff that was - what he requested - documents, all the DVD has got that is on there. Any new stuff we've given him as we find it. |
| Sam Vitaro : | Okay. |
| George: | Anyway, I just basically, I was asking VanCleave. |
| Sam Vitaro : | You guys still okay? |
| Stan | Yeah. |
| AJ : | Okay. |
| George: | I was asking him, it has come to my attention that you have informed counsel, which is like legal, of the FOIA request, which was actually later withdrawn apparently, on obtaining executive steering board minutes, as no actual documents were needed to be located as you literally provided a link to the document. That's why I didn't need the documents. He gave me a link, where you can find them. |
| Sam Vitaro: | Okay. |

George:              That's why.

Sam Vitaro:          What's the date of this?

George:              July 22, 2015.

Sam Vitaro :         Okay.

George:              I was wondering why command counsel was made aware of my FOIA request.

Sam Vitaro :         Okay.

George:              What the ...

Sam Vitaro :         What's so strange about that? That the FOIA officer might be consulting with command counsel?

George:              Well they told command counsel that I was FOIAing on their executive steering board committee minutes, so it dried up. Once they knew I was FOIAing them.

Sam Vitaro :         Can I see that? You don't have an objection to Van Cleave seeking guidance from counsel, do you?

George:              [crosstalk 04:08:00]. I don't know what he does.

Sam Vitaro :         That's not an issue is it?

George:              No. What I'm saying is once VanCleave informed the executive steering board counsel, that I was pulling information, I got some good information from them too, that I was pulling information from those meeting minutes, it dried up the well. He informed them and they cut off. Apparently, the executive steering committee meeting minutes are not documented as well as they used to be.

Sam Vitaro :         It sounds like you withdrew this request.

George:              Yeah, because he gave me the link. See instead of giving me all the meeting minutes, like files and printouts, and stuff, he gave me a link to them, so I could go look at them myself.

Sam Vitaro :         Right.

George:              I withdrew the request because he gave me a link.

Sam vitaro :         That was satisfactory to you?

George:              Yeah. He asked if that was okay. I said, "Yeah. It gets the same thing." Then I went in and

160817_004_combined                                          Page 122 of 145

**253**                                        **000265**

|   |   |
|---|---|
| | pulled the executive steering committee meeting minutes. Then started going through them and looking for stuff. |
| Sam Vitaro: | All right. |
| George: | After he told them I was doing that, the next meeting minutes from then on, even to this day, there sterile. They got nothing. |
| Sam Vitaro : | What do you mean they're sterile. |
| George: | I mean there's no information on them that shows, like in the meeting minutes it says, EEO reprisal is on the up rise, or something. It's like, okay well that's good to know, that you put that in writing. That EEO reprisal is on the up rise and nobody's happy with the Command's EEO program. That's all, the attorney was very happy to get that kind of information. I mean that's documented. It doesn't say alleged EEO reprisal. EEO reprisal's on the upswing. We need to kind of chill it up. |
| Sam Vitaro: | Your objection then isn't that he sought guidance from counsel? |
| George: | No. My objection is that he told counsel that I was FOIAing it, so counsel quit providing the meeting minutes, where I could data mine them. |
| Sam Vitaro | You drew that inference from comparing the new minutes to the old minutes. Could you send me just an illustrative sample? |
| George | A copy? That link is still on there. You can go back to the old ones and the new ones. |
| Sam vitaro | Okay, thanks. |
| George | I think. That link should work. |
| Sam Vitaro : | What you're saying is pretty close to this date, the quality and the detail - |
| George: | You'll see. In the meeting minutes and the command meeting minutes, you'll see one of the first lines there is something like, "[Chuck VanCleave informed the counsel that these minutes are being [FOIAed." That's what I was reading, I was like, "Uh-oh. That's going to dry up that well." I asked them why would he need to do that or why would he do that. Maybe he's supposed to. I don't know, that's what I'm asking. |
| Sam Vitaro : | He told me that that's what he does. He often seeks advice from counsel. |
| George: | That's what I was asking because I was going to go if you didn't have to, you just shot me in the foot because now they're not talking about anything. Excuse me, they're not documenting anything in paper where I can go back and get it. That's why I was asking him because it dried up the well. Think of it that way. |

| | |
|---|---|
| Sam Vitaro: | Did you talk about this? |
| George | Yeah. Not yet. I was looking for something. Here you go. Here is the  . . . September 3d 2014. NAVFAC. IAM, ILPC minutes. The Union indicates there is an overall problem and the union has done its part. Retaliation is more prevalent this year and there is a huge EEO problem. There is no satisfaction with the current EEOs. That kind of language dried up really quick. |
| Sam Vitaro | Can I have this? |
| George: | Sure. Here's another one. The union conveyed that management is not credible. Management says it would be a waste of time on December 9th [inaudible] |
| Sam Vitaro : | That's enough. To the extent that you have any others, feel free to send them to me. You can send them to me or give them to me now. You don't have to read them. You can show it to Stan if you want to. |
| George: | I'll look at these ones. This is back in ... |
| Sam Vitaro : | Really, just give them to me. |
| George: | I'm reading the next on from VanCleave. |
| Sam Vitaro: | Okay. Thanks. Why don't we wait until Stan finishes though. |
| George: | Okay. |
| Stan: | I can explain a little to you about the union and what's going on too, if you want. |
| George: | Yeah. |
| Sam Vitaro: | Yeah. It's actually George's call on that. |
| George: | Yeah. I'd like to know. |
| Stan : | We were building up and we're still working on the LMPC's and the SMS. We haven't been as active lately because we are focusing on a CBA. So we're missing some of these meetings, some of the LMPC meetings. They've even stopped having one or two of them on some of the subcommittees because we're not getting - we don't have the bodies to get there. We've got Steve going around to most of these meetings. That may be another reason that your information - |
| George: | That looks like it's drying up? |
| Stan : | Yeah, because I would check the thing. Steve hasn't had enough time to get in there and |

delve into it. I only know that because I helped back Steve into these meetings and helped him with the information and stuff.

George: That was probably from the last year?

Stan : No, this is just the last couple months.

George: Okay, that would explain this thing. That would explain everything getting even drier.

Stan : When we're working on the CBA we don't have all the people and all the time we need to get everywhere.

George: That makes sense. If they're getting even drier than before, I haven't looked but if you see it, it's pretty rich, getting thinner, bam, FOIA request came in. Super dry and then now even maybe less union involvement at all. That explains the last couple of months worth anyway.

Sam Vitaro : I'll check that out.

George: Okay, thanks. This is ... What is this for?

Sam vitaro : After this I don't have too much more.

George: I'm telling VanCleave that he continues to be in violation of the FOIA laws. You'd have to have the whole thing here to see it. Apparently he had said that he wasn't giving me FOIA stuff because it was similar subject matter, is what I'm guessing. He tried to aggregate the requests in order to make the process bigger. It would cost some money, maybe?

Sam vitaro : Maybe copying would be different.

George: Maybe copying or something, aggregating requests. Which you can do if you have a bunch of similar requests, you put them together. You do that. We'd have to look at this FOIA because I'm absolutely sure that I would have said this if the subject matters I was asking for were similar for him to be able to do that.

Sam Vitaro : Can I just look at that?

George: Yeah. I'll have to see what it is but I think what it was is I was asking about some different things and he grouped different things together saying they were similar. No, they're not similar. They're whole different subjects, whole different topics, they're other people. They're in no way similar and then I gave a copy of the FOIA laws off of the website explaining what that similar would be or something. I'm just telling them that they weren't similar so please -

Sam Vitaro : But you told him he's in violation of FOIA law.

| | |
|---|---|
| George: | Yeah. |
| Sam Vitaro : | You said, "You illegally aggregated - " Are you pretty confident in all that? |
| George: | Yeah. I don't vent or accuse. There's the laws and even when I write the law, here's the violation I'm claiming, here's the law. This is what it is. I don't just throw it out there. |
| Sam Vitaro : | Again, you say you have EEO and whistle blower obstruction charges against you. You have full knowledge of upcoming charges against you. |
| George: | Yeah, he's aware that I have more charges coming. |
| Sam Vitaro : | So not to claim ignorance. |
| George: | Kind of. Just so you can document the ... It makes sense too. If I said you retaliated against me for EEO activity, but you don't even know that I have EEO activity, it's a new point. I can't retaliate against something I don't know about. This makes sure up front that they know that they have done these things and here's the laws and here's the - give them all the information. Then you can research it and that way they can't come back later and say, even if they did retaliate, they can't come back later and say we didn't know so therefore we couldn't. It takes that defense away. |
| Sam Vitaro : | What's the status of the whistleblower reprisal claim against him? |
| George: | This one? |
| Sam vitaro : | Yes. |
| George: | I think I got a call a couple days ago from the DODIG people and they said it's close to getting finished or something. |
| Sam Vitaro : | What would DODDIG have to do with this? |
| George: | If that's what you're talking about the whistleblower, the online whistleblower complaint? |
| Sam Vitaro: | It sounds like this is not one you went to OSC about. |
| George: | Let me see. It says EEO whistleblowing. This would be just, there's one on DODIG hotline thing. This one is just, it looks like I say EEO whistle blower. This is probably just the EEO complaints. That would be at the discovery stage. That would be relative to the discovery stage right now with the documents and all that stuff. |
| Sam Vitaro : | Okay. This final one? |
| George: | It's this one. He's writing to me. He was forwarding the email from Stacy Holder. NAVFAC headquarters concerning my various requests. In order to help you resolve this |

160817_004_combined                                      Page 126 of 145

matter, refer you to come to my ...

Sam Vitaro :   Why don't you read it to yourself?

George:   You received a letter from ... Do we have an email from Stacy Holder?

Sam Vitaro :   I don't. If you can't answer it without that, that's fine.

George:   This is old too. This is from 2014.

Sam Vitaro:   What's the language that's highlighted? Just read it to yourself.

George:   I'm not going to read it. It's not that much. Yeah, this is when he called me an F---ing C lawyer and he hates me and all that stuff. Sue me and all that.

Sam Vitaro:   Is that related to a conflict that the two of you had here in the building?

George:   Initially, yeah. [crosstalk 04:20:10]

Sam Vitaro:   Is this when you showed up at his office but didn't want to come into the office. You wanted to go downstairs to the cafeteria?

George:   We met at the cafeteria but I don't know if I wanted to or we just happened to be there.

Sam Vitaro:   What he said is you wanted to.

George:   Okay, maybe.

Sam Vitaro:   Maybe he didn't understand why.

George:   It sounds funny, but probably for privacy, at the time. His office, at the time, was right there with everybody and it's not real private. I had like 13, 14, 15 violations that I claimed he had done lined out and I had it in writing. I was going to go ask him. I said, "Look, here's my thing and what are we going to do to get past this?" I didn't want to do it in his office and embarrass him, so we went to the cafeteria because it was empty. At that time, it's empty. We sat down in the cafeteria real quiet and empty and I showed him. I was like, "Here's my concerns and I'd like to do that." He read a few of them and then he threw it back across the table at me and goes, "I hate you fucking sea lawyers. I've been doing this for so many years and blah blah. You don't like what I'm doing? Sue me." I was like, "I'm just asking that this is going to go up the chain to headquarters and come back down. It doesn't have to."

Sam Vitaro:   You didn't say anything at all to provoke him?

George:   No. Well, I gave him the letter.

Sam Vitaro:   That's all you did was give him the letter?

| | |
|---|---|
| George | There was some talk. I said "These are my concerns I have of what I believe you're doing." I think I even told him. I said, "I think you're between a rock and a hard place and I get it. Actually, if you tell me that I'll get it even more." |
| Sam Vitaro | You didn't accuse him of acting improperly? |

The

| | |
|---|---|
| George: | Yeah, acting illegally. That's what the charges were. I had about 15 different charges saying you were acting illegal or improperly. You're acting illegally, here's the charges. Here's what I'm saying you did and here is the law that says you can't do it. I had them all lined up, all of them. |
| Sam Vitaro: | Why did you come over here, especially, to give that to him? |
| George: | To talk to him so I didn't have to send it up the chain. I believed that he was between the rock and a hard place and he was being coerced into doing their dirty deeds. |
| Sam Vitaro: | You were giving him an opportunity to avoid sending it up the chain? |
| George: | Yeah. |
| Sam Vitaro: | My guess is you would've only been satisfied if he complied with everything you had on that list. |
| George: | Well, we would've had the discussions first. Like, first off, do you agree ... Like anything, here's your charges. I go down there. Here's your charges. Do you agree, yes or no, that you did these things? He says, "This one ..." I was anticipating was like, "Well, that one I might've been a little bit loose on or that one I might've had blocks or stuff I shouldn't have, but you've got to understand I'm under pressure." Just to talk. I said, "Here's ..." |
| Sam Vitaro: | Oh my goodness, I'm sorry. (Telephone rings) |
| George: | I said, "Here's my complaints. Let's talk about them." He read a couple of them and then he got pissed off. He read a couple of them and then threw it back across the table at me and said, "I hate you effin sea lawyers. I've been doing this for all these years. I know what I'm doing. If you don't like it, sue me." I'm like, "Well, okay." I got up to walk off. |
| Sam Vitaro: | The list isn't in this email set, is it? |
| George: | No. The list would be [inaudible 04:23:22]. It was like 15 items or something and they had what I claimed he did and then the law that said ... |
| Sam Vitaro: | Could you get that to me? |
| George: | Probably. They should have it. That's the funny part about this. The agency has |

everything and they won't give me anything, so when you ask me for stuff, it's kind of funny.

Sam Vitaro:      You said that he threw it back across the table, so you're sure he has it?

George:          No, no. He doesn't have it. The agency has it in the document that he had to turn over, the emails and stuff. He didn't want to talk about it, so I sent it up the chain to Stacy Holder, apparently. I sent it up the chain and then it came back down with, "Okay, we're looking at all these things." I'm going to guess that they talked with Chuck privately and said, "It looks like you might be doing these things. Maybe you need to stop doing them." After that happened, Chuck called me back in his office and I sat there for an hour.

Sam Vitaro:      Was that the same day that he called you back to his office?

George:          No. It was a day after. He didn't want to look at it, he got mad, and, said  "Eff you sea lawyers."

Sam Vitaro:      You sure it wasn't the same day? Even after he got angry he then approached you and said, "Look, let's go into my office."

George:          No, this went up. This went up the chain.

Sam Vitaro:      Okay. When you presented it to him, was it already in a format that it was going up the chain?

George:          No, it was printed and stapled. It was just like a Word document.

Sam Vitaro:      It was a Word document, it wasn't an email list.

George:          No, it was just a Word doc. It wouldn't have been an e-mail. . It was just a Word document. I don't even think I copied and pasted. I think I included the Word document in the email that went up.

                 Okay. If you can get me that list, that'd be very helpful.

Sam Vitaro:      Let's see. FOIA, 15 complaints, maybe I'll call it?

George:          Okay.

Sam Vitaro:      He didn't want to deal with it at all. He got really upset, really pissed off, because it's his thing. I'm guessing, just my guess, I'm guessing it's that rock and a hard place. He was sitting there going, "The guy's got me busted cold, but I can't do what he wants because then I put a target on my back and the Captain will kill me." So what does he do? He's furious, he's angry because he has no out, he has no way to go. He throws it across the table at me and he just exasperated. He's like, "I hate you effing sea lawyers. You always come up with this stuff. I've been doing this all these years, 15, 20 years. If you don't like

160817_004_combined                                    Page 129 of 145

|  |  |
|---|---|
|  | what I'm doing, just sue me." I was like, "Okay. I just thought I'd give you a shot at seeing [inaudible 04:25:57]." I went back and I sent it up the chain. From what I understand, it was gone for a while. It went back and forth. I got some questions from Stacy Holder, back and forth. She or whoever it was, male or female, I'm not sure for sure because it was email. We went back and forth on a few things and apparently they tended to agree that Mr. VanCleave had maybe stepped outside of his role. |
| George: | They must've had a conversation because VanCleave called me back in his office and I sat there for an hour and he went on and on and on apologizing, saying all of this stuff. I'm like, "Dude." I couldn't say a word. He was just going for like an hour. When it ended we shook hands and we're like, "Okay. I know. I get it. You're in a really bad spot, but if you just do your job, you should be okay." From that point on, for quite a while, from that point on, it went really well. I would do FOIAs, he wouldn't bat them back, he would do stuff. I would get some pretty good stuff. Then I think they started seeing the stuff I was getting and I think they put him back under the thumb again and that stuff started drying up. |
| Sam Vitaro: | You don't know. |
| George: | No, I'm just saying. I think they put him back under the thumb again and it started drying up. I started getting a little bit more ... |
| Sam Vitaro: | Push back? |
| George: | Chuck, you're not as freely open with this stuff, you're starting to play your games again. We've been through this circus. What's going on? It's just my personal opinion, but I think he opened up and for like 6 or 8 months, I was getting really damning information on the command and then again it dried up. I had to start asking him some stuff. "Why are you perfecting this? What are you delaying for? What's going on?" |
| Sam Vitaro: | Okay. I just wanted to change directions and ask you a couple questions about the camera. |
| George: | Yeah. |
| Sam Vitaro: | Okay. You brought that in. Thank you. |
| George: | Yeah, I got it. |
| Sam Vitaro: | Why don't you describe it, for the record? |
| George: | It's a helmet camera, a Ghost HD, Drift Innovations. Just a standard. It's actually pretty old technology now. Just a standard helmet cam. People call it GoPro, but it's their competition, their competitor. I think it's better, hint hint. It's a much better camera. Buy them. It's just a helmet cam. |
| Sam Vitaro: | You don't wear this on your helmet through the gate anymore. Is that correct? |

George:         No, I take it off. I physically remove it. Before it was off, it was confused with off or off.

Sam Vitaro:     The one that people have mentioned to me, a couple of people have mentioned to me in your office, would be this one?

George:         I don't know. What'd they mention?

Sam Vitaro:     Do you have another one?

George:         No. That's it. I don't know what they told you. I got a cell phone, too. All it says was, you have an audio/video recording device. Yeah.

Sam Vitaro:     That would not be a cell phone. It would be something like that.

George:         I got audio/video recording device.

Sam Vitaro:     They described it something more as like a GoPro.

George:         Okay, that's it. That would be it.

Sam Vitaro:     Are you aware that a couple people think you're video-ing them and video-ing people that come through the office?

George:         No, but Ross Lund , when he came to my desk, wanted to do something. When it's plugged in, just so you know, when it's plugged in and charging, this light, a little light here, LED, it blinks red like really, really, really annoyingly bright when it's charging. Once it finishes charging, it turns off. Every morning when I come in, I turn it off and I plug it in and it just charges. Ross was talking to me one day and he looked over there and he goes, "Are you recording me?" I just go, "What? Oh, no. It's just charging." I grabbed it, I unplugged the charger cord, and of course it dies. I did the thing with the battery. I said, "Look, see?" It points that way because the way the cord comes off the back of the desk. I turned it sideways like that and everything, I pulled the battery out and I said, "No, I'm not. It's just charging. Don't sweat it."

Sam Vitaro:     Okay. Any claim that you're video-ing people coming into your office is untrue.

George:         Yes.

Sam Vitaro:     Okay.

George:         It's untrue.

sam vitaro:     Okay.

George:         It's only got the little memory card, and it's HD, so it doesn't record for maybe ... Maybe he might be able to get a couple hours straight, but how it's really designed is, how I've

|  | got it set up is, it runs in a five minute ... If nothing happens for five minutes, it overwrites itself, and this was instrumental in my motorcycle accident, to play back and show what happened when I got run over. |
|---|---|
| sam vitaro: | It sounds like ... Thank you. |
| George: | That's what it looks like when it's [crosstalk 04:30:34] |
| sam vitaro: | This is a photo of the charger. |
| George: | And it says, big bold charging. I've been doing it for years. I've had it there for years. Since I've been in public works and since I was down at LAPSIC. |
| sam vitaro: | Let me advise you that there are people there who think you're videoing them, and I would suggest, just for peace in the workplace, that wherever you're keeping this- |
| George: | At my desk. |
| sam vitaro: | So that people think that they're being videoed, that you move it somewhere else. |
| George: | Yeah, okay. |
| sam vitaro: | Again- |
| George: | I can put it- |
| sam vitaro: | It's for peace in the workplace. |
| George: | Now that I know. Again, all somebody would have to do is tell me that. I'm not- |
| sam vitaro: | Richard Rake says he did tell you that. |
| George | Tell me what? The camera? |
| Sam Vitaro | Yeah. He says he went through the office, he saw it, he said to you, "Hey, you're not allowed to record . . . |
| George | When? |
| sam vitaro: | He said it was about a year ago. |
| George: | Absolutely not. |
| sam vitaro: | Okay. You don't remember him every coming through and saying anything to you? |
| George: | No. No, no, no, no. See? That's absolute lies. This is what I've got to put up with. |

sam vitaro:     Okay. That's what he said.

George:         Okay. On that note, is there a policy that says I can't record or have it there?

sam vitaro:     George.

George:         No, I'm just saying.

sam vitaro:     George, George. If people in the workplace think that they're being videotaped-

George:         I understand that.

sam vitaro:     It's causing ... George, George.

George:         No. I understand.

sam vitaro:     Let me finish.

George:         I know.

sam vitaro:     It's causing disruption.

George:         I know. No, it's not causing disruption. Don't try the disruption thing.

sam vitaro:     George, I've-

George:         Has any of my work been effected?

sam vitaro:     George. George, please. Please. I thought you were being cooperative and you were going to say, "Yeah, I'll take it down."

George:         I am going to take it down.

sam vitaro:     Now you're arguing with me about whether there's a policy.

George:         No.

sam vitaro:     You're arguing about whether there's disruption. Let me represent to you. I've talked to several people who are really concerned about your videotaping them.

George:         Have they brought their concerns to me?

sam vitaro:     No.

George:         Then how would I know?

| sam vitaro: | No one that I know except what Richard Rake says, okay? But we're not talking about that now. I thought you were really cooperating. |
| George: | I am. I will put it in my drawer and let it charge. |
| sam vitaro: | Forget about whether there is a policy. |
| George: | I don't want to be written up or argued or investigated over having a recording device if there's no policy to not have one. If somebody would have said, just like you, "It's uncomfortable having it sitting there blinking at me." I'm like, "Okay," throw it in the drawer. |
| sam vitaro: | Okay. |
| George: | But my cord is there. I just plug it in in the morning. It's the same cord for all my devices. I unplug the cell phone, plug it in here, and just set it there. |
| sam vitaro: | Okay. |
| George: | When it's finished charging, I plug it on the helmet. |
| sam vitaro: | Richard Rake thinks that it is unlawful. |
| George: | Okay. But he says that he told me something, right? Because that's going to be somebody I want to depose. About a year ago? |
| sam vitaro: | Yeah. I'm not allowing you. I'm not going to give you any more information to use this like you objected to people using your ADR as a way to discover information. I've told you as much as I'm going to tell you on that, okay? |
| George: | Okay. |
| sam vitaro: | I don't want this platform to be used to sue other people. |
| George: | I'm not suing. I'm just defending myself. Find out what the truth is. |
| sam vitaro: | Okay. |
| George: | Find out if he really said that. |
| sam vitaro: | Okay, George. Okay. |
| George: | I'm all about the truth, man. |
| sam vitaro: | I understand you are. |
| George: | I was in the PRP. Personnel Reliability Program [inaudible 04:34:07]. You don't get there |

|  | if you're- |
|---|---|
| sam vitaro: | I understand you are . . . |
| George: | Unethical. |
| sam vitaro: | Okay. I'm not claiming you're unethical. |
| George: | Or lie. But you see, this is why you need witnesses everywhere, because they will lie. They are habitual liars. |
| sam vitaro: | You know, the situation that I'm looking into, where it may be a lie- I have to look into it- is the situation dealing with you filling out that application for a protection order. It's not a question of a witness being there. It's a question, of my looking at that form, and your representations on that form, and considering what you told me? That's all it is. It's not about a witness, okay? |
| George: | A witness. What do you mean, a witness? |
| sam vitaro: | What you're talking about, why do you need a witness there. |
| George: | Oh. |
| sam vitaro: | What I'm saying to you- |
| George: | Why I need a witness. Generally any time I've talked with anybody, because ... Has ... I don't know if you can tell me, but has Brian Cullen said that I was walking with him and Murphy said something and I made eye contact with him and stared him down and [inaudible] him or anything? |
| sam vitaro: | I will ask Brian Cullen. |
| George: | Yeah. This is what I'm talking about. This is why when you said, "You mean to tell me you won't go in his office and talk to him about anything?" I'm like, "Today? No. Not if I don't have to," because you get stuff like this. |
| sam vitaro: | George, I'm not going to convince you. |
| George: | I think this is pretty convincing that ... |
| sam vitaro: | What is convincing? |
| George: | All this minutiae. There's the [inaudible 04:35:35] stuff. |
| sam vitaro: | I can assure you in the situations where there were witnesses, I'll ask the witnesses about them, okay? In the situation involving Mr Cullen, Brian Cullen- |

| George: | He said I was walking with Brian, right? Me and Cullen were walking back and Murphy came and said something, right? |
| sam vitaro: | I think you're referring to that earlier e-mail . . . |
| George: | Yeah, when Murphy says I was walking with him and I was smiling. |
| sam vitaro: | Yes. |
| George: | We were talking about something maybe. I don't know. |
| sam vitaro: | Okay. Fair enough. |
| George: | But who would report that? Who would make that a statement? Who would report that being such an evil thing? Just walking across a parking lot and seeing somebody. |
| sam vitaro: | The sense I get, George, is that several employees think that you're trying to intimidate them. That you're trying to stare them down. The latest employee who told me that was Chuck. |
| George: | Chuck. |
| sam vitaro: | In my interview. |
| George: | Oh, Chuck Vancleave? |
| sam vitaro: | Vancleave. He told me that you stared at him for two minutes, and he felt so uncomfortable that he left. Maybe he's wrong. Maybe you weren't staring at him, but I'd like you to consider that maybe something is going on with you. Maybe it's unintentional, and it's causing other people to be concerned, because it's not something I'm hearing from one or two people. It's something I'm hearing from several people. |
| George: | Yeah, but these people have the preconceived notion. They picked up on- |
| sam vitaro: | George, I'm not going to argue with you. |
| George: | No. I'm not arguing. |
| sam vitaro: | Any claim that I consider, I will run by you, okay? You'll have an opportunity, a full opportunity, as you had here, to explain to me what really happened from your point of view. I'm going to be talking to other witnesses. |
| George: | Yeah. |
| sam vitaro: | And I assume I'm going to be getting additional information. Most of the [crosstalk 04:37:25] |

George:       I'll see what I can get. You know about the cell phone? You want from me? Or additional information from somewhere else?

sam vitaro:   Additional information from other people.

George:       Okay.

sam vitaro:   Somewhere else. Although, I really need the stuff from you.

George:       I'll try.

sam vitaro:   Yeah. As to those, I'll probably run them by you in email. If someone, for example, that I interview tomorrow, claims that from their point of view you did something that's within these allegations that I'm investigating, that concerned them, that was disrespectful to them, I'll send you an email. I'll ask you about it, and you can give me your response.

George:       Yeah. My biggest thing is, if these people feel that way, why hasn't anybody said anything? They're all just jovial and everybody's just like ... They act totally fine around me. They have no problem. They're not avoiding me. They don't do anything. Nothing. How am I to believe  . . .

sam vitaro:   It's not accurate to say they haven't said something. For example, in that Holzner situation, where you're in the urinal, in the bathroom, with him. You're at one urinal, he's at another. He does say something to you. Okay? You disagree with it.

George        Yeah. He said something to goad me into saying something back, so I just-

Sam Vitaro    George, I don't know why he said it. All I know, and I'm responding to your claim-

George:       One person.

Sam vitaro :  I think there are some other situations where there are other people around and these people make these claims.

George:       But let's say that's true, your opinion, that Holzner came in and said, staring at me ... Let's say he didn't even set it up with a, "You know ..." and pause, so I would then turn to look at him. Staring at me while I'm at the urinal can be considered harassment, right? So, what did I do? Pinched off, zipped up, washed, and walked out. Right?

Sam Vitaro:   That's what I wanted to hear from you. I wanted to hear your response.

George:       I walked out.

Sam Vitaro :  Okay.

George:       If somebody would say something like ... If Chuck says, "Hey, you know what?" He can call me up. "Hey, I just got your email," because we talk. I didn't like the way it was

|              |                                                                                                                                                                                                                                                                                                                                                                                                                                                  |
|--------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|              | worded. It sounded a little pissy or something.                                                                                                                                                                                                                                                                                                                                                                                                   |
| Sam Vitaro : | All I'm saying-                                                                                                                                                                                                                                                                                                                                                                                                                                   |
| George:      | I would have apologized.                                                                                                                                                                                                                                                                                                                                                                                                                          |
| Sam Vitaro : | George is that - I think some people are saying stuff to you, or giving you the message that they don't like this stuff. There clearly are some instances where people should be confronting you better, but what I'm suggesting to you from what they're telling me, and I need to listen to your response too, is that they're pretty uncomfortable, and they let you know that, either in their body language, or in what they tell you, that they don't like what you're doing. I don't think Tim Garrett liked your coming in and questioning him. I think he's very fearful of getting on the quote, un quote list. |
| George :     | He is?                                                                                                                                                                                                                                                                                                                                                                                                                                            |
| sam vitaro:  | Absolutely he is, and you know that.                                                                                                                                                                                                                                                                                                                                                                                                              |
| George :     | Well I know that now.                                                                                                                                                                                                                                                                                                                                                                                                                             |
| Speaker 3:   | You didn't know that before, going into his office and asking him questions?                                                                                                                                                                                                                                                                                                                                                                      |
| George :     | No. Because he doesn't have any EEO complaints. The only people so far, the only people they're going after is EO complaints. He doesn't have anything, and he's got a good working relationship so I just asked him a question. I pictured him and Aune. Aune's one of their favorites too so I pictured them as safe. They won't mess with him. They're not to be messed with.                                                                      |
| sam vitaro:  | You're asking questions of other people, you're asking questions of people who are within the conspiracy. You're asking questions of Chris Murphy or Brian.                                                                                                                                                                                                                                                                                        |
| George :     | How do I get information?                                                                                                                                                                                                                                                                                                                                                                                                                         |
| sam vitaro:  | You get it through  - file a grievance, and the union will help you get information under 7114. It's an easy way to get information.                                                                                                                                                                                                                                                                                                               |
| George :     | You do realize I have allegations that the union is in bed with command, right?                                                                                                                                                                                                                                                                                                                                                                   |
| sam vitaro:  | George, you have a lot of things going on.                                                                                                                                                                                                                                                                                                                                                                                                        |
| George :     | I know, but I'm saying when I see that the union doesn't do anything. They combine grievances illegally, they don't do anything union ...                                                                                                                                                                                                                                                                                                          |
| sam vitaro:  | This is no accusation against Stan?                                                                                                                                                                                                                                                                                                                                                                                                               |
| George :     | No. No.                                                                                                                                                                                                                                                                                                                                                                                                                                           |

| | |
|---|---|
| sam vitaro: | He's here. |
| George : | When I say union, I mean one person, not ... |
| Stan: | That's okay. You can speak clearly of things. I don't take offense. |
| George : | It's just like when I say the Navy. The Navy is not after me. NAVFAC is not after me. Only the people who are named are after me. I love the Navy. The Navy has been great. I love being in the service. I like my job. I like NAVFAC. I don't like the 10-15 individuals who are trying to [inaudible] me as always staring. |
| sam vitaro: | Let's get back to your claim. That's the way you need to get information. My explanation - I mean we get sidetracked, okay? We never get answers to questions. You ask me, how do I get information. The union, EEO, FOIA. You're very skilled at getting information. |
| George : | I get redacted, blank nothings. |
| sam vitaro: | George, you've already told me many number of times in this hearing that you've gotten great information. I think you've said that a couple times. |
| George : | When it wasn't dried up. It kind of comes and goes. But for the union if I want to know if Chris Murphy and Tim Garrett took off to go get his boat. In order to show disparate treatment that they can do, but if I would do that I would be fired, how does a union proceed with that information? I'm serious. |
| sam vitaro: | How do you get the information? |
| George : | Yeah. If I ask that question. Hi. I think I'm being attacked and being reprised on, and I get this disparate treatment. I know or I believe that Tim Garrett and Chris Murphy went to get his boat, Hood Canals, spent half of his day getting his boat, doing whatever. I know that Tim Garrett and them did that. I know John Aune and Murphy went over there [inaudible 04:43:13] I know that Joe Harvey went to Port Angeles and stopped off at [inaudible 04:43:18]. I want to show that these people do not get punishment, but I do. |
| Sam Vitaro | Are you asking how you get the information? |
| George | How would they then proceed? Because if this works I will do that route. |
| Sam Vitaro : | Let me just explain to you. I do arbitration so I know this a little, I know it a lot. The union has the right under a statute, it's 5USC 7114. The union has a right to request information that they need in representing employees. So in the context of a grievance, if you file a grievance, and they need information related to disparate treatment, if that's your claim, then they can get the information. |
| George: | So if I did that just like I said ... (Asking Stan) |

| | |
|---|---|
| Sam Vitaro : | You don't need to ask Stan, believe me. |
| George: | I'm just asking. |
| Sam Vitaro : | Ask him in an official capacity. Ask him after this investigation is done. |
| George: | When you make a claim that I have that route . . . |
| Sam vitaro : | Okay, fine. You can ask Stan later, but you can bank on it. You don't have the right. The union has the right, and it's under 5 USC 7114, and it's called a data request. Union's know how to do it. You have to show a particularized need. You have to show it's germane, but union's get a lot of information that way. This relates to your question to me, how do I get the information. I'm trying to suggest to you there are several ways, and it seems to me from everything we've done you get a lot of information. You are very skillful. In fact if I had to say and rate you among the people who are skilled at getting information, I don't think I know of anyone who is as skilled as you are from reading these data requests - the FOIA requests, and other ways in getting information. You've gotten a lot of information. |
| George: | Chuck trained me. He told me how to do it. |
| Sam Vitaro : | My guess is the 2 of you have grown up together. |
| George: | Yeah. And I thought we had a good working relationship. That's why we could banter. That's why I could also [inaudible 04:45:26]. |
| Sam vitaro : | You're doing more than putting him on notice. You're ridiculing him. |
| George: | But if it's bothering him then. Because of the relationship I thought he could just call me and go, "Hey. I kind of ..." |
| Sam Vitaro : | I think he thought, maybe he's wrong, I think he's reluctant to call you although he called you yesterday. I think at one point he believes you told him that you don't want him communicating with you. You want him communicating through your attorney. That could be wrong. |
| George: | I'm just trying to think. It might not be wrong. Maybe the attorney. I can't think of a situation, but maybe something that he had to give. Like Peck usually would give me stuff, but now he has to give my attorney stuff. I think that might have come from Peck saying like "if George asks you for something from an EEO case, you don't respond to George, you respond to his attorney." |
| Sam Vitaro : | Maybe. |
| George: | It might just be a little grey area where he's wondering like can I respond to George or do I have to respond to his attorney. |

160817_004_combined

Page 140 of 145

| | |
|---|---|
| Sam Vitaro : | I will, by the way, just following up on what I said earlier, I will call VanCleave. I think he's even in this building. |
| George: | Yeah. He is. |
| Sam Vitaro : | I'll go see him. I'll tell him that you'd like to talk to him. Apologize to him, if he's offended, and get his sense on that. |
| George: | And  . . . any of these people. Absolutely if there's anything, they have no fear to just tell me that makes me uncomfortable. |
| Sam Vitaro: | I think George,  a lot of people are afraid that you're going to rope them into EEO complaints and other things, and there's a concern as they expressed to me. |
| George: | That's because they see what is going on. There's that [inaudible]  for you too. This has a chilling effect. This is what the agency does, and makes everybody so nervous about doing anything, and walking on eggshells around the guy that they've got all of the guns pointed out. |
| Sam Vitaro : | People like Tim Garrett are afraid, like you know, are afraid that you're going to rope him in as he explained to you when you were talking about the letter. He was upset, wasn't he? |
| George: | He thought I had put him on the list to be interviewed, and I'm like no. I didn't put you on any list. I kept you off every list that I can think of. Same thing with Aune. Aune's got all kind of dirt that he can give up on Murphy, but I'm not deposing them. They're not on my list. |
| Sam Vitaro : | Good. I'm glad they're not. |
| George: | I don't want to get them in trouble because Murphy is the lead. He can only make them do stuff, and they're not going to say no because then they'll get a target on their back so I think I do very well to make sure that only management is looked at from my attorney. |
| Sam vitaro : | You've gone beyond management. You and I know it. |
| George: | From my attorney. |
| Sam Vitaro : | No. In terms of roping people in. It's not just management that you've roped into this. |
| George: | Who have I roped in? |
| Sam Vitaro : | How about Keith? |
| George: | Keith? Ross? |

| | |
|---|---|
| Sam Vitaro : | Yes. |
| George: | Yeah. He lied. |
| Sam Vitaro | You're going to have an exception, I know, for everything I say. |
| George : | No. He said I did, okay, no. You guys don't even see it but if you look at what he said I said, if that makes sense. If you look at what he said I said he basically asked what Ed's condition was, and he allegedly said, "I don't know. He's probably home recovering from some NAVFAC bullshit. Even if I did say that, so what? It's out in the parking lot allegedly. |
| sam vitaro: | I don't want to get into that because that's something that was ... |
| George : | Yeah, but if somebody's going to lie. |
| sam vitaro: | He has a different view of what was said. That's part of the 2-day suspension. I've interviewed him. I really didn't get into that because again, I don't want to inquire into stuff that I think is over, but I can tell from all of the statements that he's made, that I have read, I've read all of these investigations, that he has a different version. That's all. I just ask you to reflect on some of this. |
| George : | I'm just saying ask yourself the why behind all of it. Why did any of this start? |
| sam vitaro: | Okay. Let's get beyond that. |
| George : | But why, it's very important. |
| sam vitaro: | I just ask you to reflect. I will look for the why in this. I can assure you, but will you reflect? Reflect on some of this. |
| George : | I will reflect on how somebody with 18 years of flawless service suddenly ... |
| sam vitaro: | I don't think you're reflecting the way I'd like to see you reflect. |
| George : | Suddenly being attacked for all of this. They can stop it at any time, right? This kind of little investigation about walking around in the parking lot looking at people or opening my cell phone coincidentally when somebody is passing. If this is one of those then let me know. It's easy. It's not a big deal. |
| sam vitaro: | [crosstalk 04:50:25]<br><br>I think that would actually be a good gesture. |
| George: | But you've got to let me know otherwise it just sits there. It's the fruitcake scenario. If you don't tell Grandma you hate fruitcake, you're going to get one every year. |
| Sam Vitaro: | Some people can say that when Ross Lund came into your office, and he looked at that |

|  | and he thought he was being videotaped ... |
|---|---|
| George: | Yeah. He asked if I was recording. |
| Sam Vitaro : | . . . If that should give him the message that people will think from that camera that they're being recorded, so maybe you need to move it. |
| George: | Yeah, but that's because the other people know every morning I come in, take it off, unscrew the back, and plug it in and it goes beep real loud, and I plug it in to charge so they know it's charging. They can see it says charging. |
| sam vitaro: | I'd suggest to you ... |
| George : | I don't think that's bothering them because it's charging. |
| Sam Vitaro | You're wrong. |
| George | Yes, now, but tell me. Don't put me as part of an investigation to find out I'm wrong, just tell me. |
| Sam Vitaro | [I'd suggest that, in effect, Lund told you . . .] |
| George | Well, no. He wasn't saying just like you there's some people concerned you're recording them. We'd like you to charge it somewhere else. Okay. Done. It's just that easy, right? It really is, but you've got to communicate. That's part of the whole thing there. Nobody communicates, and then they keep trying to focus their – circle the wagons around, around what? Staring or being disrespectful or doing whatever, and I'm defending myself, looking for information against what they're charging me with. As far as for the staring and walking around, that's not staring. |
| Sam vitaro | I understand, and you've had the opportunity to respond to these, and any additional claims I get that are within the things I'm looking into I'll run them by you. |
| George | But I will say if these people, let them know that I'm now aware. I'll plug it somewhere else, okay? No big deal. But I need to know all of that stuff. If something's bothering them. If they say if Chuck thinks that's bad, let me know, I'll apologize to him, and I won't put him out that way – I wasn't [inaudible] with him. If any coworkers feel something is making them uncomfortable, and they don't want to tell me, tell Ross, and then have Ross tell me. |
| Sam vitaro | I'll try to convey that as best I can. |
| George | I mean just communicate. |
| Sam vitaro | Okay. I think we're wearing out these 2 guys. |
| George | Yeah. They know. |

160817_004_combined                                                      Page 143 of 145

Stan            I'm good. Just keep gabbing on. I'm still here.

Sam vitaro      Anyway. That ends this session. Thanks a lot to everyone, by the way, for listening and
                helping, and for your endurance. Thank you.

George          I've been doing this 6 years.

If you rate this transcript 3 or below, this agent will not work on your
future orders

**276**                                    000288